Michael D. McGill SBN 231613
mcgill@policeattorney.com
Carolina Veronica Cutler SBN 263301
veronica@policeattorney.com
Joseph Bolander SBN 280857
bolander@policeattorney.com
**LACKIE, DAMMEIER & MCGILL APC**
367 North Second Avenue
Upland, CA 91786
Tel:   (909) 985-4003
Fax:  (909) 985-3299

Attorneys for Plaintiffs
MITCHELL JONES

FILED
CLERK, U.S. DISTRICT COURT

JUL 2 3 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

MITCHELL JONES,

        Plaintiff,

    vs.

COUNTY OF LOS ANGELES, A Public Entity; and DOES 1 THROUGH 10 INCLUSIVE;

        Defendants.

Case No.:  **CV13- 5306** DSF( AJWx)

**COMPLAINT FOR DAMAGES BASED ON:**

1. Violations of USERRA, (38 U.S.C. §4301 *et. seq.*)

**DEMAND FOR JURY TRIAL**
F.R. Civ. P. Rule 38
C.D. Cal. Local Rule 38-1]

**(Exempt from Filing Fee Pursuant to 38 U.S.C. § 4323(h)(1))**

COMES NOW, MITCHELL JONES, who demands a jury trial and seek monetary compensation and injunctive relief against DEFENDANTS.

///

1

COMPLAINT

# I. PREFATORY

1.    This is an action for damages and injunctive relief for violations of the rights of peace officer, MITCHELL JONES.  Defendant, COUNTY OF LOS ANGELES has willfully violated the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §4301 *et. seq.*

# II. JURISDICTION AND VENUE

2.    Plaintiffs' action is authorized by 38 U.S.C. §4301 *et. seq.* which allows redress for the deprivation of rights against members of the armed forces.

3.    Jurisdiction is conferred on this Court by 28 U.S.C. §1343(4) which provides for the protection of civil rights of members and veterans of the armed forces.  Jurisdiction is also conferred on this Court by 38 U.S.C. 4323(b).

4.    Venue is proper in the Central District of California because the wrongs alleged herein occurred within the City of Los Angeles, County of Los Angeles, which is located within the Central District.

# III. PARTIES

5.    Plaintiff MITCHELL JONES ("JONES") was at all times relevant to the allegations contained herein, a resident of Los Angeles County, State of California.

6.    Defendant, COUNTY OF LOS ANGELES ("COUNTY") is a duly enacted municipality organized and existing under the laws of the State of California and wholly situated in the County of Los Angeles.   The LOS ANGELES COUNTY SHERIFFS DEPARTMENT (LASD) is an operating Department, Agency, and/or Office of CITY.

7.    PLAINTIFF, at all times relevant to the allegations contained herein, was employed by CITY as a police officer with the LASD.

2

COMPLAINT

8.    Defendants DOES 1 through 10 are unknown or unidentified at this time, but are employees of CITY.  Upon information and belief, PLAINTIFF alleges that each Doe is in some manner responsible for the wrongs alleged herein, and that each such Defendant advised, encouraged, participated in, ratified, directed, or conspired to do, the wrongful acts alleged herein.  When the true names and capacities of said Defendants become known to Plaintiff, Plaintiff will seek relief to amend this Complaint to show the true identities of each said DOE in place of their fictitious names as DOES 1 through 10.

9.    Defendants, and each of them, were the agent, employee and servant of every other Defendant and each Defendant alleged herein acted in the course and scope of said agency, service and employment at all relevant times.

## IV. FACTS COMMON TO ALL COUNTS

10.    PLAINTIFF MITCHELL JONES is a member of the Navy, and is currently a reservist. JONES also works as a full-time Deputy Sheriff for the Defendant, COUNTY OF LOS ANGELES. Plaintiff has worked as a Deputy Sheriff since 1998.

11.    PLAINTIFF JONES served our country in the Navy starting in 1989. JONES left active duty in 1998 and became a reservist in January of 1999. JONES was called to active duty four times during his military career as a reservist: 1) December 2002 for 9 months; 2) February 2005 for 1 year; 3) December 2007 for 9 months; and 4) May 2011 for 2 years.

12.    In or about 2006, JONES began receiving negative treatment because of his military service, including comments from supervisors and denial of promotions.

13.    During a career mentor session in 2006, Plaintiff's supervisor, William Miller, stated to Plaintiff that they liked his military service, but "you need to be at work".

3

COMPLAINT

14. Another supervisor, Dan Finkelstein, told JONES "Your military service is great- but you can't serve two masters". Plaintiff was also told by Chief Ronnie Williams that he "needs to be here" in reference to the Sheriff's Department.

15. Plaintiff has tested for Sergeant four times- once in or about 2001, another time in 2006, once in 2009 and also in 2011. Plaintiff passed all 3 exams in 2001, 2006 and 2009- and was placed in Band 2 for promotion. However, Plaintiff was not promoted any of those times.

16. Plaintiff took the Sergeants promotion exam in 2011- right before he was going to be deployed for 2 years on mandatory military service. Quite unexpectedly and completely out of the ordinary- Plaintiff failed the Sergeants test.

17. Plaintiff learned that he failed right before he left for his military service.

18. Plaintiff has information and belief that the Sergeants exam was manipulated so that Plaintiff would not pass the exam.

19. Plaintiff has information and belief that Defendants did not want to promote Plaintiff to Sergeant because of military service and commitments.

20. Due to time served on behalf of the military, Plaintiff was not paid his retirement/PERS- for all of his four military leaves.

21. Plaintiff complained to Defendants regarding his rights under USERRA, unfortunately, CITY has rebuffed his repeated attempts, and forced PLAINTIFF to file this action.

22. PLAINTIFF hereby fully incorporates 20 CFR 1002, Uniformed Services Employment and Reemployment Rights Act of 1994; Final Rules dated December 19, 2005 into this Complaint. A true and correct of same, is attached hereto as Exhibit A.

## V. FIRST CAUSE OF ACTION

### VIOLATIONS OF USERRA (38 U.S.C. § 4301 *et. seq.*)
### AGAINST ALL DEFENDANTS

23.    PLAINTIFF repeats and re-alleges each and every allegation set forth above, and incorporate same by reference as though set forth fully herein.

24. 38 U.S.C.A. §4301 sets forth USERRA'S express intent in that "[t]he purposes of this chapter are (1) to encourage noncareer service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service; . . . and    (3) to prohibit discrimination against persons because of their service in the uniformed services."

25.    38 U.S.C.A. §4311(a) states, "person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation

26.    38 U.S.C.A. §4311(b) provides: "An employer may not discriminate in employment against or take any adverse employment action against any person because such person (1) has taken an action to enforce a protection afforded any person under this chapter. . . or (4) has exercised a right provided for in [same]."

27.    There are no exhaustion requirements or administration remedies required under USERRA 38 U.S.C. §4323 (a)(2)(A).

28.    In addition, 20 CFR Part 1002, page 72546, requires that the provisions of USERRA are "to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need." See also, 20 CFR 1002.7 ("USERRA establishes a floor, not a ceiling, for the employment and reemployment rights and benefits of those it protects. In other words, an employer

COMPLAINT

may provide greater rights and benefits than USERRA requires, but no employer can refuse to provide any right or benefit guaranteed by USERRA.").

29.    PLAINTIFF gave CITY proper notice of their military service.

30.    PLAINTIFF reported to work and/or submitted as application for reemployment within USERRA'S statutory time frame.

31.    CITY'S failure to provide benefits of employment, such as promotions or PERS payments, violated the rights afforded PLAINTIFF under USERRA, 38 U.S.C. §§4301, *et. seq.*

32.    CITY acted voluntarily, deliberately and willfully in its violation of USERRA.

33.    CITY, deprived PLAINTIFF of his rights, privileges and immunities which were clearly established at the time CITY acted herein and the CITY knew or should have known that their conduct would violate these rights, privileges and immunities.  CITY acted with the intent to deprive the PLAINTIFF of his rights, privileges and immunities by purposely and intentionally failing to abide by USERRA.

**34.**    As a legal result of the above-described conduct of CITY, PLAINTIFF suffered incidental, consequential, liquidated and/or special damages, and will sustain attorneys' fees and costs in an amount according to proof.

## VI.

## **PRAYER**

WHEREFORE, PLAINTIFF prays:

1.    For general, special, compensatory (including lost wages, lost promotions and lost employee benefits), exemplary, liquidated damages, as well as penalties according to proof;

2.    For costs of suit incurred herein;

6

COMPLAINT

3.    For attorneys' fees under 42 U.S.C. §1988, 38 U.S.C. §§4323 et seq. or as otherwise allowed by law;

4.    For an award of interest, including prejudgment interest, at the legal rate, as allowed by law; and

5.    For any and all other appropriate relief the Court deems necessary.

Dated: July 23, 2013                    Respectfully Submitted,

                                        LACKIE, DAMMEIER & MCGILL APC

                                  By:   _____
                                        Michael A. McGill, Esq.
                                        Carolina Veronica Cutler, Esq.
                                        Joseph Bolander, Esq.
                                        Attorneys for Plaintiff,
                                        MITCHELL JONES

7

COMPLAINT

# DEMAND FOR TRIAL BY JURY

PLAINTIFF hereby demands a jury trial under the Federal Rules of Civil Procedure Rule 38 and Central District Local California Rule 38.


Dated:  July 23, 2013                    Respectfully Submitted,

                                         LACKIE, DAMMEIER & MCGILL APC

                                         By: _____

                                         Michael A. McGill, Esq.
                                         Carolina Veronica Cutler, Esq.
                                         Joseph Bolander, Esq.
                                         Attorneys for Plaintiff,
                                         MITCHELL JONES

8

COMPLAINT

# EXHIBIT "A"



Monday,
December 19, 2005

Part II

Department of Labor

Veterans' Employment and Training Service

20 CFR Part 1002
Uniformed Services Employment and Reemployment Rights Act of 1994; Final Rules

## DEPARTMENT OF LABOR

**Veterans' Employment and Training Service**

**20 CFR Part 1002**

[Docket No. VETS–U–04]

RIN 1293–AA09

**Uniformed Services Employment and Reemployment Rights Act of 1994, As Amended**

**AGENCY:** Veterans' Employment and Training Service, Department of Labor.

**ACTION:** Final rules.

**SUMMARY:** The Veterans' Employment and Training Service ("VETS" or "the Agency") issued proposed rules implementing the Uniformed Services Employment and Reemployment Rights Act of 1994, as amended (USERRA). This document sets forth the Agency's review of and response to comments on the proposal and any changes made in response to those comments.

Congress enacted USERRA to protect the rights of persons who voluntarily or involuntarily leave employment positions to undertake military service. USERRA authorizes the Secretary of Labor (in consultation with the Secretary of Defense) to prescribe rules implementing the law as it applies to States, local governments, and private employers. VETS proposed rules under that authority in order to provide guidance to employers and employees concerning their rights and obligations under USERRA. The Agency invited written comments on these proposed rules, and any specific issues related to the proposal, from members of the public.

**DATES:** *Effective Date:* This rule will be effective on January 18, 2006.

**FOR FURTHER INFORMATION CONTACT:** Robert Wilson, Chief, Investigations and Compliance Division, Veterans' Employment and Training Service, U.S. Department of Labor, 200 Constitution Avenue, NW., Room S–1312, Washington, DC 20210, *Wilson.Robert@dol.gov*, (202) 693–4719 (this is not a toll-free number).

For press inquiries, contact Michael Biddle, Office of Public Affairs, U.S. Department of Labor, 200 Constitution Avenue, NW., Room S–1032, Washington, DC 20210, *Biddle.Michael@dol.gov*, (202) 693–5051 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## I. Background

On September 20, 2004, the Department of Labor ("the Department") issued proposed regulations to implement the Uniformed Services Employment and Reemployment Rights Act of 1994, as amended (USERRA), 38 U.S.C. 4301–4334. The Department invited written comments on the proposed regulations from interested parties. The Department also invited public comment on specific issues. The written comment period closed on November 19, 2004, and the Department has considered all timely comments received in response to the proposed regulations.

The Department received 80 timely comments from a wide variety of sources. Commenters included: a member of Congress; service members and veterans; organizations representing human resource professionals and employee benefits providers; law firms; individual employers and employer associations; individual employees and employee representatives; and members of the interested public. The comments were composed of well over 300 individual queries or concerns addressed to approximately 200 specific topics set out in the Department's notice of proposed rulemaking. While a few of the comments were generalized plaudits or individualized complaints, the great majority of comments specifically addressed issues contained in the Department's proposed rule. The Department recognizes and appreciates the value of comments, ideas, and suggestions from members of the uniformed services, employers, industry associations, labor organizations and other parties who have an interest in uniformed service members' and veterans' employment and reemployment rights and benefits.

Following the publication of the NPRM, the Department issued an interim final rule, Notice of Rights and Duties Under the Uniformed Services Employment and Reemployment Act, 70 FR 12106 (March 10, 2005), to comply with an amendment made to USERRA by the Veterans Benefits Improvement Act of 2004 (VBIA), Public Law 108–454 (Dec. 10, 2004). In part, the VBIA imposed a new requirement that "Each employer shall provide to persons entitled to rights and benefits under [USERRA] a notice of the rights, benefits, and obligations of such persons and such employers under [USERRA]." 38 U.S.C. 4334(a). The VBIA required the Secretary of Labor to make available to employers the text of the required notice, 38 U.S.C. 4334(b), and the Department's publication of the interim final rule set forth such text as an appendix to these USERRA regulations.

## II. Statutory Authority

Section 4331 of USERRA authorizes the Secretary of Labor (in consultation with the Secretary of Defense) to prescribe regulations implementing the law as it applies to States, local governments, and private employers. 38 U.S.C. 4331(a). The Department has consulted with the Department of Defense, and issues these regulations under that authority in order to provide guidance to employers and employees concerning the rights and obligations of both under USERRA.

## III. Prior Laws and Interpretation

USERRA was enacted in part to clarify prior laws relating to the reemployment rights of service members, rights that were first contained in the Selective Training and Service Act of 1940, 54 Stat. 885, 50 U.S.C. 301, *et seq.* USERRA's immediate predecessor was the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. 2021–2027 (later recodified at 38 U.S.C. 4301–4307 and commonly referred to as the Veterans' Reemployment Rights Act ("VRRA"), which was amended and recodified as USERRA.

In construing USERRA and these prior laws, courts have followed the Supreme Court's admonition that:

This legislation is to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need. * * * And no practice of employers or agreements between employers and unions can cut down the service adjustment benefits which Congress has secured the veteran under the Act.

See *Fishgold v. Sullivan Drydock and Repair Corp.,* 328 U.S. 275, 285 (1946), cited in *Alabama Power Co. v. Davis,* 431 U.S. 581, 584–85 (1977); *King v. St. Vincent's Hosp.,* 502 U.S. 215, 221 n.9 (1991). The Department intends that this interpretive maxim apply with full force and effect in construing USERRA and these regulations.

This preamble also selectively refers to many other cases decided under USERRA and its predecessor statutes, to explain and illustrate the rights and benefits established under the Act. The failure to cite or refer to a particular court decision in this preamble is not intended to indicate the Department's approval or disapproval of the reasoning or holding of that case.

## IV. Plain Language

The Department wrote the proposed rule in the more personal style advocated by the Presidential Memorandum on Plain Language. "Plain language" encourages the use of:

- Personal pronouns (we and you);
- Sentences in the active voice; and,
- A greater use of headings, lists, and questions.

The Department received three comments regarding its use of "you," "I," and "my" to refer to employees, whom the Department viewed as the primary beneficiaries of USERRA rights and benefits. These commenters appreciated the use of plain language and the use of question and answer format, but expressed a preference for the use of third person pronouns so that both employers and employees are included as the audience of the rule. In response, the Department has revised the pronoun usage in the final rule, and has employed third person pronouns to refer to the rights and obligations of both employers and employees.

In addition, one of these commenters recommended the Department use a more formal style when addressing complex topics such as health and pension plan rights and obligations. In response, the Department has adopted the use of more technical guidance on these matters without unduly sacrificing clarity.

## V. Section-by-Section Summary of the Final Rule and Discussion of Comments

This preamble sets out the Department's interpretation of USERRA, section by section. The preamble generally follows the outline of the rule, which in turn follows the outline of USERRA. Within each section of the preamble, the Department has noted and responded to those comments that are addressed to that particular section of the rule. Before setting out the section-by-section analysis, however, the Department will first acknowledge and respond to comments that did not easily fit into this organizational scheme.

### A. General Comments

The Department received a number of general comments from members of the public expressing gratitude to the Department for the long-awaited USERRA regulations. In particular, Rep. John Boehner, Chairman of the U.S. House of Representatives Committee on Education and the Workforce, commended the Department for "undertaking this most important endeavor."

Conversely, the Department received a few comments from individuals complaining about their specific USERRA claims. The Department also received several comments offering assistance with grammar and punctuation. In all cases—the plaudits, the complaints, and the offers of assistance— the Department

acknowledges and appreciates the thorough and thoughtful comments.

The Department also received several comments requesting that particular text cross-reference other text or make reference to related text elsewhere in the rule. As a general matter of style, the Department views such cross-references as cumbersome and ultimately detrimental to the clarity of the text and, with few exceptions, has declined to make such revisions.

Finally, the Department received several comments asking about the application of these regulations to the Federal Government when it is acting as an employer. The Federal Office of Personnel Management has issued a separate body of regulations that govern the USERRA rights of Federal employees. See 5 CFR part 353.

### B. Compliance With USERRA and Compliance With the Internal Revenue Code

The Department received a number of comments from individuals and employers seeking guidance on compliance with USERRA in those cases in which the commenters perceived a conflict between USERRA's mandates and the mandates of the Internal Revenue Code (IRC). These comments arose primarily with regard to the health and pension plan provisions of the rule, and suggested that in some cases compliance with USERRA may cause the plan to be out of compliance with the IRC. See Subparts D and E. The Department can provide guidance only with regard to the requirements of USERRA. However, the Internal Revenue Service (IRS) and the Department of the Treasury have indicated that a health or pension plan will be deemed not to be in conflict with the applicable IRC requirements merely because of compliance with USERRA or its regulations.

### C. Comments Addressing the National Disaster Medical System

The Department received several comments from an attorney employed by the Federal Emergency Management Agency (FEMA) regarding the rule's treatment of the National Disaster Medical System (NDMS). The NDMS is a section within the U.S. Department of Homeland Security, and supports Federal agencies in the management and coordination of the Federal medical response to major emergencies and Federally declared disasters. The NDMS is composed primarily of teams of professional and para-professional volunteers, who may be activated for training or in response to public health emergencies. NDMS volunteers who are

activated are considered to be serving in the uniformed services for the purposes of USERRA. 42 U.S.C. 300hh–11(e)(3).

The FEMA commenter suggests several instances in which the Department should clarify the coverage of members of the NDMS under USERRA. The Department agrees with a number of these suggestions, and rejects others, as follows:

1. The commenter recommends that section 1002.2, which provides background and historical information on USERRA, include the statutory reference, 42 U.S.C. 300hh–11(e)(3), that provides USERRA coverage to members of the NDMS. The Department declines this suggestion, because this section of the rule is intended as a general discussion, and contains no mention of any statutory provisions that have directly or indirectly amended USERRA. However, the Department will take the opportunity to highlight the NDMS coverage issues elsewhere in this final rule.

2. The commenter recommends that the Department include a description of the NDMS in section 1002.5, which contains a number of definitions that are considered helpful in understanding USERRA. The Department has adopted this proposal. See 1002.5(f).

3. The commenter recommends a style change in NPRM section 1002.5(k), which has been incorporated. See 1002.5(l).

4. The commenter suggests that the Department include in NPRM section 1002.5 that NDMS appointees are considered members of the uniformed services when Federally activated or attending authorized training. The Department has revised section 1002.5(o) to reflect that, pursuant to the statute creating the NDMS, service in the NDMS is considered to be service in the uniformed services for the purposes of USERRA, although the appointee is not considered to be a member of the uniformed services. See 42 U.S.C. 300hh–11(e)(3).

5. The commenter suggests that the Department clarify in section 1002.6 that service in the NDMS is a type of service covered by USERRA. The Department agrees. See 1002.6.

6. The commenter requests that the Department modify 1002.41 to include a reference to the intermittent nature of the service of the NDMS. The Department rejects this suggestion because the section in question refers to the brief or intermittent nature of civilian employment, not the service in the uniformed services.

7. The commenter suggests that the Department clarify that, with regard to section 1002.56, not all NDMS service is

protected by USERRA, and that the Department remove the phrase "even if you are not a member of the uniformed services" from this section. While the Department did not adopt these suggestions, the Department reexamined the question set out in section 1002.56 and concluded it needed revision to accurately reflect the scope of the coverage of NDMS service.

8. The commenter properly suggests that the Department modify section 1002.86 to indicate that the Secretary of Homeland Security may, in consultation with the Secretary of Defense, make a determination that giving of notice by intermittent disaster-response appointees of the National Disaster Medical System is precluded by "military necessity." The revision has been made. See 1002.86.

9. The commenter requests that the Department correct a reference in section 1002.103(a)(5) and (a)(7), which addresses the types of service that do not count toward the general five-year limit on service after which a person is not entitled to reemployment rights. The correction has been made to follow precisely the corresponding sections of the statute. See 38 U.S.C. 4312(c)(4)(B) and 4312(c)(4)(D).

10. The commenter requests that the Department include within section 1002.123 an additional type of document that establishes an employee's eligibility for reemployment following covered NDMS service. The Department agrees. See section 1002.123(a)(7).

11. The commenter suggests that the Department modify section 1002.35, which specifies the types of discharge following service that will cause a person to lose reemployment rights under USERRA. The commenter sought inclusion on this list the termination of an intermittent NDMS appointee for misconduct or because. Because no statutory or regulatory guidance was provided as a basis for this suggestion, and the Department is aware of none, the suggestion is not adopted.

**Subpart A—Introduction to the Regulations Under the Uniformed Services Employment and Reemployment Rights Act of 1994**

*General Provisions*

Sections 1002.1 through 1002.7 describe the regulation's purpose, scope, and background, as well as the sense of the Congress in enacting USERRA. Section 1002.1 sets out the purpose of these regulations. See 38 U.S.C. 4301. Sections 1002.2 through 1002.4 provide additional background on USERRA, its effective date, and its purposes. Section

1002.5 defines the important terms used in the regulation. See 38 U.S.C. 4303. Sections 1002.6 and 1002.7 describe the general coverage of the rule, its applicability and its relationship to other laws, contracts, agreements, and workplace policies and practices. See 38 U.S.C. 4302.

The Department received one comment from the Equal Employment Advisory Council regarding the breadth of USERRA's definition of "employer." The proposed rule adopted, in Section 1002.5(d), USERRA's definition of "employer," which includes "any person, institution, organization or other entity that pays salary of wages for work performed or that has control over employment opportunities, including * * * a person, institution, organization, or entity to whom the employer has delegated the performance of employment-related responsibilities." 38 U.S.C. 4303(4). The EEAC proposed that the regulatory definition of employer explicitly exclude from liability for statutory violations individuals, such as managers or supervisors, who are not directly responsible for paying wages to employees. In support of this proposal, the EEAC cited case law under various civil rights statutes holding that individuals cannot be held personally liable for statutory violations if the individual does not independently meet the statute's definition of a covered "employer." See, e.g., *EEOC v. AIC Security Investigations,* LTD, 55 F.3d 1276, 1281 (7th Cir. 1995), and cases cited therein. Under the statutory definitions of "employer" in the Americans with Disabilities Act (ADA), 42 U.S.C. 12111(5), the Age Discrimination in Employment Act (ADEA), 29 U.S.C. 630(b), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e(b), which are essentially the same, the weight of authority is that Congress intended the doctrine of respondeat superior to apply, and to impose liability upon employers for acts of their agents. Id.

The Department has considered this comment and disagrees with the conclusion reached by the commenter. In comparison to the ADA, the ADEA, and Title VII of the Civil Rights Act, USERRA's definition of "employer" is quite different and much broader. USERRA imposes liability for violations upon "any person * * * [who] * * * has control over employment opportunities" including "a person * * * to whom the employer has delegated the performance of employment-related responsibilities." 38 U.S.C. 4303(4)(A)(i). At least two courts have held that, based on this

definition, individual supervisors may be liable under the Act. See *Brandasse v. City of Suffolk,* 72 F.Supp.2d 608, 617–18 (E.D.Va. 1999) (both a city, as a police officer's direct employer, and its director of personnel, who had authority over hiring and firing for the city, were subject to liability as "employers" under USERRA); *Jones v. Wolf Camera, Inc.,* 1997 WL 22678 (N.D.Tex. 1997) (at Fed.R.Civ.P. 12(b)(6) stage, individual supervisors may be liable under USERRA as "persons" with control over hiring and firing and to whom the employer has delegated the performance of employment-related responsibilities). But see *Satterfield v. Borough of Schuylkill Haven,* 12 F.Supp.2d 423 (E.D.Pa. 1998) (plaintiff could not bring an action under USERRA against individual members of a borough council, alleging that the council terminated him because of his military status, because such members did not have any individual power over the plaintiff and the plaintiff was not required to report to them individually); *Brooks v. Fiore,* 2001 WL 1218448 (D. Del. 2001) (supervisor was not covered by USERRA because he did not have the power to hire and fire the plaintiff).

Thus, courts have construed USERRA's definition of "employer" as including supervisors and managers in appropriate cases. Those courts that have found no individual liability have done so not because the language of the statute precludes it, but rather because the facts and circumstances of the case do not warrant the imposition of individual liability. Based on these considerations, the Department declines to adopt the position that individual supervisors and managers should be excluded from the regulatory definition of "employer" under USERRA.

The Department received two additional comments, one from an association of third-party employee benefit administrators and one from a trade association of firms providing health insurance products to employers, regarding the statute's broad definition of "employer" and its implications in the employee benefits area. Each commenter was concerned that USERRA's definition of "employer" was so broad as to impute liability to third parties to whom employers had delegated only ministerial responsibilities for employee benefits plans.

Congress intended that the definition of employer be broad enough to "apply to insurance companies that administer employers' life, long-term disability, or health plans, so that such entities cannot refuse to modify their policies in order for employers to comply with

requirements under [USERRA]." S. Rep. No. 158, 103d Cong., 2d Sess. 42 (1993). However, the Department agrees with the commenters that entities to whom employers or plan sponsors have delegated purely ministerial functions regarding the administration of employee benefits plans are not intended to be covered by USERRA's definition of "employer." For instance, firms whose activities are strictly limited to the preparation and maintenance of plan benefit forms, without engaging in substantive decisions regarding plan benefits, would not be considered employers for the purposes of USERRA.

The Department received comments on the rule's definitions regarding an employer's obligation to make reasonable efforts, without imposing an undue hardship on the employer, to qualify an employee returning from military service for reemployment. One commenter suggested that the definition of "reasonable efforts" in section 1002.5(i) should explicitly include an employer's obligation to provide evaluative testing, assistance with obtaining licensing, and other similar employer efforts. The Department views the definition of "reasonable efforts," which requires actions by employers "including training * * * that do not place undue hardship on the employer," as sufficiently broad so as to include other actions not specified in the definition. The same commenter requested that the Department delete from the definition of "undue hardship" in section 1002.5(n) any consideration based on "the nature and cost of the action needed." The "nature and the cost of the action" is one of the factors expressly included in USERRA's definition of "undue hardship," and the Department views consideration of all factors essential to evaluation of what constitutes "undue hardship." 38 U.S.C. 4303(15)(A)–(D).

Additionally, another commenter requested that the Department exclude "former employees" from the definition of "employee" in section 1002.5(c). Congress intended "that the term 'employee' would include former employees of an employer." H.R. Rep. No. 65, 103d Cong., 2d Sess. 21 (1993); S. Rep. No. 103–158, at 41 (1993). Therefore, the Department will retain "former employees" within this definition.

One comment suggests a revision to section 1002.6, which describes the various types of service that are covered under USERRA. USERRA's predecessor, the VRRA, provided reemployment protections that varied (in many instances) based on the type of service

performed. One of the ways in which USERRA modified the old law was to base many of the reemployment rights on the length of the service performed rather than its type. The commenter requests the deletion of the sentence from section 1002.6 that erroneously indicates that the statute's reemployment provisions vary only according to the length of service. The Department agrees, and has made the deletion. See 1002.6.

Finally, the Department received one comment regarding USERRA's relationship to the Internal Revenue Code. The commenter has requested the Department clarify how "differential pay" should be reported for tax purposes. The term "differential pay" refers to payments by employers to their employees absent to perform military service, and this pay is neither required by nor addressed in USERRA. In some cases, employers provide employees their full civilian pay, but more often they provide payments that represent the difference between the employee's military pay and civilian pay. Differential pay is a generous show of support by employers for their employees who are in service to the nation.

The commenter correctly points out that USERRA requires that a person absent from a position of employment on account of service in the uniformed services is to be considered on a furlough or leave of absence, a provision that has been incorporated in the reemployment rights statute since its first enactment in 1940. 38 U.S.C. 4316(b)(1)(A). On the other hand, the commenter notes that the Internal Revenue Service (IRS) has issued guidance that such person is considered to be "terminated" for certain tax purposes.

The Department reiterates that for the purposes of determining the rights and obligations set out in USERRA, an employee absent to perform service in the uniformed services is to be considered as on furlough or leave of absence. 38 U.S.C. 4316(b). Therefore, for the purposes of compliance with USERRA, an employee should be treated as on furlough or leave of absence, and for the purposes of compliance with the Internal Revenue Code (IRC), the IRS guidance should be followed. See IRS Revenue Ruling 69–136 (1969).

## Subpart B—Anti-Discrimination and Anti-Retaliation

### Protection From Employer Discrimination and Retaliation

USERRA prohibits an employer from engaging in acts of discrimination against past and present members of the uniformed services, as well as applicants to the uniformed services. 38 U.S.C. 4311(a). The anti-discrimination prohibition applies to both employers and potential employers. No employer may deny a person initial employment, reemployment, retention in employment, promotion, or any benefit of employment based on the person's membership, application for membership, performance of service, application to perform service, or obligation for service in the uniformed services. USERRA also protects any person who participates in an action to protect past, present or future members of the uniformed services in the exercise of their rights under the Act. The Act prohibits any employer from discriminating or taking reprisals against any person who acts to enforce rights under the Act; testifies in any proceeding or assists a statutory investigation; or exercises any right under the statute pertaining to any person. 38 U.S.C. 4311(b). A person is protected against discrimination and reprisal regardless whether he or she has served in the military.

Proposed sections 1002.18, 1002.19 and 1002.20 implement the protections of section 4311(a) and (b). Proposed section 1002.21 makes clear that the prohibition on discrimination applies to any employment position, regardless of its duration, including a position of employment that is for a brief, non-recurrent period, and for which there is no reasonable expectation that the employment position will continue indefinitely or for a significant period.

The Department received two comments on proposed section 1002.21. The first commenter suggests that the application of USERRA's anti-discrimination and anti-retaliation provisions to brief, non-recurrent positions is "unduly burdensome for employers and contains unnecessary verbiage." Because the statute explicitly requires the application of the anti-discrimination and anti-retaliation provisions to such employment positions, see 38 U.S.C. 4311(d), the Department will retain the provision unchanged. A second commenter requests that 1002.21 include a cross-reference to section 1002.41 to reflect that persons employed in brief, non-recurrent employment positions enjoy the protections of USERRA's anti-

discrimination and anti-retaliation provisions, while persons employed in temporary and seasonal employment positions are not protected by USERRA's reemployment provisions. The commenter mistakenly equates the terms "brief, non-recurrent" with "temporary" and "seasonal" when referring to employment positions. Some employment positions, such as a life guard at a swimming pool or a football coach, are temporary, seasonal positions, and such positions enjoy both the anti-discrimination/anti-retaliation and the reemployment protections afforded under USERRA. See 38 U.S.C. 4311(d) and 4312(d)(1)(C); S. Rep. No. 103–158, at 46 (1993). By contrast, some, but not all, temporary, seasonal employment positions are brief and non-recurrent, and provide the employee no reasonable expectation of continued employment, such as an employment contract that covers a one-time-only, three-month-long position. Such brief, non-recurrent positions enjoy the protections afforded by USERRA's anti-discrimination/anti-retaliation provisions, but are not protected by the statute's reemployment provisions. See 38 U.S.C. 4312(d)(1)(C); S. Rep. No. 103–158, at 46 (1993).

Proposed section 1002.22 explains who has the burden of proving that a certain action violates the statute. Proposed section 1002.23 sets out the evidentiary elements of a claimant's case and an employer's case under USERRA. The Department received several comments regarding these two provisions. Two commenters, including the National Employment Lawyers Association (NELA), criticized the provisions for failing to state explicitly in the text of the rule that once an employee has met his or her burden to prove that the employee's USERRA-protected status or activity was a reason for an employer's adverse action against the employee, that the employer's rebuttal case is an affirmative defense, which places the burden of proof on the employer to show by a preponderance of evidence that it would have taken the adverse action in the absence of the protected status or activity. In addition, two commenters, including NELA, criticized the provisions for erroneously stating that the burden of proof shifts back to the employee if the employer successfully prevails on its affirmative defense.

The Department agrees that the structures of proof set forth in proposed sections 1002.22 and 1002.23 are susceptible to confusion and should be clarified. Congress intended that the evidentiary scheme set forth by the United States Supreme Court in *NLRB* v.

*Transportation Management Corp.*, 462 U.S. 393, 401 (1983), apply to the analysis of violations under USERRA. See S. Rep. No. 103–158, at 45 (1993), and H.R. Rep. No. 103–65, Pt. I, at 18, 24 (1993). See also *Gummo* v. *Village of Depew*, NY, 75 F.3d 98, 106 (2d Cir. 1996) (citing USERRA's legislative history); *Sheehan* v. *Dept. of the Navy*, 240 F.3d 1009, 1013–1014 (Fed. Cir. 2001) (same).

Under this structure, in order to establish a case of employer discrimination, the person's membership, application for membership, performance of service, application for service, or obligation for service in the uniformed services must be a "motivating factor" in the employer's actions or conduct. 38 U.S.C. 4311(c)(1). The initial burden of proving discrimination or retaliation rests with the person alleging discrimination (the claimant). A person alleging discrimination under USERRA must first establish that his or her protected activities or status as a past, present or future service member was a motivating factor in the adverse employment action. See *Robinson* v. *Morris Moore Chevrolet-Buick, Inc.*, 974 F.Supp. 571 (E.D. Tex. 1997). The claimant alleging discrimination must prove the elements of a violation—i.e., membership in a protected class (such as past, present or future affiliation with the uniformed services); an adverse employment action by the employer or prospective employer; and a causal relationship between the claimant's protected status and the adverse employment action (the "motivating factor"). To meet this burden, a claimant need not show that his or her protected activities or status was the sole cause of the employment action; the person's activities or status need be only one of the factors that "a truthful employer would list if asked for the reasons for its decision." *Kelley* v. *Maine Eye Care Associates, P.A.*, 37 F. Supp.2d 47, 54 (D. Me. 1999); see *Robinson*, 974 F. Supp. at 575 (citing *Price Waterhouse* v. *Hopkins*, 490 U.S. 228, 250 (1989) (addressing Title VII gender discrimination claim and related defense)). "Military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Fink* v. *City of New York*, 129 F.Supp.2d 511, 520 (E.D.N.Y. 2001), citing *Robinson*, 974 F.Supp. at 576. The employee is not required to provide direct proof of employer animus at this stage of the proceeding; intent to discriminate or retaliate may be established through circumstantial evidence. See *Desert Palace, Inc.* v.

*Costa*, 539 U.S. 90 (2003); *United States Postal Service Bd. of Governors* v. *Aikens*, 460 U.S. 711, 714 (1983); *Sheehan*, 240 F.3d at 1014.

After the employee establishes the elements of an alleged violation, the employer may avoid liability by proving by a preponderance of the evidence that the claimant's military activities or status was not a motivating factor in the adverse employment action. See *Gummo*, 75 F.3d at 106. At this stage, the employer carries the burden to prove as an affirmative defense that it would have taken the action anyway, without regard to the employee's protected status or activity. *Sheehan*, 240 F.3d at 1014. Because the employer's defenses are affirmative under USERRA, if the employer fails to counter the employee's evidence, the claimant's proof establishes that the adverse employment action was more likely than not motivated by unlawful reasons. This framework is set forth in sections 1002.22 and 1002.23, which have been revised in response to the comments noted above and to accurately reflect the nature of the evidentiary structure intended by Congress.

Section 4311(c)(2) provides the same evidentiary framework for adjudicating allegations of reprisal against any person (including individuals unaffiliated with the military) for engaging in activities to enforce a protected right; providing testimony or statements in a USERRA proceeding; assisting or participating in a USERRA investigation; or exercising a right provided by the statute. 38 U.S.C. 4311(c)(2). Section 1002.19 addresses the elements of a case of retaliation. One commenter highlighted an ambiguity in the question posed in section 1002.19, and the Department has narrowed the question to clarify that the section applies only to employer retaliation.

The Department received responses to its request for comment on the application of the anti-discrimination provisions of the Act to potential employers. Because this issue is also addressed in section 1002.40, which explains in some detail the obligations of potential employers, the Department will respond to those comments in its summary of Subpart C, below.

The Department received one comment requesting clarification in the text of the final rule that USERRA protects not just a service member's activities, but also protects a service member's status in the uniformed services. For example, an employer may not discriminate against a person because of his or her status as a military veteran or member of a uniformed

service, regardless of whether that status results in the performance of military activities. The Department agrees with the comment, and has revised sections 1002.18, 1002.22 and 1002.23 to reflect that USERRA protects both military status and activities.

The Department received numerous additional comments regarding this part of the rule. One comment criticized the rule for failing to state that the evidentiary scheme set forth in sections 1002.22 and 1002.23 applies only to court proceedings and does not apply to the earlier administrative stage during which VETS investigates an employee's USERRA claim. While the evidentiary structure in the rule certainly pertains to the litigation of USERRA claims in court, the Department regards the analysis as one that should be taken into account during the investigative stage, so that adequate assessments can be made regarding the claims of any party to a USERRA dispute. An additional comment criticized the proposed rule for failing to explicitly state that an employee need only show that his or her protected status or activity was one of the factors motivating the adverse employment action. Section 1002.22 states that the employee's burden is to prove that the protected activity or status was "one of the factors for the employer's adverse action," and therefore no revision is necessary. Another commenter faulted the proposed rule for failing to state that the employee's initial burden of proof includes showing by a preponderance of evidence that the protected activity or status was a "substantial and motivating" factor. The Department has concluded that under *Transportation Management*, an employee must show that the protected status or activity was a "substantial or motivating" factor. 462 U.S. at 401. One commenter suggested the addition of the phrase "or more" to the first sentence of Section 1002.23(b) so that it states, "If you prove that the employer's action against you was based on one or more of the prohibited motives listed in paragraph (a) of this Section * * *." The Department regards this suggestion as unnecessary to clarify the meaning of the provision. Finally, the Department received one comment suggesting that in a reinstatement case in which the employer has failed to reemploy a service member in a position of like pay, status and seniority, the burden of proof should be on the employer to show that its failure was not a result of protected activity or service, and that the burden should be on the employee only after reinstatement. Because the comment is

ambiguous and does not offer clarification of any provision of the regulation, no revision has been made to respond to the comment.

## Subpart C—Eligibility for Reemployment

### *General Eligibility Requirements for Reemployment*

USERRA requires that the service member meet five general criteria in order to establish eligibility for reemployment:

(1) That the service member be absent from a position of civilian employment by reason of service in the uniformed services;

(2) That the service member's employer be given advance notice of the service;

(3) That the service member have five years or less of cumulative service in the uniformed services with respect to a position of employment with a particular employer;

(4) That the service member return to work or apply for reemployment in a timely manner after conclusion of service; and

(5) That the service member not have been separated from service with a disqualifying discharge or under other than honorable conditions.

Section 1002.32 sets out these general eligibility requirements. Sections 1002.34–.74 explain the "absent from a position of civilian service" requirement, sections 1002.85–.88 explain the "advance notice" requirement, sections 1002.99–.104 explain the "five years or less of cumulative service" requirement, sections 1002.115–.123 explain the "return to work or apply for reemployment" requirement, and sections 1002.134–.138 explain the "no disqualifying discharge" requirement.

A person who meets these eligibility criteria, which are contained in 38 U.S.C. 4312(a)–(c) and 4304, is entitled to be reemployed in the position described in 38 U.S.C. 4313, unless the employer can establish one of the three affirmative defenses contained in 38 U.S.C. 4312(d).

The Department received two comments on the general eligibility criteria set out in proposed section 1002.32. The first commenter recommended that the phrase "in the uniformed services" be inserted after the word "service" in section 1002.32(a)(2) so that the sentence more accurately states, "You have five years or less of cumulative service in the uniformed services with respect to your position of employment." The Department agrees that this amendment

improves the clarity of the text, and has made the revision. See 1002.32(a)(2). The second commenter also requested a clarification to the same sentence. In order to reflect that the five-year service limit applies to an employee's entire employment relationship with a particular employer, including any changes in employment position with that particular employer, the Department has revised this sentence accordingly. See 1002.32(a)(2).

There has been some disagreement in the courts over the appropriate burden of proof in cases brought under 38 U.S.C. 4312, the provision in USERRA establishing the reemployment rights of persons who serve in the uniformed services. One court has interpreted that provision to be "a subsection of section 4311 [the anti-discrimination and anti-retaliation provision]." *Curby* v. *Archon*, 216 F.3d 549, 556 (6th Cir. 2000). Other courts have interpreted section 4312 to establish a statutory protection distinct from section 4311, creating an entitlement to re-employment for qualifying service members rather than a protection against discrimination. *Wrigglesworth* v. *Brumbaugh*, 121 F. Supp.2d 1126, 1134 (W.D. Mich. 2000) (stating that requirements of section 4311 do not apply to section 4312). *Brumbaugh* relies in part on legislative history and the Department's interpretation of USERRA. Id. at 1137. Another district court supports the *Brumbaugh* decision and characterizes the contrary view in *Curby* as dicta. *Jordan* v. *Air Products and Chem.*, 225 F. Supp.2d 1206, 1209 (C.D. Ca. 2002).

In the proposed rule, the Department agreed with the district court decisions in *Brumbaugh* and *Jordan* that sections 4311 and 4312 of USERRA are separate and distinct. Accordingly, proposed section 1002.33 provided that a person seeking relief under section 4312 need not meet the additional burden of proof requirements for discrimination cases brought under section 4311. The Department disagreed with the decision in *Curby* v. *Archon* discussed above, insofar as it interprets USERRA to the contrary, and the Department invited comment regarding the proper interpretation of the statute regarding the burden of proof for relief under section 4312.

The Department received four comments regarding this issue, and all four agreed with the Department's interpretation that a person alleging a violation of section 4312 of USERRA need not prove the elements of an alleged violation of section 4311. In the absence of any negative comment to consider, the Department will incorporate this provision of the

proposed rule in the final rule. In addition, one of the four commenters on this topic requested that section 1002.33 contain much more detail about VETS' administrative procedures that follow the filing of a complaint stating a claim under section 4312. The Department declines this request, as it suggests the insertion of material that is covered below in Subpart F of this rule, Compliance Assistance, Enforcement and Remedies.

*Coverage of Employers and Positions*

Sections 1002.34 through 1002.44 of the final rule list the employers and employment positions that are covered by USERRA. Section 1002.34 provides that the Act's coverage extends to virtually all employers in the United States; the statute contains no threshold or minimum size to limit its reach. The Department received two comments regarding this coverage provision. First, the Department was asked whether USERRA applies to Native American tribes when they act as employers. Section 1002.34(a) reiterates USERRA's broad applicability to all employers, explicitly including the Federal government and the States. 38 U.S.C. 4303(4). While the face of the statute does not explicitly cover Native American tribal employers, USERRA's legislative history reflects the Act was intended to apply to "Native American tribes and their business enterprises." S. Rep. No, 103–158, at 42 (1993). Thus, although the Department concludes that USERRA likely applies to Native American tribal employers, the Department recognizes that there is a difference between the right to demand compliance with the law and the means to enforce it. *Kiowa Tribe of Oklahoma v. Manufacturing Techs., Inc.*, 523 U.S. 751, 754 (1998). Native American tribes, like the States, possess sovereign immunity from suit except where "Congress has authorized the suit or the tribe has waived its immunity." *Kiowa Tribe of Oklahoma*, 523 U.S. at 754. As a result, judicial enforcement of the Act against an Indian tribe depends on whether the tribe has waived its immunity, and such a waiver "cannot be implied but must be unequivocally expressed." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978). Accordingly, the Department recognizes that the application of USERRA's provisions to Native American tribal employers is a complicated and heavily fact-dependent issue that, if raised in a USERRA proceeding, will ultimately be resolved by the courts on a case-by-case basis. See, e.g., *C & L Enterprises, Inc. v. Citizen Band Potawatomi Tribe of Oklahoma*, 532 U.S. 411 (2001)

(arbitration provisions in contract amounted to clear waiver of tribal immunity).

An additional commenter suggests the elimination of section 1002.34(c), which states that USERRA applies to American firms operating in a foreign country, because it "attempts to create an extraterritorial application that is not established under the statute." To the contrary, the text set out in section 1002.34(c) is based on an unambiguous statutory provision establishing such applicability. See 38 U.S.C. 4319. Accordingly, the Department has retained this provision in the final rule. See 1002.34.

Other provisions in this section address various aspects of the employment relationship subject to the Act. Section 1002.35 defines the term "successor in interest," and section 1002.36 further addresses the issue. Section 1002.37 addresses the situation in which more than one employer may be responsible for one employee. The Department received two comments on this provision regarding multiple employers. The first commenter suggested that, as with regulations promulgated under the Family and Medical Leave Act, see, e.g. 29 CFR 825.106, the provision should allocate statutory responsibilities and liability between "primary" and "secondary" employers. Similarly, an additional commenter submitted that the statute's reemployment provisions should apply only to the "primary" employer and not the "secondary" employer.

In response to these two comments, the Department again notes USERRA's broad definition of "employer" as an entity "that has control over employment opportunities." 38 U.S.C. 4303(4). In addition, USERRA's legislative history instructs that the term "employer" is intended to be broadly construed to cover situations where more than one entity exercises control over different aspects of the employment relationship. S. Rep. No. 103–158, at 41 (1993); H.R. Rep. 103–65, Pt. I, at 21(1993), citing, e.g., *Magnuson v. Peak Technical Services, Inc.*, 808 F.Supp. 500, 507–511 (E.D. Va. 1992) (the legal issue is whether one or more of the entities exercise requisite control over significant aspects of employment relationship so as to be deemed an "employer" under the statute). Thus, in cases in which more than one entity employs an individual, the entity's status, responsibility and liability as an employer under USERRA is assessed by determining whether the entity controls the employee's employment opportunities, not by reference to shorthand labels such as "primary

employer" and "secondary employer." Indeed, under this analytical framework, employers may share or co-determine certain aspects of the employment relationship, and in those cases there will not be a "primary" and "secondary" employer. Accordingly, the Department will retain the provision unmodified. See 1002.37.

The Department received a comment from the Building and Construction Trades Department of the AFL–CIO ("BCTD") regarding the Department of Labor's treatment of hiring halls in proposed section 1002.38, which provides that a hiring hall is an "employer" if "the hiring and job assignment functions have been delegated by an employer to the hiring hall." The BCTD recommends that this provision be eliminated, arguing that hiring halls in the unionized construction industry represent an "arrangement" between the union and local employers to facilitate referral of available union members for work. According to the BCTD, hiring halls do not perform any hiring or assignment functions beyond referring the number and types of workers requested by the employer. The BCTD suggests that the multi-employer group using the hiring hall to obtain workers should be the "employer" rather than the hiring hall. In order to effectuate this suggestion, the BCTD proposes, in addition to eliminating section 1002.38, that the Department modify the regulatory definition of "employer" (section 1002.5(d)) to state, "in industries in which exclusive hiring halls are utilized, all employers who are required to obtain applicants through a given hiring hall arrangement, may constitute a single employer under the Act."

The Department's response to the BCTD's proposal lies again in the breadth of the statutory definition of "employer," and in Congress's unambiguous intent that this definition be read broadly to include entities, such as hiring halls, to whom job referral responsibilities have been delegated. See S. Rep. No. 103–158, at 42 (1993); H.R. Rep. 103–65, Pt. I, at 21(1993). In addition, the BCTD's proposed amendment to the definition of employer in section 1002.5, which seeks the permanent application of a "single employer" framework to multiple hiring hall employers, is misplaced. The term "single employer" applies to firms that operate as an integrated enterprise and "exert [ ] significant control over" the employees in question. *G. Heileman Brewing Co. v. NLRB*, 879 F.2d 1526, 1530 (7th Cir. 1989). To determine whether firms are sufficiently integrated to constitute a single employer, courts

look to (1) common management; (2) centralized control of labor relations; (3) interrelation of operations; and (4) common ownership or financial control. See *Radio and Television Broadcast Technicians Local Union 1264* v. *Broadcast Service of Mobile, Inc.*, 380 U.S. 255, 256, 85 S. Ct. 876, 13 L. Ed. 2d 789 (1965); see also *Naperville Ready Mix, Inc.* v. *NLRB*, 242 F.3d 744, 752 (7th Cir. 2001), cert. denied, 534 U.S. 1040 (2001). While one or more employers utilizing the same hiring hall may or may not operate as an integrated enterprise so that they meet the criteria of the "single employer" test, such criteria are not essential to determine whether the entity is an employer for the purposes of USERRA. Accordingly, the Department rejects the BCTD's suggestions, and will retain the provision regarding hiring halls in unchanged form. See 1002.38.

Proposed section 1002.39 covers States and other political subdivisions of the United States as employers, and the Department received one comment regarding this provision. The commenter noted USERRA's specific treatment for reemployment of employees of the Federal legislative and judicial branches and, seeing no similar provision for employees of State legislative and judicial branches, asked whether USERRA's protections applied to the latter group. In response, the Department again notes USERRA's broad applicability to all employers, explicitly including the States, 38 U.S.C. 4303(4), without regard to whether the State employer is the State's judicial or legislative branch.

The Department received three favorable comments in response to proposed section 1002.40, which confirms that USERRA makes it unlawful for any employer to deny employment to a prospective employee on the basis of his or her membership, application for membership, performance of service, application to perform service, or obligation for service in the uniformed services, or on the basis of his or her exercise of any right guaranteed under the Act. In addition to these favorable comments, the Department received two comments regarding the application of this principle in specific circumstances. The first commenter submits a hypothetical in which a person is on extended active duty and cannot interview for a job or be present for the job's start date because of service in the uniformed services. In the scenario presented, the job advertisement states clearly that the "most qualified" applicants must be interviewed and the selectee is desired to start work immediately upon

selection. The person on active duty can do neither, but does apply for the job by mail and is among the most qualified based on the application. The employer eliminates all applicants who cannot for whatever reason appear for an interview or start work immediately upon selection. The commenter requests that the Department determine that such conduct on the part of an employer would not constitute a violation of USERRA. The second commenter suggests a scenario in which a prospective employer withdraws an offer of employment because of a person's military service or obligations, and urges the Department to state in the final rule that while such a withdrawal may constitute discrimination under USERRA, the prospective employee is not entitled to reemployment rights under section 4312 of the statute.

The Department declines to include either of these hypothetical scenarios or their suggested outcomes in the final rule. Each individual case involving an issue under USERRA must be decided based on the specific facts of that case, with all the attendant and potentially influential details, together with the appropriate and applicable legal standards.

In addition, the Department received three comments regarding whether employer inquiries about military service or obligations during the hiring process are permissible under USERRA. The Department concludes that it is not unlawful in itself for a prospective employer to ask an applicant about military service or obligations. Indeed, in many instances a prospective employee's military experience may enhance his or her potential value to the employer. However, if information elicited in response to such questions forms the basis of the employer's decision not to hire the applicant, or to take other adverse action against the person once hired, the inquiries may constitute evidence of unlawful discrimination.

As stated earlier, temporary, part-time, probationary, and seasonal employment positions are also covered by USERRA. The Department received one comment on proposed section 1002.41, which establishes that an employer does not have reemployment obligations under USERRA if the temporary or seasonal position is for a brief, non-recurrent period and the employee has no reasonable expectation of continued employment indefinitely or for a significant period. The commenter submits that the Department should state in the final rule that in such cases, an employer need not provide employment benefits during the absence

from employment due to military service.

Section 4312(d)(1)(C) of USERRA clearly provides that an employer does not possess any reemployment obligations if an employee departing for military service is in a brief, non-recurrent position and has no reasonable expectation that such employment will continue indefinitely or for a significant period. However, an employee in a brief, non-recurrent position may be entitled to non-seniority benefits under certain situations. Because section 4316(b)(1)(B) requiring employers to provide non-seniority benefits to employees is not limited by an exception regarding employees occupying brief, nonrecurrent employment positions, the Department interprets the mandate of section 4316(b)(1)(B) to apply to all employees, including those in brief, nonrecurrent positions of employment. However, as discussed below in Subpart D and in section 1002.150 of this rule, the employer is obligated to provide non-seniority benefits to employees on military leave only to the extent that the employer provides such benefits to similarly situated employees on comparable non-military furlough or leave of absence. As a result, if an employer provides non-seniority benefits to similarly situated employees in brief, nonrecurrent employment positions on comparable, non-military leave, those benefits must also be provided to employees in brief, nonrecurrent employment positions on military leave.

Section 1002.42 explains that USERRA covers employees on strike, layoff, or leave of absence, and section 1002.43 makes clear that persons occupying professional, executive and managerial positions are also entitled to USERRA rights and benefits. The Department received two comments on proposed section 1002.44, which addresses the distinction between an independent contractor and an employee under USERRA. This section provides that USERRA does not apply to individuals who act as independent contractors rather than as employees of an employer, and outlines six factors that must be considered in deciding whether a person is an independent contractor. One commenter suggested the Department eliminate as too limiting the word "managerial" from one of the six factors that addresses a "person's opportunity for profit or loss that depends on his or her managerial skill." The second commenter disputed the six-factor test entirely, and stated the appropriate legal standard for determining whether a person is an

employee or an independent contractor is found in *Nationwide Mutual Insurance Co.* v. *Darden,* 503 U.S. 318 (1992), a case decided under the Employee Retirement Income Security Act (ERISA). In *Darden,* the Supreme Court set forth a common-law-based "degree of control" test that focuses primarily on "the hiring party's right to control the manner and means by which the product is accomplished." Id. The commenter sought the elimination of three of the six factors set out in 1002.44 as inconsistent with the common law test and because "they do not help to inform the decision."

The independent contractor provision in this rule is based on Congress's intent that USERRA's definition of "employee" be interpreted in the same expansive manner as the term is defined under the Fair Labor Standards Act (FLSA). H.R. Rep. No. 103–65, Pt. I, at 29 (1993) (citing *Brock* v. *Mr. W. Fireworks, Inc.,* 814 F.2d 1042 (5th Cir.), cert. denied, 484 U.S. 924 (1987)); S. Rep. No. 103–58, at 40 (1993). In determining whether a person is a statutory employee or an independent contractor under the FLSA, the "economic reality" test is employed. See, e.g., *Mr. W. Fireworks,* 814 F.2d at 1043; see also *Debra T. Landis,* Determination of "Independent Contractor" and "Employee" Status for Purposes of the FLSA, 51 A.L.R. Fed. 702 (2005). The focal point of the test is whether the individual is economically dependent on the business to which he or she renders service or is, as a matter of economic fact, in business for him- or herself. *Bartels* v. *Birmingham,* 332 U.S. 126, 130 (1947). In applying the test, courts generally examine five or six factors. *Landis,* supra, section 2. None of the factors is determinative. *Rutherford Food Corp.* v. *McComb,* 331 U.S. 722 (1947). Moreover, the factors are "simply analytical tools," thus, "their weight, number and composition are variable." *Dole* v. *Snell,* 875 F.2d 802, 805 n. 2 (10th Cir. 1989). In *Mr. W. Fireworks,* the court examined five factors to use in determining independent contractor status: "(1) The degree of control exercised by the alleged employer; (2) the extent of the relative investments of the putative employee and employer; (3) the degree to which the 'employee's' opportunity for profit and loss is determined by the employer; (4) the skill and initiative required in performing the job; and (5) the permanency of the relationship." Id. (citing *United States* v. *Silk,* 331 U.S. 704 (1947)). Many courts also examine a sixth factor: Whether the service

rendered is an integral part of the employer's business. See, e.g., *Henderson* v. *Interchem Coal Co.,* 41 F.3d 567, 570 (10th Cir. 1994); *Real* v. *Driscoll Strawberry Associates, Inc.,* 603 F.2d 748 (9th Cir. 1979).

Consistent with USERRA's legislative history, the proposed section essentially restates the test used under the FLSA to determine independent contractor status. In addition, in FLSA cases, "the courts have generally indicated that the common law degree of control test is not controlling." See *Landis,* supra, section 2. Indeed, even in *Darden,* the Supreme Court indicated that the common law test is inappropriate in FLSA cases. 503 U.S. at 326 ("While the FLSA, like ERISA, defines an 'employee' to include 'any individual employed by an employer,' it defines the verb 'employ' expansively to mean 'suffer or permit to work.' This latter definition [* * *] stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." (internal citations omitted)). USERRA's legislative history shows that Congress made a clear choice between the test employed under the FLSA and the degree-of-control test, and explicitly chose the former. In addition, with respect to the proposal to delete the word managerial from the second factor of the test set out in section 1002.44(b), the Department notes that most courts use that term when applying the test. See, e.g., *Imars* v. *Contractors Manufacturing Services, Inc.,* 165 F.3d 27 (6th Cir. 1998). As a result, the Department will retain the test for independent contractor as set forth in section 1002.44.

*Coverage of Service in the Uniformed Service*

Sections 1002.54 through 1002.62 explain the term "service in the uniformed services," list the various types of uniformed services, and clarify that both voluntary and involuntary duty are covered under USERRA. Section 1002.54 provides that "service in the uniformed services" includes a period for which a person is absent from a position of employment for the purpose of an examination to determine his or her fitness to perform duty in the uniformed services. Sections 1002.55 and 1002.56 provide that service under certain authorities for funeral honors duty or as a disaster-response appointee also constitute service in the uniformed services. Section 1002.57 clarifies when service in the National Guard is covered by USERRA, and section 1002.58 addresses service in the commissioned corps of the Public Health Service, a

division of the Department of Health and Human Services. Section 1002.59 recognizes the coverage for persons designated by the President in time of war or national emergency.

Sections 1002.60, 1002.61, and 1002.62 address the coverage of a cadet or midshipman attending a service academy, and members of the Reserve Officers Training Corps, Commissioned Corps of the National Oceanic and Atmospheric Administration, Civil Air Patrol, and Coast Guard Auxiliary. The Department received one comment regarding the provision in section 1002.61, which states that training performed by members of ROTC is not considered "service in the uniformed services" under USERRA's definition of that term, except in very limited circumstances. In particular, section 1002.61 explains that, on occasion, Reserve and National Guard units will enroll enlisted unit members in a local college's ROTC program in order to train them to become officers. In such cases, the ROTC member may perform ROTC training while in a duty status with the National Guard or Reserve unit, either active duty training or inactive duty training. Under these circumstances, the ROTC duty would be considered "service in the uniformed services" for USERRA purposes, and the ROTC member would be entitled to reemployment rights following such service. 38 U.S.C. 4303(13).

The commenter has requested that the Department modify section 1002.61 to establish broader USERRA protection for ROTC members. Specifically, the commenter points out that where an ROTC member has a contractual obligation to complete the ROTC course of training, he or she should have USERRA protection against discrimination. An ROTC member generally signs an agreement that specifies he or she will complete the ROTC program and accept a commission upon graduation, or serve as an enlisted member of the service if he or she fails to successfully complete ROTC training. The Department agrees with the commenter and, following consultation with the Department of Defense, has made the necessary revision by adding subsection (b) to 1002.61. The Department's consultation with the Department of Defense also resulted in technical modifications to section 1002.61(a). See section 1002.61.

*Absence From a Position of Employment Necessitated by Reason of Service in the Uniformed Services*

The Department received four comments regarding proposed section 1002.73, which addresses the issue of

the employee's reason for leaving employment as it bears on his or her reemployment rights. Section 4312(a) of the Act states that "any person whose absence from a position of employment is necessitated by reason of service in the uniformed services" is entitled to the reemployment rights and benefits of USERRA, assuming the Act's eligibility requirements are met. Military service need not be the only reason the employee leaves, provided such service is at least one of the reasons. See H.R. Rep. No. 103–65, Pt. I, at 25 (1993).

All four commenters expressed unease about the apparent latitude given employees in this section. The first commenter, concerned about an employee's opportunity to seek other employment during absence for military leave, suggested that the Department permit employers to evaluate whether it was reasonable that an employee's absence included a particular purpose other than the actual time engaged in service itself. Similarly, a second commenter suggested that the Department indicate in this provision that a neutral observer must be able to conclude that the absence is related to performing military service. Although the commenters did not say so explicitly, the presumed result of imposing such requirements on an employee's non-military activities would be to permit employers to deny reemployment if the employer concludes that the employee's absence included a purpose that was unreasonable or inappropriate. The effect of these suggestions would be to impose an additional requirement for reemployment eligibility based on an employee's conduct during absence from employment for military service beyond the requirements contained in the statute. Consequently, the Department will not include the proposed addition.

The third commenter requests that the Department state in section 1002.73 that an employee cannot extend the USERRA-protected period of absence for non-military purposes. Because section 1002.73 clearly provides that the period of absence from employment must be necessitated by military service, there is no need for modification on this point. The final commenter on this provision requests that the Department require an employee to return to work within a prescribed period of time if the employee's mobilization orders are cancelled. The Department will not prescribe a set period of time within which an employee must report back to work following the cancellation of mobilization orders, because the facts and circumstances of each case will

differ. However, in the event that a mobilization is cancelled, an employee on military leave of absence should report back to his or her employer as soon as practicable.

USERRA does not impose a limit on the amount of time that may elapse between the date the employee leaves his or her position and the date he or she actually enters the service. Proposed section 1002.74 recognized that no such limit is warranted. A person entering military service generally needs a period of time to organize his or her personal affairs, travel safely to the site where the service is to be performed, and arrive fit to perform service. The amount of time needed for these preparations will vary from case to case. Moreover, the actual commencement of the period of service may be delayed for reasons beyond the employee's control. If an unusual delay occurs between the time the person leaves civilian employment and the commencement of the uniformed service, the circumstances causing the delay may be relevant to establish that the person's absence from civilian employment was "necessitated by reason of service in the uniformed services." See *Lapine* v. *Town of Wellesley*, 304 F.3d 90, 100 (1st Cir. 2002).

The Department received two comments suggesting this provision could be subject to abuse. One commenter suggested that the Department should restrict the time off to prepare for military service solely to travel or to a prescribed time period. The second commenter requested that the Department state that USERRA permits time off from employment to put one's affairs in order only immediately and seamlessly before the military service itself and not on an intermittent or periodic basis during the weeks prior to military service. The final commenter was more concerned that employees facing an extended period of military service are ensured an adequate period of time to prepare for service, so requested that the rule provide that an employee is entitled to a minimum of one week off from employment prior to service.

The Department is averse to placing in this provision the limitations or specific time frames suggested by these commenters. The amount of time that an employee may need to prepare for military service will vary, and will depend on the facts of each case. In addition, employees may need intermittent time off from work prior to military service for brief but repeated periods to put their affairs in order, and such periods may be necessary to, for example, interview child care providers,

go to meetings with bank officers regarding financial matters, or seek assistance for elderly parents. Although the commenter's limitations in section 1002.74, the Department has revised the text of the provision to reflect that the duration of the military service, the amount of notice supplied to an employee called to military service, and the location of the service are all factors that influence the amount of time an employee may need in order to rest and/or put his or her affairs in order.

*Requirement of Advance Notice*

Section 1002.85 explains one of the basic obligations imposed on the service member by USERRA as a prerequisite to reemployment rights: the requirement to notify the employer in advance about impending military service. 38 U.S.C. 4312(a)(1). Section 4312(a)(1) of USERRA contains three general components of adequate notice: (i) The sender of the notice; (ii) the type of notice; and (iii) the timing of notice. First, the employee must notify his or her employer that the employee will be absent from the employment position due to service in the uniformed services. An "appropriate officer" from the employee's service branch, rather than the employee, may also provide the notice to the employer on behalf of the employee. Second, the notice may be either verbal or in writing. See 38 U.S.C. 4303(8) (defining "notice" to include both written and verbal notification) and 38 U.S.C. 4312(a)(1). Although written notice by the employee provides evidence that can help establish the fact that notice was given, the sufficiency of verbal notice recognizes the "informality and current practice of many employment relationships[.]" S. Rep. No. 103–158, at 47 (1993). The act of notification is therefore more important than its particular form. Third, the notice should be given in advance of the employee's departure. USERRA does not establish any bright-line rule for the timeliness of advance notice, i.e., a minimum amount of time before departure by which the employee must inform the employer of his or her forthcoming service. Instead, timeliness of notice must be determined by the facts in any particular case, although the employee should make every effort to give notice of impending military service as far in advance as is reasonable under the circumstances. See H.R. Rep. No. 103–65, Pt. 1, at 26 (1993).

The Department received several comments concerning the general requirement of notice. One commenter suggested the regulations address situations in which an employee is

75256    Federal Register / Vol. 70, No. 242 / Monday, December 19, 2005 / Rules and Regulations

employed by more than one employer, for instance, in cases in which an employee is referred by a hiring hall to various employers in a common industry, or cases in which an employment agency assigns an employee to a particular job site. The commenter suggests that the rule provide that where an employee is employed by one or more employers, the employee must provide the required notice to each employer. The Department agrees with the submission, and has modified section 1002.85 accordingly. See section 1002.85(a).

Four commenters requested the regulations adopt a general requirement that notice be given 30 days in advance of impending service. Another commenter requested the Department employ stronger language with respect to an employee's obligation to give timely notice, suggesting the final rule state the employee should "make every effort" to give advance notice "as promptly as possible." The Department does not intend that these regulations impose any new requirements, either explicit or implied, upon the exercise of the rights granted to protected persons by the statute. Therefore, the Department did not adopt these suggestions concerning the timeliness of notice. However, the Department has revised Section 1002.85 to note that the Department of Defense, in their USERRA regulations, "strongly recommends that advance notice to civilian employers be provided at least 30 days prior to departure for uniformed service when it is feasible to do so." See 32 CFR 104.6(a)(2)(i)(B). While this provision does not establish an inflexible 30-day requirement for the provision of advance notice, it does serve to demonstrate that the Department of Defense expects that service members exercise care when providing notice to their employers of impending service in the uniformed services.

The Department received seven comments related to the provision in section 1002.85 that advance notice may be either written or verbal. One commenter requested the final rule contain a "recommendation" that notice be in writing. Another commenter requested the regulation provide that an employee use the employer's established procedure for requesting other types of leave (i.e., written), except in cases where written notice is precluded pursuant to USERRA. Five commenters requested the final rule require the employee to provide, either before or shortly after the commencement of the uniformed service, some form of documentation,

either a written notice or a copy of military orders or similar documentation of the service. As noted above, both the statutory language and the legislative history make clear Congress's intent that advance notice may be either verbal or written. However, the Department again notes that the Department of Defense regulations under USERRA provide guidance to service members that "strongly recommends" that advance notice be given in writing, while acknowledging that verbal notice is sufficient. See 32 CFR 104.6(a)(2)(i)(B). The Department of Defense regulations also make clear that the military services must consider and, where military requirements permit, accommodate legitimate concerns of civilian employers concerning the military service or obligations of their employees. See 32 CFR 104.4(c) and (d); 104.5(b)(6); and 104.6(n), (o).

Section 1002.86 implements the statutory exceptions to the requirement of advance notice of entry into the uniformed services. The statute recognizes that in rare cases it may be very difficult or impossible for an employee to give advance notice to his or her employer. To accommodate these cases, the advance notice requirement may be excused by reason of "military necessity" or circumstances that make notice to the employer "otherwise impossible or unreasonable." 38 U.S.C. 4312(b). Section 4312(b) also provides that the uniformed services make the determination whether military necessity excuses an individual from notifying his or her employer about forthcoming military service. Any such determination is to be made according to regulations issued by the Secretary of Defense. See 32 CFR part 104. Finally, section 4312(b) states that the "military necessity" determination is not subject to judicial review. The same finality and exemption from review, however, do not apply if the employee fails to provide notice to his or her employer because the particular circumstances allegedly make notification "impossible or unreasonable." Whether the circumstances of the case support the employee's failure to provide advance notice of service are questions to be decided by the appropriate fact-finder. See S. Rep. No. 103–158, at 47 (1993).

One commenter requested the Department note in section 1002.86 that situations in which the provision of advance notice is precluded because it is "impossible or unreasonable" will be rare, especially in light of the access to telephones, e-mail and other readily available sources by which contact with an employer may be made. The

commenter also requested the section provide that in such rare cases, the employee must give the employer notice at the employee's earliest opportunity. The Department views the current language in subsection 1002.86(b) as sufficient to address the notice requirement in "impossible or unreasonable" circumstances, and therefore has not adopted the commenter's suggested revision.

Proposed section 1002.87 makes explicit that the employee is not required to obtain the employer's permission before departing for uniformed service in order to protect his or her reemployment rights. Imposing a prior consent requirement would improperly grant the employer veto authority over the employee's ability to perform service in the uniformed services by forcing the employee to choose between service and potential loss of his or her employment position, if consent were withheld.

Section 1002.88 implements the long-standing legal principle that an employee departing for service is not required to decide at that time whether he or she intends to return to the pre-service employer upon completion of the tour of duty. Rather, the employee may defer the decision until after he or she concludes the period of service, and the employer may not press the employee for any assurances about his or her plans. See H.R. Rep. No. 103–65, Pt. I, at 26 (1993) ("One of the basic purposes of the reemployment statute is to maintain the service member's civilian job as an 'unburned' bridge.") and S. Rep. No. 103–158, at 47 (1993), both of which cite Fishgold v. Sullivan Drydock and Repair Corp., 328 U.S. 275, 284 (1946).

Section 1002.88 also provides that an employee cannot waive the right to reemployment by informing the employer that he or she does not intend to seek reemployment following the service. This general principle that an employee cannot waive USERRA's right to reemployment until it has matured, i.e., until the period of service is completed, is reiterated in the discussion of USERRA's "Furlough and Leave of Absence" provisions. See section 1002.152.

The Department received three comments regarding section 1002.88, all of which contested the Department's conclusion that a person cannot waive the right to reemployment by notifying the employer prior to or during the period of military service that he or she does not intend to seek reemployment upon completion of the service. Commenters included the Equal Employment Advisory Council, the U.S.

Chamber of Commerce, and a law firm. The Department's conclusion is based on both the USERRA's broad prohibition against waivers of statutory rights, and the statute's legislative history on this point. Section 4302(b) of USERRA states that the statute supersedes "any * * * contract, agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates in any manner any right or benefit provided by [the Act]." 38 U.S.C. 4302(b). This provision against waivers has been interpreted expansively; for instance, it includes a prohibition against the waiver in an arbitration agreement of an employee's right to bring a USERRA suit in Federal court. See, e.g., *Garrett* v. *Circuit City Stores, Inc.,* 338 F.Supp.2d 717, 721–22 (N.D.Tex. 2004). USERRA's legislative history underscores that this provision is intended to prohibit "employer practices and agreements, which provide fewer rights or otherwise limit rights provided under amended chapter 43 or put additional conditions on those rights * * *." *H. Rep. No. 103–65,* Pt. I, at 20 (1993). This provision, coupled with the mandate to courts to liberally construe USERRA to the benefit of the service member, supports the Department's determination regarding waivers of reemployment rights made before or during service. However, in light of the comments received on this point, the Department has revised section 1002.88 to clarify that a person cannot waive his or her reemployment rights prior to or during a period of service in the uniformed services. See section 1002.88.

*Period of Service*

USERRA provides that an individual may serve up to five years in the uniformed services, in a single period of service or in cumulative periods totaling five years, and retain the right to reemployment by his or her pre-service employer. 38 U.S.C. 4312(c). Sections 1002.99 through 1002.104 implement this statutory provision. The Department received one comment on Section 1002.99, which implements the basic five-year period established by the statute, requesting that the five-year period be reduced to two years. Because the time period is established by statute, the Department has rejected the suggestion. See section 1002.99.

Section 1002.100 provides that the five-year period includes only actual uniformed service time. Periods of time preceding or following actual service are not included even if those periods may involve absences from the employment position for reasons that are service-related, for example, travel time to and from the duty station, time to prepare personal affairs before entering the service, delays in activation, etc. The Department received one comment regarding this provision, indicating that employers may have difficulty in ascertaining which part of the absence from employment is attributable to actual time in the uniformed service, and which part of the absence was service-related. As a result, the commenter suggests that employers either be allowed to assess an employee's entire absence from employment for the purposes of the five-year limit or, alternatively, be permitted to request documentation from an employee that will demonstrate the precise length of the actual military service. Because the text of the provision comports with the statute and its legislative history, the Department declines the suggestion to amend the text of the rule. However, in response to the stated concerns, the Department advises employers that the Secretaries of the Military Departments and the Commandant of the Coast Guard are expected to provide assistance to civilian employers of employees covered by USERRA, 32 CFR 104.5(b)(6). Such assistance may include support to employers to ascertain which part of the absence from employment constituted service in the uniformed services.

Section 1002.101 clarifies that the five-year period pertains only to the cumulative period of uniformed service by the employee with respect to one particular employer, and does not include periods of service during which the individual was employed by a different employer. Therefore, the employee is entitled to be absent from employment with a particular employer because of service in the uniformed services for up to five years and still retain reemployment rights with respect to that employer; this period starts anew with each new employer. The regulation derives from section 4312(c)'s language tying the five-year period "to the employer relationship for which a person seeks reemployment[.]" 38 U.S.C. 4312(c).

One commenter requested guidance on applying the five-year limit to cases in which an employee is employed by more than one employer. The Department has revised section 1002.101 to reflect that if an employee is employed by more than one employer, a separate five-year period runs as to each employer independently, even if those employers share or co-determine the employee's terms and conditions of employment. See section 1002.101.

Section 1002.102 addresses periods of service undertaken prior to the enactment of USERRA, when the Veterans' Reemployment Rights Act (VRRA) was in effect. If an individual's service time counted towards the VRRA's four or five-year periods for reemployment rights, then that service also counts towards USERRA's five-year period. The regulation implements section (a)(3) of the rules governing the transition from the VRRA to USERRA, which appear in a note following 38 U.S.C. 4301.

The Department invited comments as to whether its interpretation in proposed section 1002.102 best effectuates the purpose of the Act, and received one comment in response. The commenter indicated that in reply to the question posed in section 1002.102 regarding whether the five-year service limit includes periods of service that the employee performed before USERRA was enacted, the Department should not provide an unqualified "yes," but instead should indicate that "it depends" on whether the individual's service time counted towards the VRRA's four or five-year periods for reemployment rights. The Department agrees, and has made the change to the text of this provision. See section 1002.102.

Section 4312(c) enumerates eight specific exceptions to the five-year limit on uniformed service that allow an individual to serve longer than five years while working for a single employer and retain reemployment rights under USERRA. 38 U.S.C. 4312(c)(1)–(4)(A)–(E). The exceptions involve unusual service requirements, circumstances beyond the individual's control, or service (voluntary or involuntary) under orders issued pursuant to specific statutory authority or the authority of the President, Congress or a Service Secretary. Section 1002.103 implements this provision by describing each exception set out in the statute.

The regulation also recognizes a ninth exception based on equitable considerations. A service member is expected to mitigate economic damages suffered as a consequence of an employer's violation of the Act. See *Graham* v. *Hall-McMillen Co., Inc.,* 925 F. Supp. 437, 446 (N.D. Miss. 1996). If an individual remains in (or returns to) the service in order to mitigate economic losses caused by an employer's unlawful refusal to reemploy that person, the additional service is not counted against the five-year limit. The Department sought comment on whether an exception to the five-year limit based on the service member's mitigation of economic loss furthers the

purposes of the statute, and received four comments in support of the provision.

Section 1002.104 implements section 4312(h), which prohibits the denial of reemployment rights based on the "timing, frequency, and duration" of the individual's training or service, as well as the nature of that service or training. 38 U.S.C. 4312(h). A service member's reemployment rights must be recognized as long as the individual has complied with the eligibility requirements specified in the Act. *Id.* The legislative history of section 4312(h) makes clear the Congress' intent to codify the holding of the United States Supreme Court in *King v. St. Vincent's Hospital,* 502 U.S. 215 (1991). See H.R. Rep. No. 103–65, Pt. I, at 30 (1993); S. Rep. No. 103–158, at 52 (1993). In King, the court held that no service limit based on a standard of reasonableness could be implied from the predecessor version of USERRA. Section 4312(h). Section 1002.104 therefore prohibits applying a "reasonableness" standard in determining whether the timing, frequency, or duration of the employee's service should prejudice his or her reemployment rights.

Consistent with views expressed in the House report, Section 1002.104 counsels an employer to contact the appropriate military authority to discuss its concerns over the timing, frequency, and duration of an employee's military service. The Department received two comments regarding this provision. One commenter suggests that section 1002.104 state that employer contacts with a military authority to discuss concerns regarding timing, frequency, and duration of an employee's military service should not be considered as evidence of discrimination in violation of section 4311 of USERRA. The Department declines the opportunity to make such a categorical statement in the final rule that would apply in all circumstances. However, the Department notes that good faith contacts with the military to express legitimate concerns about timing, frequency, and duration of an employee's military service do not evidence a discriminatory motive. The second comment regarding section 1002.104 involves the provision stating that "military authorities are required to consider requests from employers of National Guard and Reserve members to adjust scheduled absences from civilian employment to perform service." The commenter asks whether this statement subjects the military authority to suit under the Administrative Procedures Act (APA) in cases in which it may be

alleged that the military authority's response to such requests is arbitrary and capricious. The Department views this inquiry as raising an issue beyond the scope of these regulations. However, the Department notes that this requirement is established by Department of Defense regulations. See 32 CFR 104.6(o).

### Application for Reemployment

In order to protect reemployment rights under USERRA, the returning service member must make a timely return to, or application for reinstatement in, his or her employment position after completing the tour of duty. 38 U.S.C. 4312(a)(3). Sections 4312(e) and (f) establish the required steps of the reinstatement process. 38 U.S.C. 4312(e), (f). Section 4312(e) of USERRA establishes varying time periods for requesting reinstatement, and section 1002.115 explains that the three statutory time periods for making a request for reinstatement are dependent on the length of the period of military service, except in the case of an employee's absence for an examination to determine fitness to perform service.

The Department received three general comments with regard to the time periods set out in section 1002.115. Two commenters suggest that the Department indicate that employees and employers may lawfully agree to extend the time periods for making a request for reinstatement. Section 4302(a) of USERRA states that "[n]othing in this chapter shall supersede, nullify or diminish any * * * contract, agreement, policy, plan, practice, or other matter that establishes a right or benefit that is more beneficial to, or is in addition to, a right or benefit provided" under USERRA. The Department concludes that this statutory provision permits the types of agreements to which the commenters refer, and finds it unnecessary to add such a provision to the final rule. A final general comment suggests that the Department indicate that an employee's separate but proximate periods of service be accumulated into one period for the purposes of determining the time period within which to apply for reemployment. The Department disagrees with the approach offered by the commenter. Under USERRA, an employee may not add together service days from separate but proximate periods of military service to create a longer period within which to apply for reemployment with the employer. Similarly, if an additional period of military service intervenes in the statutory period within which to apply

for reemployment with the employer, an employee may not bank any remaining days from that period and add them on to the subsequent period within which to report back to or apply for reemployment with the employer.

Section 1002.115 also specifies the actions that must be taken by the employee. Section 4312(e)(1)(A)(i) of USERRA provides that the employee reporting back to the employer following a period of service of less than 31 days must report:

(i) Not later than the beginning of the first full regularly scheduled work period on the first full calendar day following the completion of the period of service and the expiration of eight hours after a period allowing for the safe transportation of the person from the place of that service to the person's residence * * *

38 U.S.C. 4312(e)(1)(A)(i).

The Department interprets this provision as requiring the employee to report at the beginning of the first full shift on the first full day following the completion of service, provided the employee has a period of eight hours to rest following safe transportation to the person's residence. See H.R. Rep. No. 103–65, Pt. I, at 29 (1993). If it is impossible or unreasonable for the employee to report within this time period, he or she must report to the employer as soon as possible after the expiration of the eight-hour period.

The Department invited comment as to whether the interpretations in section 1002.115(a) best effectuate the statute, and received four comments in response. Two commenters asserted that the statute requires that an employee report back to the employer "by the beginning of the first full shift on the first calendar day that falls after the eight hour rest period ends." One commenter requested that this provision be re-drafted to improve its clarity, and one commenter requested that the Department extend the 8-hour period of rest because it is too brief.

After reviewing these comments, and the arguments in support of a modification to this provision, the Department views section 1002.115(a), which requires an employee to report back to the employer no later than the beginning of the first full regularly-scheduled work period on the first full calendar day following the completion of the period of service, provided the employee has an 8-hour rest period, as a proper and accurate interpretation of section 4312(e)(1)(A)(i). Neither the statute nor the legislative history suggests that an employee must report back on the first full shift on the day following the day that includes the period of rest. Nor can the Department

extend that period of rest beyond eight hours, as is called for in the statute.

An additional commenter sought guidance on the application of section 1002.115(a) to a case in which an employee is subject to rotating shifts. This rule is not intended as an opportunity to resolve issues arising under individual facts and circumstances. However, the Department views the text of section 1002.115(a), which requires an employee to report back "at the beginning of the first full regularly-scheduled work period on the first full calendar day following the completion of the period of service," as capable of resolving the inquiry. Under this provision, an employee need not report back until the beginning of the first full regularly scheduled work period, whether the shift is conventional or rotating.

Two final commenters on this provision asked the Department to clarify the application of USERRA's rules covering reporting back to work following periods of service for less than 31 days in light of a recent case from a Federal appeals court, *Gordon v. WAWA, Inc.*, 388 F.3d 78 (3rd Cir. 2004). In Gordon, an employee returning from weekend duty with the Army Reserve stopped by his workplace to collect his paycheck and was allegedly ordered by the employer to return to work before he had an opportunity to return home and rest. The employer allegedly threatened Gordon with termination if he did not work the upcoming shift. The employee apparently did not insist on his rest period, and worked the upcoming (midnight) shift. He was not denied reemployment. After working his shift, the employee suffered a fatal automobile accident while driving home.

The court reviewed USERRA's legislative history, which demonstrates Congressional intent that service members reporting back to their civilian employment "be allowed sufficient time to return to their residence and be rested before they are to perform their work." 388 F.3d at 83, citing S. Rep. No. 103–158, at 50 (1993). However, the court held that the time periods provided by USERRA in which a returning service member must notify the pre-service employer of his or her intent to return to work are obligations the service member must meet to reclaim the pre-service job, not rights that can be enforced under USERRA in cases where, as here, the person was in fact reemployed. As a result, the court held that the statute's reporting-back requirement, 38 U.S.C. 4312(e)(1), "does

not confer a right to rest" to a returning service member.

Although Gordon did not interpret USERRA to provide relief to an employee allegedly injured by the employer's denial of the eight-hour rest period, the Department's view is that the case does not interfere with the eight-hour, 14-day, and 90-day rest/ notification periods allowed under USERRA. The facts in Gordon were unusual; the employer reportedly threatened the employee with termination if he did not work the upcoming shift, but the employee apparently did not insist on his rest period, and was not denied reemployment. Consequently, the employee was not denied his USERRA right to be reemployed.

Gordon also does not change the procedure that a service member must follow to be entitled to reemployment rights. An employee must report to the employer or apply for reemployment within the specified time periods to be eligible for reemployment. If the employee is required by the employer to report to work, or apply for reemployment, earlier than is provided by USERRA, the employee should seek assistance from VETS or seek relief in the courts to prevent the employer from enforcing such a policy. A service member may not be required by an employer to forego any portion of the applicable eight-hour, 14-day, or 90-day rest/notification period as a condition of reemployment.

Section 1002.115(b) and (c) set out the other time periods in which an employee must report back to an employer. If the individual served between 31 and 180 days, he or she must make an oral or written request for reemployment no more than 14 days after completing service. If it is impossible or unreasonable for the employee to apply within 14 days through no fault of the employee, he or she must submit the application not later than the "next full calendar day after it becomes possible to do so." The Department indicated in the proposed rule that it understands the term "next" in the clause "next first full calendar day" in section 4312(e)(1)(C) to be superfluous, and received one comment agreeing with the position. Finally, if the individual served more than 180 days, he or she must make an oral or written request for reemployment no more than 90 days after completing service.

Section 1002.116 addresses the situation in which a service member is unable to meet the foregoing timeframes due to the individual's hospitalization for or convalescence from a service-

related illness or injury. Such a person must comply with the notification procedures determined by the length of service, after the time period required for the person's recovery. The recovery period may not exceed two years unless circumstances beyond the individual's control make notification within the required two-year period impossible or unreasonable.

The Department received two requests for guidance on section 1002.116 from one commenter. The commenter would like to know whether the two-year period begins on the date of military discharge, on the date the recovery period ends, or on the date the employee returns to work, and how to apply the rule in a situation in which the returning service member has already reported to the employer and a service-related medical condition arises requiring absence from work. As to the first issue, section 4312(e)(2)(A) of the statute states that a "person who is hospitalized for, or convalescing from, an illness or injury incurred in, or aggravated during, the performance of service in the uniformed services shall, at the end of the period that is necessary for the person to recover from such illness or injury, report to the person's employer * * * or submit an application for reemployment with such employer * * * [and] such period of recovery may not exceed two years." The Department concludes, based on this provision of USERRA, that the two-year recuperation period begins on the date of completion of the service.

This represents a change from USERRA's predecessor law, under which an employee with a service-related injury or illness could seek reemployment within 90 days of the conclusion of a period of hospitalization of not more than one year (a maximum of one year plus 90 days). USERRA's enactment extended the period for recuperation and recovery from one year to two years, but did not allow any additional time for application or reporting back after the end of the recuperation period. USERRA's legislative history supports this reading by indicating that if time were needed for recuperation and recovery, the time for application or reporting back would be extended "by up to two years." See, e.g., S. Rep. No. 103–158, at 51 (1993) (USERRA "provides for extending reemployment reporting or application dates for up to two years."); H.R. Rep. No. 103–65, Pt. I, at 29 (1993) (USERRA extends the reporting deadlines "by up to two years.").

As a result, unless extended to accommodate circumstances beyond the control of the employee that make

reporting within such period impossible or unreasonable, the entire period between the date of completion of service and the date of reporting to work or applying for reemployment can be no greater than two years, and there is no longer an additional extension of 14 or 90 days for applying for reemployment at the end of the recuperation period. However, because the recuperation period is coextensive with the 14- or 90-day application period under USERRA, the service member is entitled to whichever period is longer, but not both.

The second request for guidance on section 1002.116 asks whether the provision of section 1002.116 applies in a situation in which the returning service member has already reported to the employer and a service-related medical condition arises, necessitating absence from work. The Department concludes that the extension of time for recuperation and recovery applies only to the period in which the employee has to report back or apply for reemployment, and does not apply after the person is reemployed. Although this conclusion does not provide for cases in which service-related injuries or illnesses, such as post-traumatic stress disorder or exposure to battlefield toxins, become apparent only following reemployment, it is nevertheless consistent with the unambiguous statutory language on this issue. The Department has revised section 1002.116 to reflect this position.

Section 1002.117 covers the situation where the employee fails to report or to submit a timely application for reemployment. Such failure does not automatically divest the individual of his or her statutory reemployment rights. See 38 U.S.C. 4312(e)(3). However, the employer may subject the employee to the workplace rules, policies and practices that ordinarily apply to an employee's unexcused absence from work.

Sections 1002.118 through 1002.123 establish procedures for notifying the employer that the service member intends to return to work. These sections also address the requirement that the returning service member provide documentation to the employer in certain instances. The documentation provides evidence that the service member meets three of the basic requirements for reemployment: Timely application for reinstatement, permissible duration of service, and appropriate type of service discharge. USERRA expressly provides that the Secretary may prescribe, by regulation, the documentation necessary to demonstrate that a service member

applying for employment or reemployment meets these requirements.

The Department received two comments on section 1002.119 of the proposed rule, which indicates to whom an employee must submit an application for reemployment. The first commenter suggests that the Department incorporate in this provision a statement that an employee is "encouraged, but not required, to notify [the employee's] human resources officer and * * * supervisors as soon as practicable." The second commenter suggests that the provision include a statement that if a pre-service employer "has an established channel for receiving employment or reemployment applications, [an employee] should follow that channel." The Department views both suggestions as ones that can be construed as imposing on service members obligations not set forth in the statute and, as a result, declines the proposals.

The Department received two comments on proposed section 1002.120, which, as originally drafted, provided unconditionally that the service member does not forfeit reemployment rights with one employer by working for another employer after completing his or her military service, as long as the service member complies with USERRA's reinstatement procedures. The commenters suggested either deletion of the provision entirely, or the placement of some limitations on the right to seek alternative employment during the application period. One commenter suggests that such limitations are required in cases in which such alternative employment may violate the pre-service employer's workplace policies, such as employment with a competitor of the pre-service employer that violates an employer's policy against non-competition, or employment that presents a conflict of interest for the employee. The Department agrees with the comments, and has modified this provision accordingly. Section 1002.120 now reflects that a service member's alternative employment during the application period must not violate the pre-service employer's employment policy to such a degree that it constitutes just cause for discipline or termination by the pre-service employer. The Department views this new language as striking an appropriate balance between protecting the proprietary interests of pre-service employers and providing flexibility for employees to explore other post-service employment opportunities. In addition, the modification comports with

USERRA's provision protecting reemployed service members from discharge for a certain period following reemployment, except for "cause." 38 U.S.C. 4316(c).

Section 4312(f) of USERRA describes the documentary evidence that the service member must submit to the employer in order to establish that the service member meets the statutory requirements for reinstatement, and the rule implements these documentation requirements at 1002.121 to .123. Section 1002.121 establishes that an individual applying for reemployment who served more than 30 days in military service must provide certain documentation upon the employer's request. The documentation must establish that the individual's application is timely; he or she has not exceeded the five-year service limitation; and the type of separation from service does not disqualify the individual from reemployment. Section 1002.122 provides that an employer is required to reemploy a service member even if documentation establishing the service member's reemployment eligibility does not exist or is not readily available.

The Department received five comments on sections 1002.121 and 1002.122, each of which addresses a different aspect of the provisions. One comment urged the Department to include language in section 1002.122 imposing an affirmative obligation on the employee to make a "reasonable effort" to secure the documentation, and assist the employer in obtaining such documentation. Section 4312(f)(1) of USERRA states that an employee applying for reinstatement "*shall provide* to the person's employer" the requested documentation (emphasis supplied). Section 1002.121 follows the directive of the statute and similarly states that the employee "must" provide the documentation. The Department concludes that adding the "reasonable effort" language to the rule is redundant, and arguably diminishes the mandatory directive of the statute. Furthermore, Department of Defense regulations under USERRA obligate the military services to provide documentation upon request by the service member "that may be used to satisfy the Service member's entitlement to statutory reemployment rights and benefits." 32 CFR 104.6(l). The service branch is therefore ultimately obligated to provide the documentation that the employee requires in order to satisfy his or her own obligation to the employer. The Department concludes that a service member seeking reemployment will realistically make every effort to

obtain the documentation or assist the employer in doing so. However, in difficult cases, the military services can assist employers.

Two comments regarding these provisions were very similar in their suggested solutions to the situation in which documentation is unavailable in a timely fashion. One comment suggested specific time frames for the employee to provide the documentation, and both suggested sanctions for failing to do so in a timely manner. The suggestions included a three-step proposal that should apply to an employee who is unable to produce documentation at the time he or she applies for reemployment: First, the employer may require the employee to execute an affidavit confirming the dates of service, and the employer may terminate the employee if the information is later proven incorrect; second, if the employee does not provide requested documentation within a specific period (28 business days is suggested), the employer may place him or her on unpaid leave; and third, if the employee does not provide the documentation after a specific period of unpaid leave (28 days is again suggested), the employer may terminate him or her.

The Department concludes that the proposed change is inconsistent with the statute and USERRA's general policy of eliminating obstacles to prompt reemployment. Both section 1002.122 and the legislative history of USERRA's section 4312(f) clearly establish that the employer may not deny or delay reemployment if the requested documentation is nonexistent or not "readily available." H.R. Rep. No. 103–65, Pt. I, at 29–30 (1993); S. Rep. No. 103–158, at 51 (1993). Requiring an affidavit in lieu of documentation at the time of reemployment places an additional condition on reemployment beyond the general obligation to obtain the documentation. Furthermore, both sections 4312(f)(3)(A) and 1002.122 permit an employer to terminate an employee only if the documentation ultimately proves the employee was not eligible for reemployment. Terminating the employee for failure to provide the documentation after a prescribed period is inconsistent with the statute.

The fourth comment suggests that 1002.122 be modified to state that an employer may terminate an employee following reemployment if documentation received after reemployment indicates that the employee was not entitled to reemployment, "unless the employer's policy, plan, or practice provides otherwise under the circumstances."

The Department views the provision permitting an employer to terminate an employee if documentation fails to support the employee's entitlement to reemployment as permissive and not a mandatory directive. The proposed addition neither enhances nor circumscribes the employer's discretion on this subject, and is therefore unnecessary.

The final comment with respect to these provisions urged the Department to require the employee to provide the documentation within a reasonable time. The Department concludes that adoption of this option imposes an additional obligation on the employee not contemplated by the statute, particularly in those cases in which delays in obtaining documentation following return from service may be caused by the military unit and not by the employee. After considering all the comments on these provisions, the Department has concluded that it will retain them in unchanged form. See sections 1002.121 and 1002.122.

*Character of Service*

USERRA makes entitlement to reemployment benefits dependent on the characterization of an individual's separation from the uniformed service, or "character of service." 38 U.S.C. 4304. The general requirement is that the individual's service separation be under other than dishonorable conditions. Section 1002.135 lists four grounds for terminating the individual's reemployment rights based on character of service: (i) Dishonorable or bad conduct discharge; (ii) "other than honorable" discharge as characterized by the regulations of the appropriate service Secretary; (iii) dismissal of a commissioned officer by general court-martial or Presidential order during a war (10 U.S.C. 1161(a)); and, (iv) removal of a commissioned officer from the rolls because of unauthorized absence from duty or imprisonment by a civil authority (10 U.S.C. 1161(b)). 38 U.S.C. 4304(1)–(4). The uniformed services determine the individual's character of service, which is referenced on Defense Department Form 214. See section 1002.136. For USERRA purposes, Reservists who do not receive character of service certificates are considered honorably separated; many short-term tours of duty do not result in an official separation or the issuance of a Form 214.

Sections 1002.137 and 1002.138 address the consequences of a subsequent upgrading of an individual's disqualifying discharge. Upgrades may be either retroactive or prospective in effect. An upgrade with retroactive

effect may reinstate the individual's reemployment rights provided he or she otherwise meets the Act's eligibility criteria, including having made timely application for reinstatement. However, a retroactive upgrade does not restore entitlement to the back pay and benefits attributable to the time period between the individual's discharge and the upgrade.

The Department received two comments regarding the character-of-service provisions. The meaning of the first comment was difficult to discern, but appeared to be related to an obligation an employer might have to pay back-wages to an employee who receives a retroactive upgrade in the characterization of his or her service. Section 1002.137 expressly provides that in such a case an employer is not required to pay back-wages for the period from the date of completion of service to the date of the retroactive upgrade. The final commenter requests that in the event a service member otherwise eligible for reemployment receives an upgrade to the characterization of his or her service months or even years later, the employer should enjoy some flexibility in its obligation to reemploy. Because a person who receives a retroactive upgrade and meets all other eligibility requirements is eligible for reemployment, there is no basis for providing flexibility regarding an employer's obligation to reemploy. However, such employers may rely on the undue hardship or changed circumstances defenses, if applicable. After considering all the comments on the character-of-service provisions, the Department will retain them as originally proposed. See sections 1002.137 and 1002.138.

*Employer Statutory Defenses*

USERRA provides three statutory defenses that an employer may assert against a claim for USERRA benefits. The employer bears the burden of proving any of these defenses. 38 U.S.C. 4312(d)(2)(A)–(C).

An employer is not required to reemploy a returning service member if the employer's circumstances have so changed as to make such reemployment impossible or unreasonable. 38 U.S.C. 4312(d)(1)(A). In view of USERRA's remedial purposes, this exception must be narrowly construed. The employer bears the burden of proving that changed circumstances make it impossible or unreasonable to reemploy the returning veteran. 38 U.S.C. 4312(d)(2)(A); proposed section 1002.139. The change must be in the pre-service employer's circumstances,

as distinguished from the circumstances of its employees. For example, the defense of changed circumstances is available where reemployment would require the creation of a "useless job or mandate reinstatement where there has been a reduction in the workforce that reasonably would have included the veteran." H.R. Rep. No. 103–65, Pt. I, at 25 (1993), citing *Watkins Motor Lines* v. *De Galliford*, 167 F.2d 274, 275 (5th Cir. 1948); *Davis* v. *Halifax County School System*, 508 F. Supp. 966, 969 (E.D. N.C. 1981). However, an employer cannot establish that it is unreasonable or impossible to reinstate the returning service member solely by showing that no opening exists at the time of the reemployment application or that another person was hired to fill the position vacated by the veteran, even if reemploying the service member would require terminating the employment of the replacement employee. See Davis at 968; see also *Cole* v. *Swint*, 961 F.2d 58, 60 (5th Cir. 1992); *Fitz* v. *Bd. of Education of Port Huron Area Schools*, 662 F. Supp. 1011, 1015 (E.D. Mich. 1985), aff'd, 802 F.2d 457 (6th Cir. 1986); *Anthony* v. *Basic American Foods, Inc.*, 600 F. Supp. 352, 357 (N.D. Cal. 1984); *Goggin* v. *Lincoln St. Louis*, 702 F.2d 698, 704 (8th Cir. 1983). Id.

An employer is also not required to reemploy a returning service member if such reemployment would impose an undue hardship on the employer. 38 U.S.C. 4312(d)(1)(B). As explained in USERRA's legislative history, this defense only applies where a person is not qualified for a position due to disability or other bona fide reason, after reasonable efforts have been made by the employer to help the person become qualified. H.R. Rep. No. 103–65, Pt. I, at 25 (1993). USERRA defines "undue hardship" as actions taken by the employer requiring significant difficulty or expense when considered in light of the factors set out in 38 U.S.C. 4303(15). USERRA defines "reasonable efforts" as "actions, including training provided by an employer, that do not place an undue hardship on the employer." 38 U.S.C. 4303(10). USERRA defines "qualified" in this context to mean having the ability to perform the essential tasks of the position. 38 U.S.C. 4303(9). These definitions are set forth in sections 1002.5(n) ("undue hardship"), 1002.5(i) ("reasonable efforts"), and 1002.5(h) ("qualified").

The third statutory defense against reemployment requires the employer to establish that "the employment from which the person leaves to serve in the uniformed services is for a brief, nonrecurrent period and there is no reasonable expectation that such employment will continue indefinitely or for a significant period." 38 U.S.C. 4312(d)(1)(C), (2)(C). USERRA does not define "significant period." Under both USERRA and its predecessor, the VRRA, a person holding a seasonal job may have reemployment rights if there was a reasonable expectation that the job would be available at the next season. See, e.g., *Stevens* v. *Tennessee Valley Authority*, 687 F.2d 158, 161–62 (6th Cir. 1982), and cases cited therein; S. Rep. No. 103–158, at 46–47 (1993).

The Department received three comments on section 1002.139, which sets forth the employer's statutory defenses. Two of the comments request the deletion of one or more of the statutory defenses from the rule. Because these defenses are expressly provided in the statute, the Department will retain them in the rule. The final comment requested that this provision of the rule should express that the statutory defenses are affirmative ones and that the employer carries the burden to prove them by a preponderance of the evidence. Section 4312(d)(2) expressly provides that the employer has the burden to prove its statutory defenses, and it is appropriate for the rule to include this statutory provision. Therefore, the rule has been modified accordingly. See section 1002.139.

## Subpart D—Rights, Benefits, and Obligations of Persons Absent From Employment Due to Service in the Uniformed Services

### Furlough or Leave of Absence

Sections 1002.149 and 1002.150 implement section 4316(b) of the Act, which establishes the employee's general non-seniority based rights and benefits while he or she is absent from the employment position due to military service. 38 U.S.C. 4316(b). The employer is required to treat the employee as if he or she is on furlough or leave of absence. 38 U.S.C. 4316(b)(1)(A). The employee is entitled to non-seniority employment rights and benefits that are available to any other employee "having similar seniority, status, and pay who [is] on furlough or leave of absence. * * *" 38 U.S.C. 4316(b)(1)(B). These non-seniority rights and benefits may be provided "under a contract, agreement, policy, practice, or plan in effect at the commencement of such service or established while such person performs such service." Id. For example, if the employer offers continued life insurance coverage, holiday pay, bonuses, or other non-seniority benefits to its employees on furlough or leave of absence, the employer must also offer the service member similar benefits during the time he or she is absent from work due to military service. If the employer has more than one kind of non-military leave and varies the level and type of benefits provided according to the type of leave used, the comparison should be made with the employer's most generous form of comparable leave. See *Waltermyer* v. *Aluminum Company of America*, 804 F.2d 821 (3d Cir. 1986); H.R. Rep. No. 103–65, Pt. I, at 33–34 (1993); *Schmauch* v. *Honda of America Manufacturing, Inc.*, 295 F. Supp. 2d 823 at 836–839 (S.D. Ohio 2003) (employer improperly treated jury duty more favorably than military leave). The employee is entitled not only to the non-seniority rights and benefits of workplace agreements, policies, and practices in effect at the time he or she began the period of military service, but also to those that came into effect during the period of service.

The Department also interprets section 4316(b) of the Act to mean that an employee who is absent from a position of employment by reason of service is not entitled to greater benefits than would be generally provided to a similarly situated employee on non-military furlough or leave of absence. See Sen. Rep. No. 103–158, at 58 (1993).

The Department invited comments as to whether its interpretation in sections 1002.149 and 1002.150 best effectuates the purpose of section 4316(b). In response, the Department received six comments generally addressing the provisions, and fifteen comments addressing specific issues contained in the provisions. Of the general comments, three expressed general support for the Department's interpretation in this provision. A fourth general comment suggested that employers that are contractors with the Federal government be required to provide to employees on military leave any non-seniority rights and benefits provided to Federal employees. The same commenter suggested that an employer be required to provide to employees on military leave any non-seniority rights and benefits provided to other employees under a collective bargaining agreement. In response to each scenario, the Department underscores that the statute requires that an employer provide to employees on military leave those non-seniority employment rights and benefits that are available to any other employee "having similar seniority, status, and pay who [is] on furlough or leave of absence. * * *" 38 U.S.C. 4316(b)(1)(B). The statement in the preamble to the proposed rule that the "Department also

does not interpret the second use of the term 'seniority' in section 4316(b)(1)(B) as a limiting factor'' is inaccurate: for the purposes of section 4316(b)(1)(B), the comparator must be employees of the employer with similar seniority, status, and pay. Although a determination of whether an employee is ''similarly situated'' under section 1002.150 includes consideration of seniority as well as status and pay, it is not necessary for the seniority to be determined by a collective bargaining agreement, nor does consideration of seniority in determining whether an employee is ''similarly situated'' make the benefit a seniority benefit for purposes of USERRA. The final general comment suggested that the rule state that an employer does not violate USERRA if it characterizes an employee on military leave as ''terminated'' for the purposes of its administrative systems. The Department agrees that an employer's characterization, or mis-characterization, of a service member's absence from employment is unimportant so long as the employer is in full compliance with USERRA's substantive requirements on this issue, but because the rule is sufficiently clear on this point, the suggested modification is unnecessary.

Of the specific comments received regarding these provisions, two comments expressed agreement with the terms in section 1002.150 and the remaining comments primarily addressed the mechanics of implementing the provisions of section 1002.150. Four commenters requested that the Department indicate whether vacation accrual is a seniority-or non-seniority-based benefit. Three of the four comments take the position that vacation accrual is not a seniority-based benefit; the fourth simply seeks clarification of the issue. The regulations provide that a particular right or benefit is seniority-based if it accrues with or is determined by seniority, and depends primarily on whether the benefit is a reward for length of service. See section 1002.212. Under this construct, the Supreme Court has held that vacation accrual, rather than being a perquisite of seniority, is a form of short-term compensation for work performed. *Foster* v. *Dravo*, 420 U.S. 92 (1975). Accordingly, the Department has long viewed the accrual of vacation leave as a non-seniority based benefit and, because a significant number of comments were received on this subject, has amended the text of the rule to reflect this determination. See section 1002.150(c).

USERRA requires, and section 1002.150 reiterates, that an employee on

military leave must be accorded the non-seniority rights and benefits generally provided by the employer to other employees with similar seniority, pay, and status that are on furlough or leave of absence based on ''employment contract, agreement, policy, practice, or plan'' in effect at the workplace. 38 U.S.C. 4316(b)(1)(B); section 1002.150. The Department received one question asking whether non-seniority benefits that are required by law, rather than by ''employment contract, agreement, policy, practice, or plan,'' to be provided to employees on other types of leaves of absence must be provided to employees on military leave. For instance, regulations promulgated by the Department pursuant to the Family and Medical Leave Act, 29 U.S.C. 2601 et seq. (FMLA), require that covered employers extend to employees who have taken leave under the FMLA bonuses that do not require performance by the employee but rather contemplate the ''absence of occurrences'' of some particular event. See 29 CFR 825.215(c)(2). For instance, under this provision, bonuses for perfect attendance and for safety do not require performance by the employee but rather contemplate the absence of occurrences, and an employee absent from employment due to FMLA leave may not be disqualified from the award of such bonuses because of taking FMLA leave. 29 CFR 825.215(c)(2). The commenter argues that if such bonuses are contemplated by section 4316(b)(1)(B) of the statute, they may become the ''most favorable treatment'' to which employees on military leave are entitled.

USERRA's legislative history gives no unambiguous indication whether Congress intended that non-seniority benefits required to be provided by law to employees on other types of leaves of absence must also be provided to employees on military leave. S. Rep. 103–158, at 58 (1993) (reemployed service member entitled to the ''agreements and practices in force'' at the time of departure and the ''agreements and practices which became effective'' during military service); H.R. Rep. 103–65, Pt. I, at 33 (1993) (service member entitled to ''whatever non-seniority related benefits are accorded other employees on non-military leaves of absence''). As a result, the Department is averse to responding to the inquiry in a manner that establishes a rigid rule regarding the application of non-seniority benefits established by law. Rather, the Department views the issue as one that must be decided on a case-by-case basis,

and depends on the nature of the leave to which the benefits apply, whether that leave is comparable, the nature of the benefit mandated by other law, and the nature of the ''employment contract, agreement, policy, practice, or plan'' that implements the non-seniority benefit provisions of the other law.

The Department received seven comments regarding section 1002.150(b), which states that if non-seniority benefits to which employees on other types of furlough or leave of absence vary according to the type of leave, the employee on military leave must be given the most favorable treatment accorded to employees on any comparable leave. One commenter was in complete agreement with the provision, and a second commenter requests that the Department designate what factors to consider when assessing whether two types of leave are comparable. The third commenter submitted that employees on military leave should be afforded only those non-seniority-based benefits that are provided to other employees on unpaid, long-term leaves of absence. Similarly, the fourth commenter queried whether the voluntary provision of salary to an employee during military leave altered the treatment of non-seniority benefits, so that the employer must provide an employee on military leave those non-seniority benefits provided to employees on other types of paid leave. Three final commenters stated that section the requirement in 1002.150(b) that employers provide to employees on military leave the ''most favorable treatment'' accorded to employees on comparable leave is confusing, exceeds the scope of the statutory mandate, or both.

The plain language of the statute mandates that an employee on military leave be granted non-seniority benefits afforded to ''employees having similar seniority, status, and pay who are on furlough or leave of absence. * * *'' The requirement that an employee on military leave must be given the ''most favorable treatment'' accorded to other employees on leave is based on legislative history requiring that ''to the extent that employer policy or practice varies among various types of non-military leaves of absence, the most favorable treatment accorded any particular leave would also be accorded the military leave. * * *'' H.R. Rep. 103–65, Pt. I, at 33 (1993), citing *Waltermyer*, 804 F.2d at 825, in which the court held that the service member's leave for Reserve training was comparable to other forms of leave to which benefits attached under the collective bargaining agreement and,

therefore, the service member could not be afforded less favorable treatment.

The *Waltermyer* court held that in providing non-seniority benefits to employees on military leave, an employer cannot treat those employees less favorably than other employees on comparable forms of leave. In comparing types of employee leave, the court first assessed the purpose of the collective bargaining agreement's provision rewarding holiday pay to those employees that either worked during the week of the holiday or were away from work for specified, non-military reasons. The court found that the purpose of the benefit was to protect against excessive absenteeism during the holiday week, and that the collective bargaining agreement's exemption from the policy of certain types of absence from work served to protect those employees who were absent involuntarily. Therefore, the court found that because military leave was similarly involuntary, it was comparable to other types of involuntary absences from work and should be afforded the holiday pay. *Waltermyer*, 804 F.2d at 825.

The Department recognizes that under the proposed rule, employers may have had some difficulty in assessing whether one or more types of leave are comparable for the purposes of this provision, and has accordingly amended section 1002.150(b) to provide further guidance. The additional text indicates that in determining whether any two types of leave are comparable, the duration of the leave may be the most significant factor to compare. For instance, a two-day funeral leave will not be comparable to an extended military leave. The new language also states that in addition to comparing the duration of the absences, other factors such as the purpose of the leave and the ability of the employee to choose when to take the leave should also be considered. See section 1002.150(b). Finally, USERRA's legislative history indicates that Congress intended that for the purposes of implementing this provision, it is irrelevant whether the non-military leave is paid or unpaid. See H.R. Rep. 103–65, Pt. I, at 33–34 (1993). Therefore, contrary to the request of one commenter, the Department has declined to include as a factor in determining the comparability of leave whether the non-military leave is paid or unpaid.

The final comment regarding these provisions sought further guidance on the provision of bonuses, for example, attendance bonuses or performance bonuses, to employees on military leave. The provision of employment benefits during military leave depends first on whether the benefit is a seniority-based or non-seniority based benefit. As noted above, a particular right or benefit is seniority-based if it accrues with or is determined by seniority, and depends primarily on whether the benefit is a reward for length of service. If a bonus is based on seniority, it must be included in the escalator position and provided upon reemployment. See sections 1002.191–1002.193. If a bonus is non-seniority-based and is provided to similarly situated employees on comparable non-military leave, it must be provided to employees on military leave. Therefore, after considering all the comments applicable to sections 1002.149 and 1002.150, the Department has made revisions only with regard to the issues of leave comparability factors and accrual of vacation leave. See section 1002.149 and 150.

Section 1002.152 addresses the circumstances under which an employee waives entitlement to non-seniority based rights and benefits. Section 4316(b)(2) of the Act provides that an employee who "knowingly" states in writing that he or she will not return to the employment position after a tour of duty will lose certain rights and benefits that are not determined by seniority. 38 U.S.C. 4316(b)(2). The Department intends for principles of Federal common law pertaining to a waiver of interest to apply in determining whether such notice is effective in any given case. See *Melton* v. *Melton*, 324 F.3d 941, 945 (7th Cir. 2003); *Smith* v. *Amedisys, Inc.*, 298 F.3d 434, 443 (5th Cir. 2002). By contrast, a notice given under 38 U.S.C. 4316(b)(2) does not waive the employee's reemployment rights or seniority-based rights and benefits upon reemployment.

The Department invited comments as to whether this interpretation best effectuates the purpose of this provision, and received four comments in response. Of these, three commenters requested that the Department clarify what USERRA rights may be waived by an employee and what USERRA rights are not susceptible to waiver. The final commenter requested that the Department include in the text of the rule the legal elements that must be met in order for a waiver to be effective.

Pursuant to section 4316(b)(2)(A) of USERRA, if an employee provides to his or her employer a written notice that he or she intends not to return to employment with the pre-service employer, the employee has effectively waived any non-seniority based benefits to which he or she is entitled under section 4316(b)(1) of the statute. Such waiver is effective only with regard to the employee's non-seniority-based rights, and will not pertain to the employee's right to reemployment. For example, if prior to departure for military service, or during military service, an employee sends his or her employer a letter that states that the employee will not be returning to his or her pre-service employment after military service, the employee may have waived his or her entitlement to non-seniority based benefits, depending on whether the elements of waiver have been met. However, if the same employee changes his or her mind after sending the letter, and decides that he or she will seek reemployment, the employee may do so, despite having sent the letter. The right to reemployment, with all its attendant rights, cannot be waived prior to or during military service. See section 1002.88.

The fourth commenter addressing section 1002.152 requested the Department include in the text of the rule the legal elements of waiver of statutory rights. As noted above, whether an employee has effectively waived a right protected by USERRA is to be determined by application of Federal common law. The common law test is fact intensive, and seeks to determine whether the employee's waiver is explicit, knowing, voluntary, and uncoerced. *Melton*, 324 F.3d at 945; *Smith*, 298 F.3d at 443. The statute provides the additional element that the waiver must be in writing. 38 U.S.C. 4316(b)(2)(A)(ii). Because the test is based on common law and is intended to provide a flexible approach to the analysis of a wide variety of circumstances, the Department is reluctant to establish the legal elements within the text of the regulation. After considering all the comments applicable to section 1002.152, the Department has retained the provision in unchanged form. See section 1002.152.

Section 1002.153 clarifies that an employer may not require the employee to use his or her accrued vacation, annual or similar leave to cover any part of the period during which the employee is absent due to military service. 38 U.S.C. 4316(d). The employee must be permitted upon request to use any accrued vacation, annual or similar leave with pay during the period of service. The employer may require the employee to request permission to use such accrued leave. The proposed rule stated that because sick leave is not comparable to vacation, annual or similar types of leave, and its entitlement is generally conditioned on the employee (or a family member) suffering an illness or receiving medical

care, an employee is not entitled to use accrued sick leave solely to continue his or her civilian pay during a period of service. The Department received one comment that disagreed with the restriction on use of accrued sick leave, arguing that the restriction is overly-broad, particularly in cases in which an employer may permit the use of sick leave for non-illness-related or non-injury-related absences. The Department agrees with the comment, and has revised the provision accordingly. See section 1002.153.

The Department received three additional comments on section 1002.153, one of which was generally supportive of the provision. An additional comment regarding this provision asked that the Department specify that an employer cannot require an employee to use accrued annual leave while absent on military leave "unless the employer's policy requires use of leave as part of a pay differential program, and the value of the forfeited leave is less than the value of the pay provided by the employer." The Department must decline to include this suggestion in the final rule because it does not comport with the statutory language in section 4316(d), which states without condition that "[n]o employer may require any [employee on military leave] to use vacation, annual, or similar leave during such period of service." 38 U.S.C. 4316(d).

The final commenter regarding section 1002.153 seeks guidance on a situation in which an employer switches an employee's days off so that they coincide with the employee's obligation to participate in a regular, monthly two-day military drill or similar military obligation. This may be a hardship to the employee because he or she will lose leisure time as a result of having to perform service obligations during the scheduled time off. Because this comment does not concern the use of accrued leave, it does not require modification of section 1002.153. However, the Department notes that such a scenario may constitute a violation of USERRA's anti-discrimination provisions if the employee successfully establishes the elements of a discrimination case set forth in sections 1002.22 and 1002.23. USERRA prohibits the denial of any "benefit of employment" on the basis of military service obligations, see section 1002.18, and it bears emphasis in response to this inquiry that USERRA includes an employee's "opportunity to select work hours" as a "benefit of employment," see 38 U.S.C. 4303(2); section 1002.5(b)).

## Health Plan Coverage

Section 4317 of USERRA provides that service members who leave work to perform military service have the right to elect to continue their existing employer-based health plan coverage for a period of time while in the military. "Health plan" is defined to include an insurance policy or contract, medical or hospital service agreement, membership or subscription contract, or other arrangement under which health services for individuals are provided, or the expenses of such services are paid. 38 U.S.C. 4303(7); 1002.5(e). USERRA's health plan provisions are similar but not identical to the continuation of health coverage provisions added to Federal law by the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA). As with COBRA, the Act permits the continuation of employment-based coverage. Unlike COBRA, USERRA's continuation coverage is available without regard to either the size of the employer's workforce or to whether the employer is a government entity. As with every other right and benefit guaranteed by USERRA, the employer is free to provide continuation health plan coverage that exceeds that which is required by USERRA.

Section 4317 also requires that the employee and eligible dependents must, upon the service member's reemployment, be reinstated in the employer's health plan without a waiting period or exclusion that would not have been imposed had coverage not been suspended or terminated due to service in the uniformed services. The employee need not elect to continue health plan coverage during a period of uniformed service in order to be entitled to reinstatement in the plan upon reemployment. Section 4317 of USERRA is the exclusive source in USERRA of service members' rights with respect to the health plan coverage they receive in connection with their employment. Section 4317 therefore controls the entitlement of a person to coverage under a health plan, and supersedes more general provisions of USERRA dealing with rights and benefits of service members who are absent from employment. See 38 U.S.C. 4316(b)(5). Sections 1002.163 through 1002.171 of this rule implement USERRA's health plan provisions.

As an initial matter, the Department received several comments questioning the interaction of USERRA's health plan provisions with other Federal laws governing health plans. One commenter in particular requested that the Department provide a general statement

in the final rule that an employee's rights under USERRA are protected and preserved, and USERRA will not be violated, where a health plan follows existing plan procedures concerning elections and re-enrollment that are in compliance with the Internal Revenue Code (IRC), the Employee Retirement Income Security Act (ERISA, 29 U.S.C. 1001, et. seq.) and the Health Insurance Portability and Accountability Act (HIPAA, Pub. L. 104–191 (1996)). USERRA contains requirements that may be different from requirements established under other statutes, and compliance with those laws does not necessarily indicate full compliance with USERRA. In addition, providing guidance related directly to the provisions of the IRC, ERISA and HIPAA is beyond the scope of these regulations. However, as stated earlier, the Internal Revenue Service (IRS) and the Department of the Treasury have indicated that a health or pension plan will be deemed not to be in conflict with the applicable IRC requirements merely because of compliance with USERRA or its regulations.

Similarly, the Department received three comments seeking clarification of the relationship between USERRA and so-called "cafeteria" plans established pursuant to section 125 of the IRC. 26 U.S.C. 125. Generally, "cafeteria" plans allow employees to pay for certain benefits, including health benefits, using pre-tax dollars. With respect to health benefits, an employee may be allowed to pay for health plan premiums on a pre-tax basis or to pay for health care expenses not covered by insurance, such as deductibles or co-payments, through a health flexible spending arrangement (health FSA) using pre-tax dollars. Such plans qualify as health plans under USERRA because, as noted in the definition discussed above, they are an "arrangement under which * * * expenses of [health] services are paid." See 38 U.S.C. 4303(7); section 1002.5(e). Accordingly, these plans must comply with the statute's continuation and reinstatement provisions. See 38 U.S.C. 4317. In cases in which cafeteria plans provide for health FSAs, it may be advantageous for an employee who is absent from employment due to military service to elect continuation coverage until amounts allocated to the health FSA are used. The IRS and the Department of the Treasury have indicated that an amount will not be treated as violating the cafeteria plan rules because a plan provides for a new election either upon leaving employment for military service or subsequent reemployment.

In a final inquiry about USERRA's relationship to other Federal laws governing health plans, one comment requested clarification of whether an employee who elected continuation coverage under USERRA but did not return to the pre-service employer would then be eligible for COBRA coverage. Because this involves the interpretation of COBRA, not USERRA, it is beyond the scope of these regulations.

Under USERRA, the term "employer" is defined broadly to cover entities, such as insurance companies or third party plan administrators, to which employer responsibilities such as administering employee benefit plans or deciding benefit claims have been delegated. 38 U.S.C. 4303(4); section 1002.5(d). The Department received two comments concerning the definition of "employer" and potential liability of third-party health plan administrators under USERRA. Of these, one commenter requested the final rule specify that plan administrators that perform employment-related functions on behalf of the employer be excluded from the definition of "employer." The other commenter requested the final rule clarify that a plan administrator or a plan is liable under USERRA only when the delegation of employment-related responsibilities is made through a written agreement with the employer. The Department declines to adopt either of these recommendations. As noted in above in Subpart A, Introduction to the Regulations Under USERRA, the statute is clear that an entity to which an employer has delegated employment-related responsibilities is to be considered an "employer" for USERRA purposes and does not condition this application upon the existence of a written agreement. See 38 U.S.C. 4303(4)(A)(i). However, the Department has amended the definition of employer in section 1002.5 to clarify that those third-party entities that perform purely ministerial functions at the request of an employer will not be considered "employers" for the purpose of determining USERRA liability. An example of a purely ministerial function would be maintaining an employer's personnel files. The examples provided in the revised section are not intended to be an exclusive list but rather are offered only as illustrations. See section 1002.5(d)(1)(i).

Because USERRA's continuation coverage and reinstatement provisions only apply to health plan coverage that is provided in connection with a position of employment, coverage obtained by an individual through a professional association, club or other

organization would not be governed by USERRA, nor would health plan coverage obtained under another family member's policy or separately obtained by an individual. The Department received two comments concerning the application of USERRA's continuing coverage and health plan reinstatement provisions to cases in which the dependent of a person receiving employer-based health plan coverage leaves to perform service in the uniformed services and both commenters sought the application of USERRA's right to continuing coverage for those dependents. In a similar vein, a third comment contended that retirees covered by their former employer's health plan who leave to perform military service should not be entitled to USERRA continuing coverage. USERRA's continuing coverage and reinstatement provisions are employment-based, and apply only in cases in which the service member has coverage under a health plan in connection with the service member's position of employment. 38 U.S.C. 4317(a)(1). As a result, where the service member is a dependent of the covered employee or the service member is a retiree, USERRA's continuing coverage and reinstatement provisions would not apply because the coverage is not in connection with his or her position of employment. The regulation implements this statutory mandate and, as a result, no change is mandated in response to the comments. The Department notes, however, that while dependents and retirees who are service members are not covered by USERRA's continuing coverage provisions, such persons may be entitled to reinstatement of health plan coverage following periods of certain types of military service under the provisions of the Servicemembers Civil Relief Act (SCRA). See 50 U.S.C. App. 594. The Department does not interpret the SCRA, but notes that, in general, attorneys or other experts in the military services may provide technical assistance on its provisions.

The Department also received comments about the application of USERRA's health plan election provisions to dependents of service members receiving employment-based health coverage. Two commenters sought the establishment in the final rule of a separate right for dependents to elect or waive continuation coverage, arguing that this is necessary to avoid any sudden termination of civilian health plan coverage for dependents if the service member declines or fails to elect continuing coverage. Furthermore,

the commenters state, such termination may be in conflict with a custody or child support agreement or court order. USERRA provides that individuals who are absent from employment to perform military service have the right to elect to continue employer-provided health plan coverage for themselves and their dependents. 38 U.S.C. 4317(a)(1). There is no provision in USERRA for a separate election for dependents. As a result, the Department concludes that such a modification is not compelled by the statute. However, as discussed below, Section 1002.165 of the rule provides plan administrators with the flexibility necessary to establish a comprehensive schedule of notice, election and waiver procedures, if they choose to do so.

Section 1002.164 of the rule, which addresses the length of time the service member is entitled to continuing health plan coverage, reflects a recent amendment to USERRA. Congress amended the statute in December, 2004, with passage of the Veterans Benefits Improvement Act (VBIA, Pub. L. 108–454). As a result, 38 U.S.C. 4317(a)(1)(A), and section 1002.164 now provide that the maximum period of continued coverage is the lesser of 24 months or the period of military service (beginning on the date the absence begins and ending on the day after the service member fails to apply for reemployment).

As noted above, section 1002.165 provides that plan administrators and fiduciaries may develop reasonable requirements and operating procedures for the election of continuing coverage, consistent with USERRA and the terms of the plan. Such procedures must take into consideration the requirement in USERRA section 4312(b) that where military necessity prevents the service member from giving the employer notice that he or she is leaving for military duty, or where giving such notice would be impossible or unreasonable, plan requirements may not be imposed to deny the service member continuation coverage. The Department invited comments as to whether this approach—allowing health plan administrators latitude to develop reasonable requirements for employees to elect continuation coverage—best effectuates the purpose of the statute. As an alternative to this flexibility, the Department requested comments on whether these regulations should establish a date certain by which time continuing health plan coverage must be elected.

The provision in section 1002.165 that health plan administrators may establish reasonable rules that govern an

employee's election of continuation coverage, and the alternative question of whether the final rule should establish specific deadlines within which such elections must be made, received more comments than any other health plan issue. Six commenters, including America's Health Insurance Plans, ORC Worldwide, Equal Employment Advisory Council, Society for Human Resources, and U.S. Chamber of Commerce, generally favored the flexibility provided in the proposed rule, while nine commenters, including the Society of Professional Benefit Advisors, National Association of Employment Lawyers, WorldatWork, Illinois Credit Union League, TOC Management Services, National School Boards Association, and three law firms, requested more regulatory specificity. Most of the nine comments suggested that the final USERRA rule contain provisions identical to or substantially the same as those provided in COBRA, which establishes specific timeframes within which the employer must notify the employee of his or her COBRA rights, followed by a specific time within which the person must make an election to accept or decline continuation coverage. *See* 26 U.S.C. 4980B(f). One commenter in particular captured the essence of those comments seeking the imposition of COBRA rules, arguing that the Department's uniform adoption of COBRA rules and timeframes would avoid disputes over what constitutes a "reasonable" rule. Several additional commenters suggested that the adoption of COBRA rules and timeframes would ease a plan's administration of USERRA's requirements.

In response to those comments requesting the imposition of COBRA-like timeframes for notice and election, the Department notes that it is generally averse to imposing on employers covered by USERRA relatively inflexible rules such as those established under COBRA. Such rules may unduly burden many smaller employers that are covered by USERRA but are not covered by COBRA. The Department views each individual plan as best qualified to determine what election rules are reasonable based on its own unique set of characteristics, and therefore declines to amend section 1002.165 in this manner. However, under the USERRA rule, plans themselves are permitted to adopt reasonable rules, and, depending on a particular plan's circumstances, these may include COBRA timeframes.

However, the Department has decided to amend the election provisions in response to comments seeking a revision to those provisions for other

reasons. Several commenters suggested that the Department should adopt specific rules and timeframes for election of continuing coverage because establishing a time certain by which an election must be made would help employers avoid paying premiums for employees who do not want continuation coverage but have failed to advise their employer of this fact. In addition, the Department received five comments regarding the provision in section 1002.165 stating that service members must be provided continuing coverage if their untimely election was excused because it was impossible or unreasonable, or precluded by military necessity. These commenters shared the concern that employers may be required to pay premiums for employees who do not want continuation coverage but have failed to advise their employer of this fact.

After considering these comments, the Department has added a new section 1002.167, and sequentially renumbered the succeeding health plan provisions,[1] to permit an employer to cancel the employee's health insurance if the employee departs work for military service without electing continuing coverage, with a requirement for retroactive reinstatement under certain circumstances. See 1002.167. For instance, new section 1002.167(a) provides that in cases in which an employee's failure to give advance notice of service was excused under the statute because it was impossible, unreasonable, or precluded by military necessity, the employer will be required to retroactively provide continuing coverage during the period of service if the employee elects and pays all unpaid amounts due for the coverage, and the employee must not incur administrative reinstatement costs. Id. This is consistent with the statute's provision regarding excusal for failure to provide notice to the employer of service, which states that an employee is excused from giving advance notice of impending military service in cases where the giving of notice is precluded by military necessity or is otherwise impossible or unreasonable under the circumstances.

See 38 U.S.C. 4312(b)(1); section 1002.86.

New section 1002.167(b) addresses those cases in which an employee leaves employment for uniformed service in excess of 30 days and provides advance notice of the military service but does not elect continuing coverage. In such cases, a plan administrator that has developed reasonable rules regarding the election of continuing coverage may cancel the employee's health plan coverage but must reinstate it upon the employee's election and full payment within the time periods established by the plan, without the imposition of administrative reinstatement costs. Alternatively, a plan administrator that has not developed rules regarding the election of continuing coverage may cancel the employee's health plan coverage but must reinstate it upon the employee's election and full payment within the time periods established under section 1002.164(a), also without the imposition of administrative reinstatement costs. See section 1002.167(b).

Section 1002.166 implements USERRA section 4317(a)(2), which provides that a service member who elects to continue employer-provided health plan coverage may be required to pay no more than 102 percent of the full premium (the employee's share plus the employer's share) for such coverage, except that service members who perform service for fewer than 31 days may not be required to pay more than the employee share, if any, for such coverage. The legislative history of USERRA indicates that the purpose of these provisions, and in particular the requirement that service members pay only the employee share for coverage during service lasting fewer than 31 days, is to ensure that there is no gap in health insurance coverage for the service member's family during a short period of service. Dependents of Reserve Component members are entitled to participate in the military health care system, called TRICARE, only if the period of service exceeds 30 days. See H.R. Rep. No. 103–65, Pt. 1, at 34 (1993). USERRA does not provide specific guidance concerning the timing of payments for continuation coverage and the termination of coverage for failure to make payments, and section 1002.166(c) of the proposed rule provided that plan administrators may develop reasonable procedures for payment, consistent with the plan's terms.

The Department received four comments concerning section 1002.166. One commenter queried whether the payment obligation began at the

---

[1] The insertion of new section 1002.167 requires the sequential renumbering of proposed sections 1002.167, 1002.168, and 1002.169, resulting in the contents of proposed section 1002.167 being found in final rule section 1002.168, and so on. In discussing these sections below, the Department will use the new section numbers to refer to the sections as proposed. As an aid, the initial reference to provisions 1002.168, 1002.169, and 1002.170 will include a single reminder that the discussion involves the content of the provision as it was proposed.

beginning of the period of coverage or 31 days after the beginning of the continuation coverage. The statute states that an employee who elects continuation coverage may be required to pay no more than the employee share if the coverage pertains to service of less than 31 days, and may be required to pay no more than 102% of the full premium under the plan if the coverage pertains to service of 31 days or more. In either case, the payment obligation begins on the first day of the continuation coverage.

The three additional comments regarding section 1002.166 sought more guidance concerning payment for continuation coverage and the plan's entitlement to cancel coverage for non-election or non-payment. Of these, one recommended that the final rule adopt COBRA guidelines for payment and termination for non-payment. Another commenter suggested that the rule include a provision that the use of COBRA-compliant forms and procedures is reasonable under USERRA. In addition, as noted in the discussion of section 1002.165 above, absent any affirmative provisions in the rule regarding the ability of employers to cancel employee coverage during military leave, employers and plan administrators noted that they would have to bear the entire cost of continuing coverage when the employee leaves employment without electing continuing coverage.

After considering these comments, the Department has added a provision to new section 1002.167 that establishes that plans may develop reasonable rules to permit termination of coverage if an employee elects but does not pay for continuation coverage. In addition, new section 1002.167(c) provides that in cases where plans are covered by COBRA, it may be reasonable to adopt COBRA rules concerning election and payments so long as the plan complies with all related provisions of USERRA and these regulations. See section 1002.167(c).

Section 1002.168 (proposed section 1002.167) explains the right of a reemployed service member to reinstatement of coverage in a health plan if coverage has been terminated as a result of his or her failure to elect continuation coverage, or length of service. At the time of reemployment, no exclusion or waiting period may be imposed where one would not have been imposed if the coverage of the service member had not terminated as a result of service in the uniformed services. This provision also applies to the coverage of any other person who is covered under the service member's

policy, such as a dependent. Injuries or illnesses determined by the Secretary of Veterans' Affairs to have been incurred in or aggravated during the performance of service in the uniformed services are excluded from the ban on exclusions and waiting periods; however, the service member and any dependents must be reinstated as to all other medical conditions covered by the plan.

The Department received eight comments related to section 1002.168. Of these, three comments concerned issues addressed in relation to other provisions, and are covered elsewhere in this section of the preamble. One commenter requested the Department include in the rule a definition of "prompt reinstatement" in connection with this provision. Section 1002.168 provides for prompt reinstatement upon reemployment generally without the imposition of any waiting periods or exclusions, thus making further clarification unnecessary. The same commenter requested the rule state that the failure to promptly reinstate the health coverage as required by this section is evidence of discrimination in violation of section 4311 of USERRA. While the Department is disinclined to include such a far-reaching generalization in this context, the Department reiterates that the denial of any benefit of employment that is motivated by an employee's status or activity protected by USERRA is a violation of the statute's anti-discrimination provisions. See 38 U.S.C. 4311(c); sections 1002.18–1002.23.

Two commenters expressed concern that if an insurance carrier imposes an exclusion or waiting period upon a returning employee in violation of section 4317(b) of USERRA, implemented by section 1002.168(a), the employer could be liable for funding health claims that should have been paid by the insurance carrier. The commenters suggested that reinstatement be limited to those circumstances in which coverage is available through the plan's insurance carrier or, in the alternative, that the employer should not be liable for insurer's practices that violate USERRA. Section 4317(b) of USERRA requires reinstatement of employer-provided insurance upon reemployment, and section 1002.168(a) makes no exceptions to that reinstatement requirement other than the limited exceptions contained in 4317(b) itself. The additional exceptions proposed by the commentators are not appropriate, because they would reduce the protections provided by USERRA. Employers that utilize third-party insurance plans to provide health

coverage for employees are obliged to negotiate coverage that is compliant with USERRA to avoid possible liability for failure to properly reinstate coverage upon reemployment. In this context, USERRA's legislative history suggests there are circumstances in which an insurance company could be considered an employer under USERRA and could not "refuse to modify their policies in order for employer's (sic) to comply with [Section 4317 of USERRA]." S. Rep. No. 103–158, at 42 (1993).

One commenter recommended that section 1002.168 provide that reinstatement of health plan coverage must be immediate, even in cases where the employer is unable to immediately reemploy the returning employee for reasons permitted under the statute. USERRA requires prompt, but not necessarily immediate, reemployment. See section 1002.181. The statute requires reinstatement of health plan coverage "upon reemployment," not upon application for reemployment. See 38 U.S.C. 4317(b)(1). Therefore, an employer must reinstate coverage upon the employee's prompt reemployment, and the Department declines to adopt the commenter's suggestion.

Section 1002.169 (proposed section 1002.168) provides that where a returning employee chooses to delay reinstatement of health plan coverage for a period of time following reemployment, the employer may allow the delay but is not required by USERRA to do so. The requirement to reinstate health plan coverage without the imposition of exclusions or waiting periods (except for service-connected conditions and exclusions or waiting periods that would have been imposed had coverage not been terminated as the result of military service) exists only upon reemployment, not later. The Department also sought comments on whether the rule should provide that a service member be permitted to delay electing continuation health plan coverage under some circumstances. In addition, in a case where health plan coverage was terminated or suspended by reason of military service, if the employee is permitted to delay reinstatement to the health plan for a period of time after the date of reemployment, the Department invited comments as to whether such delayed reinstatement coverage should be subject to an exclusion or waiting period. See 38 U.S.C. 4317(b)(1).

The Department received six comments in response. Of these, one commenter recommended the final rule provide that where the employee chooses to delay reinstatement of health plan coverage to a time after

reemployment, the employer must reinstate the coverage immediately with no exclusions or waiting periods. Another commenter suggested allowing a reemployed service member the same amount of time to elect reinstatement in the health plan as the employer allows newly hired employees to choose to enroll in the plan, and such period of time would vary from employer to employer. Another commenter proposed that if an employee elects to delay reinstatement in the health plan, the employer should be permitted to impose exclusions or waiting periods. Two commenters noted that various rules under other statutes such as HIPAA and the IRC might affect the ability of the employer to immediately reinstate the coverage for an employee who chooses to wait until some time after reemployment to request reinstatement of the coverage. The final commenter suggested the rule provide that an employer should treat an employee who chooses to delay health plan reinstatement until some time following reemployment the same as it treats other similarly situated employees who are returning from a leave of absence where health plan coverage was interrupted.

After reviewing these comments, the Department maintains its original position that an employer may, but is not required to, reinstate an employee's health plan coverage if the employee chooses to delay reinstatement following his or her reemployment under USERRA. This interpretation is consistent with the statute's requirement that reinstatement of health coverage must be made "upon reemployment," and restores a service member to the position he or she would have been in if there had been no absence from work for military service. Although the provision does not mandate that an employer permit an employee to delay reinstatement at the employee's option, the provision balances the interests of both employers and employees, and provides sufficient flexibility for both.

Section 1002.170 (proposed section 1002.169) deals with special rules governing multiemployer health plans. Generally, under USERRA, if the employer cancels health plan coverage for its employees while the service member is performing service, or if the employer goes out of business, the service member's coverage terminates also. USERRA's treatment of multiemployer health plans provides an exception to this result. Section 1002.170 requires continued health plan coverage in a multiemployer plan even when the service member's employer no longer exists, or no longer participates

in the plan. Any liability under the multiemployer plan for employer contributions and benefits under USERRA is to be allocated as provided by the sponsor maintaining the plan. If the sponsor does not provide for an allocation of responsibility, the liability is allocated to the last employer employing the person before the period of uniformed service. Where that employer is no longer functional, the liability is allocated to the plan.

The Department received three comments from the multiemployer plan community concerning the application of USERRA to those types of health plans referred to variously as "credit bank," "dollar bank" or "hour bank" plans. This type of plan ("bank" plan) is typically provided by a multiemployer plan, particularly in industries where employment may be sporadic or seasonal. "Bank" plans establish accounts in which employees save prospective health benefits credits that may be spent later, and typically use a lag period system for accumulating credits for eligibility and coverage. For example, work performed by an employee in January could result in credit to the employee's health benefits bank account in February that will result in eligibility to use the credits in March. If under the terms of a "bank" plan an employee must work 150 hours to have coverage for a month and the employee works 200 hours, the 50 hours in excess of the amount required for coverage is credited to the employee in a "bank" for future use. The hours from the "bank" can be used by the employee to provide health plan coverage for months when the employee does not work.

The comments received concerning "bank" plans requested that the Department provide guidance as to whether an employee should be allowed to deplete the balance of "banked" credits during a period of service in the uniformed services. The commenters indicated that USERRA's requirement of immediate reinstatement in a health plan upon reemployment may require the plan to fund the health coverage of a person that had depleted the "banked" hours during service and therefore lacked the credits necessary to initiate or resume coverage upon reemployment. After considering these comments, the Department has added new section 1002.171 to provide that a "bank" plan may permit an employee to deplete "banked" credits in order to continue coverage at no cost to the employee so long as the plan provides for reinstatement of the coverage upon reemployment. The plan may require the employee to pay the full cost of the

reinstated coverage until the employee has earned enough credits after reemployment to resume normal coverage. In addition, if the "banked" credits are depleted during the applicable eligibility period, the employee must be permitted at his or her option to pay for continuation coverage for the balance of the period. Alternatively, the plan may permit an employee to "freeze" existing credits when leaving to perform military service, pay for continuation coverage as provided for in section 1002.166, and then restore those credits intact upon reemployment. The employer should counsel the employee about these options and the consequences of selecting one or the other. See new section 1002.171.

Finally, one commenter expressed concern that the effective dates for coverage under USERRA and COBRA are different in the case of "bank" plans, and recommended that the rule be amended to adopt the COBRA standard so that the two periods are consistent. The commenter states that under COBRA, the continuation coverage would not begin until any "banked" credits are depleted, whereas under USERRA the continuation coverage begins upon the person's departure from employment to perform military service. The Department declines to modify the effective date for continuation coverage under USERRA because it is mandated by statute. See 38 U.S.C. 4317(a)(1).

In addition to the changes made in response to the comments, the Department made technical corrections to two health plan provisions. First, subsection (b) of section 1002.168 (proposed section 1002.167), which referenced reinstatement procedures applicable to multiemployer plans in proposed section 1002.169, was deleted, and the subsequent subsection was re-lettered accordingly, because proposed section 1002.169 did not discuss reinstatement procedures. Second, section 1002.170 (proposed section 1002.169) was revised to more closely track section 4317(a)(3) of the statute.

## Subpart E—Reemployment Rights and Benefits

### Prompt Reemployment

One of the stated purposes of USERRA is "to minimize the disruption to the lives of persons performing service in the uniformed services * * * by providing for [their] prompt reemployment." 38 U.S.C. 4301(a)(2). Section 4313 requires that a returning service member who meets the eligibility requirements of section 4312 be "promptly reemployed" in the

appropriate position. 38 U.S.C. 4313(a). The circumstances of each individual case will determine the meaning of "prompt." See H.R. Rep. No. 103–65, Pt. I, at 32 (1993); S. Rep. No. 103–158, at 54 (1993). Section 1002.181 provides guidance for the "prompt" reinstatement of returning service members. The regulation states, as a general rule, that the employer shall reinstate the employee as soon as practicable under the circumstances. Reinstatement must occur within two weeks after he or she applies for reemployment "absent unusual circumstances." The reasonableness of any delay depends on a variety of factors, including, for example, the length of the service member's absence or intervening changes in the circumstances of the employer's business. An employer does not have the right to delay or deny reemployment because the employer filled the service member's pre-service position and no comparable position is vacant, or because a hiring freeze is in effect. Moreover, prompt reemployment should be required even in cases in which re-training or re-certification is mandated by law, because the obligation to reemploy in those circumstances may be met by reemployment to a comparable position while re-training or re-certification is sought. Finally, if the period of service is less than 31 days, then the statute requires that the returning employee simply report back to work; these regulations require that such a person will be immediately reemployed.

The Department invited comments as to whether allowing the employer two weeks to reemploy the service member returning from a period of service of more than 30 days best effectuates the purpose of this provision of USERRA. In response, the Department received nine comments, which include three comments that agreed with the two-week reemployment period, three comments that recommended the Department enlarge the reemployment period to 30 days, particularly in those cases following long periods of military service, and two comments seeking guidance regarding those circumstances in which the two-week period may be excused. Finally, one commenter, concerned that the regulation can be misread to permit employer discretion to take up to two weeks to reemploy an employee absent for a period of service of less than 31 days, seeks inclusion in the text of this provision a mandate requiring reemployment the next day following the completion of service.

After reviewing these comments, the Department has concluded that it will

retain section 1002.181 as it was proposed. The Department has considered the advantages and disadvantages associated with altering the two-week reemployment period, and has concluded that two weeks represents an equitable balance between the interests of employers, who may face some challenges in reemploying an employee in the organizational structure after a lengthy period of absence, and the interests of employees, who have been making the greatest of sacrifices in service to their country. In addition, employers unduly burdened by the two week reemployment period may rely on the "unusual circumstances" exception to reemployment within two weeks, although it is the Department's view that these exceptions should be narrowly drawn and will be relatively rare. An example of "unusual circumstances" would be where a service member seeks reemployment with his or her employer, who, apart from the service member, employs only one current employee. The current employee is near the end of a highly complex, months-long project, which is due to be completed just four weeks from the point at which the service member makes an application for reemployment. The employer is prepared to comply with its obligation to reemploy the returning service member, and will have work for him or her following the completion of the current project in four weeks, but cannot reemploy the returning employee until that time. Under these unusual circumstances, the employer would not be expected to reemploy its employee within two weeks. Finally, in response to the comment above seeking more clarity in the provision regarding prompt reemployment following brief periods of service, the Department notes that section 1002.181 already states that "prompt reemployment" following brief periods of service "generally means the next regularly scheduled work day." See section 1002.181.

*Reemployment Position*

In construing an early precursor statute to USERRA, the Selective Training and Service Act of 1940, 50 U.S.C. Appendix, 308(b, c), the Supreme Court recognized a basic principle in the early reemployment protections provided for veterans, which was to become a bedrock concept of all subsequent veterans reemployment legislation. Thus, in *Fishgold v. Sullivan Drydock and Repair Corp.,* 328 U.S. 275, 284–85 (1946), the Supreme Court stated that the returning service member "does not step back on the seniority escalator at the point he stepped off. He

steps back on at the precise point he would have occupied had he kept his position continuously during the war." Id. *Fishgold* principally involved the issue of a veteran's seniority; however, the principle applies with equal force to all aspects of the service member's return to the work force. The returning service member therefore should be restored to "a position which, on the moving escalator of terms and conditions affecting that particular [pre-service] employment, would be comparable to the position which he would have held if he had remained continuously in his civilian employment." *Oakley v. Louisville & Nashville R.R.,* 338 U.S. 278, 283 (1949). The position to which the returning service member should be restored has become known as the "escalator position." The requirement that the service member be reemployed in the escalator position is codified in section 4313 of USERRA. 38 U.S.C. 4313.

Sections 1002.191 and 1002.192 implement general principles related to a returning veteran's right to reemployment in this escalator position. Sections 1002.193, 1002.194 and 1002.195 clarify that seniority, status, pay, length of service, and service-related disability may affect the service member's reemployment position. Sections 1002.196 and 1002.197 explain the employer's obligations to reemploy the service member based on the duration of the person's absence from the workplace. Section 1002.198 describes the criteria to be followed by the employer in making reasonable efforts to enable the service member to qualify for the reemployment position. Finally, section 1002.199 provides guidance for employers in determining the priority of two or more service members who are eligible for the same employment position.

The Department received several comments from employers and employer associations inquiring about the application of the escalator position to six particular circumstances: employers who use bidding systems for job assignments; the use of promotions based on an employer's discretion; reductions in force, layoffs, and disciplinary procedures; bargaining units on strike at time of reemployment; apprenticeships; and probationary periods. The Department will provide guidance on each of these cases in turn.

*Bidding Systems:* Many employers, for example, employers in the airline and railroad industries, use seniority-based bidding systems to award jobs and other perquisites of employment to their employees. The Equal Employment Advisory Council (EEAC) submitted a

comment asking how the escalator principle should apply to a returning service member seeking reemployment when the employer has a seniority-based bidding system in place. The EEAC proposed that the Department create an exception to the escalator principle, so that service members returning to a reemployment position in which they have missed an opportunity to bid on a particular job or other perquisite are not entitled to recover that missed opportunity: "The final regulations should provide a temporary exception for employers that have a legitimate, bona fide bidding system in place. Where jobs, shifts, and/or locations are opened to employee bid frequently, e.g. every 120 days, returning employees could be slotted in accordance with the employer's operational needs (but with full escalator pay and benefits) until the next regularly occurring bid."

USERRA's intent is to ensure that returning service members are accorded the status, pay and benefits to which they are entitled had they not served in the uniformed services, generally without exception. In its administrative enforcement of the Act, the Department has long interpreted the statute and its predecessor to require that a returning service member should be awarded a job or other perquisite of employment if it is reasonably certain that the service member would have received it but for the interruption due to military service. See Veterans' Reemployment Rights Handbook at 13–4 (1988); sections 1002.191, 1002.193, 1002.213, 1002.214; 1002.236. This analysis comports with the statute and its legislative history governing the nature of the reemployment position. The Department concludes that, as a general matter, a reemployed employee should not be required to wait for the next regularly occurring opportunity to bid in order to seek promotions and other benefits tied to the "escalator" position.

*Discretionary Promotions:* The EEAC suggests that in the case of promotions based on employer discretion, section 1002.192 requires employers "to speculate whether a returning employee would have (1) sought the promotion in the first instance and (2) have been chosen over the successful candidate. * * * Section 1002.192 [should state] that: Your escalator position would not include a promotion based on discretionary factors." Similarly, a large human resources consulting firm submitted that "[b]ecause most employees are promoted based on demonstrated ability and experience, rather than length of service, the escalator principle cannot operate even-

handedly for all employees. The escalator principle is appropriate only in workforces where pay increases and promotions occur automatically (e.g. according to collective bargaining agreements or tenure tracks,) rather than for achievement or merit."

Under the statute and case law, a returning service member is entitled to a promotion upon reemployment if there is a reasonable certainty that the employee would have been promoted absent military service. *Coffy v. Republic Steel,* 447 U.S. 191, 197–98 (1980); *Goggin v. Lincoln St. Louis,* 702 F.2d 698, 701 (8th Cir. 1983). The statute's legislative history similarly states that returning service members are entitled to whatever position it is reasonably certain the employee would have attained but for the military service. H.R. Rep. No. 103–65, Pt. I, at 39 (1993). However, case law and longstanding Departmental policy are clear that if the promotion depends "not simply on seniority or some other form of automatic progression but on an exercise of discretion on the part of the employer," the returning service member may not be entitled to the promotion. *McKinney v. The Missouri-Kansas-Texas Railroad Company,* 357 U.S. 265 (1958); Veterans' Reemployment Rights Handbook at 10–2 ("distinction must be made between those benefits which are largely dependent upon length of service, and thus are perquisites of seniority, and those benefits which are largely dependent upon management discretion. * * * A reemployed veteran claiming a right to a promotion or other benefit allegedly missed during military service must demonstrate that it was reasonably certain that he would have received the benefit if he had remained continuously employed.")

Sections 1002.191 and 1002.192 advances these principles, and incorporates the reasonable certainty test as it applies to discretionary and non-discretionary promotions. In addition, it is consistent with the case law because it does not rely on the label associated with particular personnel actions, e.g., "discretionary promotions," or "seniority-based promotions," and the analysis instead focuses on whether a personnel action was "reasonably certain." The final rule promotes the application of a case-by-case analysis rather than a rule that could result in the unwarranted denial of promotions to returning service members based on how the promotion was labeled rather than whether or not it was "reasonably certain."

*Reductions in Force (RIFs), Layoffs, and Disciplined Employees:* An

individual submitted a comment asking that the final rule "explicitly address layoffs, RIFs and, most significantly, disciplinary actions including removal/discharge actions which were interrupted by the employee's service." Regarding reductions-in-force and layoffs, section 1002.42 establishes that employees that are laid off with recall rights may be entitled to reemployment upon return if the employer would have recalled the employee but for the military service. This section also notes that similar principles apply in other cases in which an employee may be absent from work at the onset of military leave or upon return from service, such as in cases in which the employee is on non-military leave when activated.

In the event that a returning employee was subject to a disciplinary review at the time of the onset of service, or in the event that the employer discovers conduct prior to reemployment that may subject the returning service member to disciplinary review upon reemployment, the Department concludes that the employer retains the reemployment obligation in such cases. However, the employer may resume the disciplinary review upon reemployment at the point at which it was left at the time of the onset of military service, or may initiate such review based on conduct discovered prior to reemployment. The Department has long interpreted the statute to prohibit an employer from denying reemployment rights on the basis that the employee would have been discharged had he or she not left for military service. Veterans' Reemployment Rights Handbook at 8–1 (1988). However, the Department recognizes that there may be some instances in which the returning employee may be legitimately subject to an employer's disciplinary review following reemployment. In these circumstances, the employer retains the obligation to reemploy the service member, thus giving rise to USERRA's prohibition of discharge following reemployment for one year except for just cause in section 4316(c), and serving to ensure that any post-service discipline or discharge will be justifiable, legitimate, and not pretextual. See also section 1002.247 and 1002.248.

*Employee Bargaining Unit on Strike:* The Department received one comment seeking further clarification on the determination of the escalator position when the returning service member's bargaining unit is or has been on strike. As section 1002.42 indicates, an employee in this situation remains an employee for purposes of reemployment

rights governed by USERRA. However, employers and employees should be aware that the employee's reemployment rights may be affected by Federal labor law under the National Labor Relations Act, 29 U.S.C. 141, *et seq.* (NLRA), which includes decisional law under the NLRA governing reinstatement rights of workers engaged in a work stoppage.

*Apprenticeships and Probationary Periods:* The Building and Construction Trades Department of the AFL–CIO argues that an employer should not be required to reemploy a returning service member who was part of a bona fide apprenticeship program on the escalator position with an advanced pay rate until the employee takes a test or undergoes a skills evaluation upon which the advanced rate is contingent. Similarly, the National School Board Association (NSBA) takes the position that a teacher's time away on military leave should not be counted towards a teacher's completion of a probationary period. The NSBA argues that the probationary period for a teacher is a time for the employer to observe and evaluate the teacher as well as a time to train the teacher, and urges the Department to determine that the probationary period for teachers is akin to a skills test and returning service members should still be required to complete the probationary period before attaining a tenured post probationary period.

With regard to apprenticeships and the escalator position, the Department has long held that if the apprentice position is bona fide and not merely a time-in-grade requirement, the returning service member should be restored as an apprentice at a level that reflects both the experience and training he or she received pre-service. Upon completion of the apprenticeship post-service, the employee should be entitled to "journeyman" seniority plus any seniority that would have accrued during military service had the journeyman status been attained during the period of uniformed service. See Veterans' Reemployment Rights Handbook at 11–3. Similarly, the Department has long held that if a probationary period is a bona fide period of observation and evaluation, the returning service member must complete the remaining period of probation upon reemployment. See Veteran's Reemployment Rights Handbook at 3–6, 3–7, 13–11 (1988). Therefore, the Department concludes that if an employee who left employment for military service was in the midst of a bona fide apprenticeship program or probationary period that

required actual training and/or observation in the positions, rather than merely time served in the position, the employee should be allowed to complete the apprenticeship or probationary period following reemployment. Once the employee completes the apprenticeship or probationary period, the employee's pay and seniority should reflect both the pre- and post-service time in the apprenticeship or probationary period, plus the time served in the military.

In some workplaces, where opportunities for promotion are conditioned upon the employee passing a skills test or examination, determining the escalator position will require administering a makeup promotional exam. If a reemployed service member was eligible to take such a promotional exam and missed it while performing military service, the employer should provide the employee with an opportunity to take the missed exam after a reasonable period of time to acclimate to the employment position. See, e.g., *Fink* v. *City of New York*, 129 F.Supp.2d 511, 519 (S.D.N.Y. 2001). In some cases, success on a promotional exam entitles an employee to an immediate promotion, and in some cases it entitles an employee only to a particular placement on an eligibility list. If the reemployed employee is successful on the makeup exam, and there is a reasonable certainty that, given the results of that exam, the reemployed employee would have been promoted during the time he or she was in military service, then the reemployed employee's promotion must be made effective as of the date it would have occurred had the employment not been interrupted by military service. Similarly, if the reemployed employee is successful on the makeup exam, and there is a reasonable certainty that, given the results of that exam, the reemployed employee would have been placed in a particular position on an eligibility list during the time he or she was in military service, then the reemployed employee's placement on the list must be made effective as of the date it would have occurred had the employment not been interrupted by military service. This requirement is similar to the requirement in section 1002.236, that obliges an employer to give a reemployed employee, after a reasonable amount of time to adjust to the reemployment position, a missed skills test or examination that is the basis of a merit pay increase. Section 1002.193 implements these requirements.

The Department invited comment as to whether this interpretation best

effectuates the purpose of this provision, or whether the issue of promotional exams requires more detailed treatment in these regulations. The Department received six comments in response, several of which were generally supportive of the provision. The Society for Human Resources Management (SHRM) and WorldatWork expressed overall support for the requirements of the provision. Two commenters, the National Employment Lawyers Association and ORC Worldwide, a management consulting firm, seek more guidance on the provision, in particular, on the length of time that an employer reasonably permits an employee to adjust to the employment position before administering a makeup exam. Two commenters, EEAC and one representing a municipal government, argue that the provision is unworkable because it is impossible to accurately predict a returning service member's retroactive placement on the escalator having given him or her a makeup exam.

Section 1002.193 is consistent with the general principles regarding the application of the escalator provision, which require that a service member receive a missed promotion upon reemployment if there is a reasonable certainty that the promotion would have been granted. *McKinney* v. *Missouri-Kansas-Texas R.R. Co.*, 357 U.S. 265, 274 (1958); *Tilton* v. *Missouri Pacific R.R. Co.*, 376 U.S. 169, 177 (1964). In addition, recent USERRA case law dealing precisely with the issue of missed promotional exams also supports this provision of the rule. *Fink* v. *City of New York*, 129 F.Supp.2d 511, 519–20 (E.D.N.Y. 2001). In that case, the court affirmed the jury award in favor of a fire marshall who missed a promotional exam because of his military service, holding that there was enough evidence for the jury to conclude that the plaintiff's military status was a motivating factor in the decision to deny him a promptly administered promotional exam upon reemployment. Id. at 520. As the court stated, "the employer must sometimes treat [service members] differently from other employees in order to assure that they receive the same benefits as their coworkers. Thus, * * * where a neutral employment policy provides that a promotional exam shall only be administered on a particular date to all employees, it may constitute discrimination to refuse to allow veterans away on leave on the date in question to take a make-up exam upon their return from service." Id. at 519.

Federal Register / Vol. 70, No. 242 / Monday, December 19, 2005 / Rules and Regulations      75273

Accordingly, section 1002.193 requires an employer to administer its otherwise neutral evaluative employment practices in a manner that affords a returning service member the opportunity, after a reasonable period of time for adjustment, to participate in or meet the standards of that practice. As with apprenticeship systems and probationary periods addressed above, upon successfully meeting the evaluative standards, the employee's reemployment position should be adjusted based on the prior date he or she would have completed the process had he or she not entered military service. Regarding the question of what amount of time is reasonable to permit an employee to adjust, the Department has revised section 1002.193 to reflect that no fixed time will be deemed a reasonable amount of time in all cases. However, in determining a reasonable time to schedule a makeup exam, employers should take into account a variety of factors, including but not limited to, the length of time the returning employee was absent from work, the level of difficulty of the test itself, the typical time necessary to prepare or study for the test, the duties and responsibilities of the reemployment position and the promotional position, and the nature and responsibilities of the service member while serving in the uniformed service. See section 1002.193.

The Department received two additional comments regarding promotions and the escalator position. The first commenter suggests that the rule require employers to permit employee access to all personnel records so that returning service members will be fully informed of missed promotional opportunities. The Department is without authority in the statute to require such a result. Finally, the Department declines to adopt the suggestion of one commenter that suggests the provision should state its applicability to cross-departmental promotions within an organization because it is ambiguous.

Depending on the circumstances, section 4313 of USERRA either permits or requires the employer to reemploy a returning service member in a position with equivalent (or the nearest approximation to "equivalent") seniority, status and pay to the escalator or pre-service position. 38 U.S.C. 4313(a)(2)(A), (B), (3)(A), (B). Although "seniority" and "pay" are generally well-understood terms, USERRA does not define "status" as it is used in section 4313 of the Act. Case law interpreting VRRA, a precursor to USERRA, recognized status as

encompassing a broader array of rights than either seniority or pay. Job status varies from position to position, but generally refers to the incidents or attributes attached to, and inherent in, a particular job. The term often includes the rank or responsibility of the position, its duties, location, working conditions, and the pay and seniority rights attached to the position. See H.R. Rep. No. 103–65, Pt. I, at p. 31 (1993); *Duarte* v. *Agilent Technologies, Inc.*, 366 F.Supp.2d 1039, 1045 (D.Colo. 2005). Examples of status may be the exclusive right to a sales territory; the opportunity to advance in a position; eligibility for possible election to a position with the employee representative organization; greater availability of work where piece rates apply; the opportunity to work additional hours and to advance in a job; the opportunity to withdraw from a union; the opportunity to obtain a license; or, the opportunity to work a particular shift. The facts and circumstances surrounding the position determine whether a specific attribute is part of the position's status for USERRA purposes. Sections 1002.193 and .194 implement these provisions of the Act.

The Department received one comment regarding proposed section 1002.194, which establishes the principle that the escalator principle may result in adverse consequences upon reemployment. The proposed section stated that depending on an employee's circumstances, his or her "seniority rank" may cause reemployment in a higher or lower position, laid off, or even terminated. The commenter correctly suggests that there are "escalator-based" factors other than seniority, such as job location, job classification, or shift assignment, which may affect the reemployment position. The Department agrees that the first two sentences of the provision are too narrowly drawn, although the latter portion of the provision accurately captures the issue. Accordingly, the Department has made the necessary revision. See section 1002.194.

The statute makes the duration of a returning employee's period of service a critical factor in determining the reemployment position to which the employee is entitled upon return from service. After service of 90 days or less, the person is entitled to reinstatement in the position of employment in which he or she would have been employed if not for the interruption in employment due to uniformed service (the escalator position). 38 U.S.C. 4313(a)(1)(A). The employer must make reasonable efforts to assist the individual in becoming qualified for the reemployment position. In the event the returning employee

cannot become qualified for the escalator position despite reasonable efforts by the employer, the returning employee is entitled to the employment position in which he or she was employed on the date that the period of service commenced. 38 U.S.C. 4313(a)(1)(B). These requirements are implemented in section 1002.196. The Department received one comment on this provision, requesting that it include the definition of "escalator position." "Escalator position" is defined in section 1002.192, and consequently it is not necessary to define it in section 1002.196.

The service member returning from a period of service longer than 90 days is similarly entitled to reemployment in the escalator position, but, at the employer's option, may also be reinstated in any position for which the employee is qualified with the same seniority, status, and pay as the escalator position. 38 U.S.C. 4313(a)(2)(A). This statutory option is intended to provide the employer with a degree of flexibility in meeting its reemployment obligations. As with an employee returning from a shorter period of service, the employer must first make reasonable efforts to qualify the individual for the escalator position or for the position of like seniority, status, and pay. In the event the returning employee cannot become qualified for one of these positions despite reasonable employer efforts, the person is entitled to the employment position in which he or she was employed on the date that the period of service commenced, or a position of like seniority, status, and pay. 38 U.S.C. 4313(a)(2)(B). These requirements are implemented in section 1002.197.

In some instances, the service member may not be able to qualify for either the escalator position or the pre-service position (or a position similar in seniority, status, and pay to either of these positions) despite reasonable employer efforts. In such an event, the employee is entitled to be reemployed in any other position that is the nearest approximation to the escalator position. If there is no such position for which the returning service member is qualified, he or she is entitled to reemployment in any other position that is the nearest approximation to the pre-service position. In either event, the returning service member must be reemployed with full seniority. 38 U.S.C. 4313(a)(4). This requirement is implemented by sections 1002.196(c) and .197(c).

The Department received one comment regarding section 1002.197, which sought an amendment to permit

employers to reemploy employees in lesser positions temporarily, while employers "find a position of appropriate status." The Department declines the suggestion. The priority of positions established in section 1002.197 is based on priorities set by statute, 38 U.S.C 4313(a)(2). Moreover, such an amendment would conflict with the statute's requirement that service members must be promptly reemployed, see section 1002.181, in the escalator position, see section 1002.192. Section 1002.197 reflects that a position other than the escalator position may be used only in those cases in which the service member is not qualified to perform the duties of the escalator position.

Notwithstanding the escalator principle, USERRA does not require an employer to reinstate a returning service member in an employment position if he or she is not qualified to perform the civilian job. See section 1002.198. USERRA defines "qualified" as "having the ability to perform the essential tasks of the position." 38 U.S.C. 4303(9). The Department understands the statutory term "qualify" in 38 U.S.C. 4313 to include the employer's affirmative obligation to make reasonable efforts to assist the returning employee in acquiring the ability to perform the essential tasks of the reemployment position. This understanding is reflected in the language used in the regulations. The Department requested comments on whether this interpretation is proper, and received only two comments, both of which agreed with the interpretation.

An individual's performance qualifications are a function of his or her ability to perform the "essential tasks" of the employment position. This regulation provides guidelines for determining whether a given task is essential for proper performance of the position. In general, whether a task is essential for a position will depend on its relationship to the actual performance requirements of the position rather than, for example, the criteria enumerated in a job description. An employer may not decline to rehire a returning service member simply because he or she is unable to do some auxiliary, but nonessential, parts of the job.

The Department invited comments as to whether this interpretation best effectuates the purpose of this provision, and received seven comments in response. Four of the seven suggested, for reasons of consistency, that the USERRA rule adopt the definition of "essential functions" from the regulations promulgated under the Americans with Disabilities Act (ADA), 42 U.S.C 12101,

et seq. See 29 CFR 1630.2(n). The ADA defines a "qualified individual with a disability" as an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position the individual holds or desires. 42 U.S.C. 12111(8). The ADA regulations define "essential functions" generally as "the fundamental job duties of the employment position * * *. The term * * * does not include the marginal functions of the position." 29 CFR 1630.2(n)(1).

The ADA regulation lists a number of factors that could render a job function "essential," including: (1) The position exists to perform the function; (2) there are a limited number of employees available among whom performance of the job function can be distributed; and/or (3) the function is highly specialized so the incumbent is hired for his or her expertise or ability to perform the function. 29 CFR 1630.2(n)(2). The ADA regulation provides examples of "evidence of whether a particular function is essential," including: (1) The employer's judgment as to which functions are essential; (2) written job descriptions developed before the hiring process begins; (3) the amount of time on the job spent performing the function; (4) the consequences of not requiring the individual to perform the function; (5) the terms of a collective bargaining agreement; (6) the work experience of past incumbents in the job; and/or (7) the current work experience of incumbents in similar jobs. 29 CFR 1630.2(n)(3).

After considering all these comments, the Department has revised section 1002.198 to adopt the regulatory definition of "essential functions" under the ADA. Many of the "essential tasks" listed in proposed section 1002.198 were similar to those listed in the ADA's "essential functions" regulation. USERRA's legislative history does not address whether "essential tasks" is akin to or different from the ADA's "essential functions." However, a number of ADA cases use the term "tasks" interchangeably with "functions." See *Allen* v. *Pacific Bell,* 348 F.3d 1113, 1114–15 (9th Cir. 2003); *Byrne* v. *Avon Prods. Inc.,* 328 F.3d 379, 381 (7th Cir.), cert. denied, 540 U.S. 881 (2003); *Kvorjak* v. *Maine,* 259 F.3d 48, 55 (1st Cir. 2001); *Reed* v. *Heil Co.,* 206 F.3d 1055, 1057, 1062–63 (11th Cir. 2000). Accordingly, in order to provide employers and employees with some regulatory consistency, the Department is making the suggested revision. See section 1002.198(a)(2).

The remaining commenters on section 1002.198 made a variety of suggestions: one comment noted that the listing of essential tasks reads as if it were exhaustive, and suggested that it instead be revised so that it is non-exhaustive; one comment noted that the use of the word "and" between the penultimate and the last listed items suggests that all listed items must apply to a particular task in order for the task to be essential, and recommended using "and/or" instead, as does the ADA essential functions regulation; one comment objected to the provision's distinction between actual performance requirements and the criteria enumerated in a job description; one comment objected to the discussion of the listed items as "factors" because it thought that this suggested that all of the listed terms had to be considered, and suggested that the list should be written instead in terms of what would be evidence that a task is essential; the same comment also stated that the list should include a number of other items, including: (1) The business consequences of an employee's inability to perform a task, and not merely the safety consequences; (2) consideration of written job descriptions prepared before the issue of the employee's reemployment arose as evidence that the employer considered the task to be essential; (3) the work experience of other employees in the same or similar positions because the job may have changed in the employee's absence; and (4) a statement that performing the job under certain conditions could be essential, such as interacting with others, environmental extremes, attendance, etc. After considering these comments, the Department has revised the list in section 1002.198 to reflect that it is not exhaustive. These factors and other relevant circumstances may be employed to ascertain whether a task is essential to the performance of a particular position. See section 1002.198(a)(2).

Section 1002.198 also describes the employer's obligation to assist a service member returning for reemployment in becoming qualified for a civilian position. USERRA requires the employer to make reasonable efforts to enable the returning service member to qualify for a position that he or she would be entitled to if qualified. Section 4303(10) defines "reasonable efforts" as "actions, including training provided by an employer, that do not place an undue hardship on the employer." 38 U.S.C. 4303(10); section 1002.5(i). Section 4303(15) defines "undue hardship" as "actions [taken by an employer]

requiring significant difficulty or expense, when considered in light of * * * the overall financial resources of the employer'' and several other stated factors. 38 U.S.C. 4303(15); section 1002.5(n). Depending upon an employer's size and resources, a given level of effort might be an undue hardship for one employer and yet reasonable for another. The employer has the burden of proving that the training, retraining, or other efforts to enable the returning employee to qualify would impose an undue hardship. The rule describes the criteria that apply in determining whether the steps for aiding the service member in becoming qualified impose an undue hardship on the employer.

The Department received five comments regarding an employer's obligation to make reasonable efforts to qualify returning service members in becoming qualified for the reemployment position. Of these, one comment generally agreed with the Department's approach. The second comment suggested that the employer's obligations should be reduced by placing limits on the training an employer must provide to assist a returning employee. The Department concludes that section 1002.198 appropriately reflects the statute's intent, and reiterates that employers that are unduly burdened by this obligation may rely on the "undue hardship" defense to reemployment. See section 1002.139(b).

Two comments regarding section 1002.198 were submitted by one commenter, who requested that the provision be amended to reflect both that an employer's qualification efforts include any training necessary to update a returning employee's skills if the employee is no longer qualified to perform the job due to technological advances, and to reflect that an employer must permit an employee a sufficient amount of time to become qualified. The Department concludes that the commenter's suggestions are covered by section 1002.5(i), which defines an employer's "reasonable efforts," and includes those actions, including training provided by an employer, that do not place an undue hardship on the employer.

The final commenter on section 1002.198 suggested corrections to references to the regulatory definitions of "reasonable efforts" supplied in subsection (b) of the provision, and the Department has made the corrections.

Section 1002.199 implements USERRA section 4313(b), which governs the priority of reemploying two (or more) service members who are entitled

to reemployment in the same position. 38 U.S.C. 4313(b). The individual who first vacated the employment position for military service has the highest priority for reemployment. 38 U.S.C. 4313(b)(1). If this priority means another returning service member is denied reemployment in that position, the USERRA rules that give employment options to the employer would govern the reemployment of the second person. Thus, the second service member is entitled to "any other position" offering status and pay similar to the denied position according to the statutory rules generally applicable to returning service members. 38 U.S.C. 4313(b)(2)(A). A disabled service member in this situation would be entitled to any other position offering status and pay similar to the denied position according to the rules governing disabled service members. 38 U.S.C. 4313(b)(2)(B).

*Seniority Rights and Benefits*

Section 4316(a) provides that a reemployed service member is entitled to "the seniority and other rights and benefits determined by seniority" that the service member had attained as of the date he or she entered the service, together with the additional seniority he or she would have attained if continuously employed during the period of service. 38 U.S.C. 4316(a). As with the principles governing the determination of the reemployment position, this provision reflects the escalator principle. As applied to seniority rights under section 4316(a), the escalator principle entitles the returning service member to the "same seniority and other rights and benefits determined by seniority that [the service member] would have attained if [his or her] employment had not been interrupted by service in the uniformed services." S. Rep. No. 103–158, at 57 (1993); see also H.R. Rep. No. 103–65, Pt. I, at 33 (1993). Section 1002.210 states the basic escalator principle as it applies to seniority and seniority-based rights and benefits. It bears emphasis here that the escalator principle is outcome-neutral in terms of the effect of restoring the service member's seniority. For example, the application of the principle does not offer protection against adverse job consequences that result from placing the service member in his or her proper position on the seniority escalator. Finally, this section explains that the rights and benefits protected by USERRA upon reemployment include those provided by employers and those required by statute, such as the right to leave under the Family and Medical Leave Act of 1993, 29 U.S.C. 2601 et seq. (FMLA).

Accordingly, a reemployed service member would be eligible for FMLA leave if the number of months and the number of hours of work for which the service member was employed by the civilian employer, together with the number of months and number of hours of work for which the service member would have been employed by the civilian employer during the period of military service, meet FMLA's eligibility requirements.

The Department received two questions regarding the application of USERRA's seniority provisions to rights under the FMLA. The Equal Employment Advisory Council contended that allowing time spent on military leave to count when determining FMLA eligibility contradicts the definition of "service" under the FMLA regulations, and suggested its deletion or a revision consistent with the FMLA regulations. In 2002, the Department issued guidance from VETS, the Wage and Hour Division, which administers and enforces the FMLA, and the Solicitor of Labor, concluding that the time and hours an employee would have worked but for his or her military service should be combined with the time employed and the hours actually worked to meet the eligibility criteria of the FMLA. See Memorandum of July 22, 2002, *Protection of Uniformed Service Member's Rights to Family and Medical Leave* at *http://www.dol.gov/vets/ media/fmlarights.pdf.* The Department determined that:

Under USERRA, a person who is reemployed is entitled to the rights and benefits he (or she) would have attained if he had remained continuously employed. [Footnote omitted.] The "rights and benefits" protected by USERRA include those provided by employers and those required by statute, such as the right to leave under the FMLA. Accordingly, a returning service member would be entitled to FMLA leave if the hours that he or she would have worked for the civilian employer during the period of military service would have met the FMLA eligibility threshold. Therefore, in determining whether a veteran meets the FMLA eligibility requirement, the months employed and the hours that were actually worked for the civilian employer should be combined with the months and hours that would have been worked during the twelve months prior to the start of the leave requested but for the military service.

The Department has read the two statutes in harmony, so that neither is made ineffective, and so that reemployed service members are not denied military leave to which they would otherwise be entitled but for their uniformed service. See, e.g., *Pittsburgh & Lake Erie Railroad Company* v.

*Railway Labor Executives' Association,* 491 U.S. 490, 510 (1989) (when two statutes are capable of coexistence, the two should be construed, absent clearly expressed Congressional intention to the contrary, to regard each as effective). Therefore, the Department has retained section 1002.210's inclusion of rights protected under the FMLA, except that it has clarified that in the event that a service member is denied FMLA leave for failing to satisfy the FMLA's hours of work requirement due to absence from employment necessitated by military service, the service member may have a cause of action under USERRA but not under the FMLA. See section 1002.210.

The Department received one comment from a human resources firm requesting further guidance on the computation, for FMLA purposes, of hours a service member would have worked but for military service. Because of the variables involved with each employer and each employee, the Department is unable to provide detailed guidance in this regulation in response to the inquiry. However, employers should develop reasonable methods for computation of hours that would have been worked but for the military service. The guidance provided in section 1002.267 regarding the computation of pension contributions during military absence may serve as a model in many cases.

The final comment regarding section 1002.210 resulted in an additional modification to the text of the rule. The commenter asked whether an employee continues to accrue seniority and seniority-based rights and benefits if the employee is not immediately reemployed following discharge from service due to a service-related illness or injury. USERRA provides, and this rule reiterates, that an employee may have up to two years to report to or submit an application for reemployment to the employer if necessary in order to recover from the illness or injury incurred in, or aggravated during, the performance of service. See section 1002.116. Section 1002.210 has been amended to reflect that an employee continues to accrue seniority-based rights and benefits during any period required for recovery from service-related illnesses or injuries. The Department made a corresponding modification to section 1002.259, which establishes the period of time that must be considered to determine pension entitlement, in order to respond to an inquiry whether the time that an employee is absent from work under section 1002.74 prior to the beginning of a period of military service should be

considered service with the employer for purposes of determining the employee's USERRA pension entitlements upon reemployment. Under the revisions to both section 1002.210 and section 1002.259, the entire period of absence from work due to or necessitated by service in the uniformed services, including preparation time and recuperation time, is to be considered service with the employer upon reemployment for computation of seniority and seniority-based rights, including pension entitlements.

Section 1002.211 makes clear that USERRA section 4316(a) is not a statutory mandate to impose seniority systems on employers. Rather, USERRA requires only that those employers who provide benefits based on seniority restore the returning service member to his or her proper place on the seniority ladder.

Section 1002.212 adopts the basic definition of seniority-based rights and benefits developed in Supreme Court decisions. This definition imposes two requirements: First, the benefit must be provided as a reward for length of service rather than a form of short-term compensation for services rendered; second, the service member's receipt of the benefit, but for his or her absence due to service, must have been reasonably certain. *See Coffy* v. *Republic Steel Corp.,* 447 U.S. 191, 197–98 (1980); *Alabama Power Co.* v. *Davis,* 431 U.S. 581 (1977); see also S. Rep. No.103–158, at 57 (1993), citing with approval *Goggin* v. *Lincoln, St. Louis,* 702 F.2d 698, 701 (8th Cir. 1983) (summarizing Supreme Court formulation of two-part definition of "perquisites of seniority"). Section 1002.212(c) adds a third consideration which derives from another Supreme Court decision, *McKinney* v. *Missouri-Kansas-Texas R.R. Co.,* 357 U.S. 265 (1958). In that case, the Court allowed consideration of the employer's "actual practice" in making advancement an automatic benefit based on seniority under the collective bargaining agreement. Id. at 274. Accordingly, section 1002.212(c) adds the requirement that "actual custom or practice" in conferring or withholding a benefit also determines whether the benefit is a perquisite of seniority.

The Department received a comment requesting additional guidance on the determination of rights and benefits based on length of service versus rights and benefits for actual services rendered. Because the Department anticipates that a bright-line rule would be unworkable in application to the myriad of factual situations that may

arise in the employment setting, the analysis must revolve around the general guidelines established in the rule. Finally, the Department received a comment suggesting that, with regard to an employer's "actual custom or practice" as a consideration in providing or withholding a right or benefit as a reward for length of service, the word "actual" should be deleted. The commenter argues that the term will breed disputes over whether a practice is "actual" or in flux. The Department views the inclusion of the word "actual" as key to the implementation of this provision, and intends it to differentiate between those practices that are carried out in the workplace and those that are merely written in a handbook but have not been realized.

Section 1002.213 further defines one aspect of seniority-based rights and benefits: The requirement that receipt of the benefit be "reasonably certain." The proposed regulation describes a "reasonably certain" likelihood as a "high probability" that the returning service member would have obtained the seniority-based benefit if continuously employed. A "high probability" is less than an "absolute certainty," which the Supreme Court has rejected in analyzing the degree of probability a reemployed service member must satisfy in order to establish that his or her advancement would have been "reasonably certain" but for the period of service. See *Tilton* v. *Missouri Pacific Railroad Co.,* 376 U.S. 169, 180 (1964). The employer may not deny a reemployed service member seniority-based rights or benefits based on a scenario of unlikely events that allegedly could have occurred during the period of service.

Proposed section 1002.214 established that the returning employee is also entitled to claim perquisites of seniority that first became available to co-workers or that were modified while he or she was in the service. The Department received one comment on this provision, suggesting that it provide an alternate, and more lucid, illustration of the application of this provision in section 1002.214(b). After considering the comment, and reviewing a number of examples that may serve to illustrate the point, the Department has concluded that the response provided in section 1002.214(b) is vague and does not provide practical guidance on the issue addressed. In addition, the principle established in section 1002.214(a) is simply a reiteration of the principle established in section 1002.210 regarding the seniority-based rights and benefits to which a returning

employee is entitled. As a result, the Department has removed the section in its entirety from the final rule.

## Disabled Employees

USERRA imposes additional requirements in circumstances involving the reemployment of a disabled service member. A disabled service member is entitled, to the same extent as any other individual, to the escalator position he or she would have attained but for military service. If the disability is not an impediment to the service member's qualifications for the escalator position, then the disabling condition is irrelevant for USERRA purposes. If the disability limits the service member's ability to perform the job, however, the statute imposes a duty on the employer to make reasonable efforts to accommodate the disability. 38 U.S.C. 4313(a)(3). In some instances, an employer is unable to accommodate a service member's disability despite reasonable efforts. If, despite the employer's reasonable efforts to accommodate the returning disabled service member cannot become qualified for his or her escalator position, that person is entitled to be reemployed "in any other position which is equivalent in seniority, status, and pay, the duties of which the person is qualified to perform or would become qualified to perform with reasonable efforts by the employer." 38 U.S.C. 4313(a)(3)(A). If no such position exists, the service member is entitled to reemployment "in a position which is the nearest approximation * * * in terms of seniority, status, and pay consistent with circumstances of such person's case." 38 U.S.C. 4313(a)(3)(B). See, e.g., *Hembree* v. *Georgia Power Co.*, 637 F.2d 423 (5th Cir. 1981); *Blake* v. *City of Columbus*, 605 F. Supp. 567, 571 (D. Ohio 1984).

Section 1002.225 sets forth the priority of reemployment positions for which the disabled service member should be considered. The regulation also implements the statutory requirement for reasonable accommodation of the returning service member's disability. Such accommodations may include placing the reemployed person in an alternate position, on "light duty" status; modifying technology or equipment used in the job position; revising work practices; or, shifting job functions. The appropriate level of accommodation depends on the nature of the service member's disability, the requirements for properly performing the job, and any other circumstances surrounding the particular situation. See 38 U.S.C.

4303(9), (10), and (15); 4313(a)(3); H.R. Rep. No. 103–65, Pt. I, at 31 (1993); S. Rep. No. 103–158, at 53 (1993).

Section 1002.226 establishes that the employer must make reasonable accommodations for any disability incurred in, or aggravated during, a period of service. The accommodation requirement is not limited to disabilities incurred during training or combat, so long as they are incurred during the period of service. Any disability that is incurred or aggravated outside of a period of service (including a disability incurred between the end of the period of service and the date of reemployment) is not covered as a service-related disability for USERRA purposes. The disability must have been incurred or aggravated when the service member applies for reemployment, even if it has not yet been detected. If the disability is discovered after the service member resumes work and it interferes with his or her job performance, then the reinstatement process should be restarted under USERRA's disability provisions.

A returning service member may have rights under USERRA based on a service-related disability that is not permanent. A service member who incurs a temporary disability may be entitled to interim reemployment in an alternate position provided he or she is qualified for the position and the disability will not affect his or her ability to perform the job. If no such alternate position exists, the disabled service member would be entitled to reinstatement under a "sick leave" or "light duty" status until he or she completely recovers.

In identifying an alternate position for a disabled service member, the focus should be on the returning service member's ability to perform the essential duties of the job. The position must be one that the person can safely perform without unreasonable risk to the person or fellow employees. The disabled service member is required to provide information on his or her education and experience, the extent of the disability, and his or her present capabilities. The employer then has the duty to disclose all positions that the service member may be qualified to perform. Because the employer has greater knowledge of the various positions and their requirements in the organization, the employer, and not the service member, is exclusively responsible for accommodating the disability by identifying suitable positions within the service member's abilities and capabilities.

The Department received four comments regarding the provisions

implementing USERRA's requirements concerning the reemployment of a disabled service member. One commenter suggests that the Department should amend section 1002.225 to moderate the employer's duty to make reasonable efforts to accommodate the disability to reflect that an employee should bear some responsibility in cooperating in his or her own reemployment. The Department views the statute as imposing a duty on the employer to make reasonable efforts to accommodate the disability. 38 U.S.C. 4313(a)(3). In addition, as stated above, because the employer has greater knowledge of the various positions and their requirements in the organization, the burden is appropriately placed on the employer. Nevertheless, it is customary to assume that an employee seeking reemployment will cooperate with the employer's reasonable efforts to accommodate a disabled employee.

The Department received two comments regarding this provision from one commenter. The commenter requested that the provision include a statement indicating that as with a non-disabled employee, a disabled employee is entitled to reemployment on the escalator position. The commenter also requested that the Department indicate in section 1002.225(b) that in reemploying a returning service member in "the nearest approximation" to the equivalent escalator position, such position may be one that is higher or lower, depending on the circumstances. The Department agrees that both suggestions clarify the text of the final rule, and has made the amendments. See section 1002.225.

Finally, the Department received a suggestion that it employ the ADA's regulatory standards, in particular, the ADA's provisions concerning a "qualified individual with a disability" and "reasonable accommodations." The Department declines this suggestion because neither term is used in USERRA. In addition, although interpretations of the ADA may be useful in providing some guidance under USERRA's provisions regarding accommodating an employee with a disability, the Department is reluctant to adopt extensive portions of complex regulations promulgated under other statutes not administered or enforced by the Department, and notes that there are significant differences in the coverage of the two statutes. For example, the ADA covers only "disabilities" as defined in that statute, whereas USERRA covers any disability incurred in or aggravated during service in the uniformed services.

Finally, the Department received one comment requesting that it require employers to provide lifetime disability coverage for employees disabled as the result of their service in the uniformed services. Such a request is beyond the mandates set out in the statute.

*Rate of Pay*

The escalator principle also determines the returning service member's rate of pay after an absence from the workplace due to military service. As with respect to benefits and the reemployment position, the application of this fundamental principle with respect to pay is intended to restore the returning service member to the employment position that he or she would have occupied but for the interruption in employment occasioned by military service. *See generally Fishgold v. Sullivan Drydock and Repair Corp,* 328 U.S. 275 (1946). Section 1002.236 implements the escalator principle for purposes of determining the reemployed service member's rate of pay. The regulation also addresses the various elements of compensation that often comprise the returning service member's "rate of pay." Depending on the particular position, the rate of pay may include more than the basic salary. The regulation lists various types of compensation that may factor into determining the employee's overall compensation package under the escalator principle. The list is not exclusive; any compensation, in whatever form, that the employee would have received with reasonable certainty if he or she had remained continuously employed should be considered an element of compensation. The returning employee's rate of pay may therefore include pay increases, differentials, step increases, merit increases, periodic increases, or performance bonuses.

In some workplaces, merit pay increases are conditioned upon the employee passing a skills or performance evaluation. The employer should allow a reasonable period of time for the employee to become acclimated in the escalator position before such an evaluation is administered. In order that the employee not be penalized financially for his or her military service, the employee must be reemployed at the higher rate of pay, assuming that it is reasonably certain that the employee would otherwise have attained the merit pay increase during the period of military service. This requirement is similar to the requirement in Section 1002.193, which obliges an employer to give a reemployed employee, after a reasonable amount of time to adjust to the reemployment position, a missed skills test or examination that is the basis of an opportunity for promotion.

The Department invited comments as to whether this interpretation best effectuates the purpose of this provision, or whether the issue of merit pay requires more detailed treatment in these regulations, and received seven comments in response. One commenter expressed overall support for the provision, but found it unworkable due to the difficulty in accurately predicting the date of the returning service member's retroactive placement on the escalator. Three commenters seek more guidance on the provision, in particular, on the length of time given to the returning service member to acclimate before administering a makeup evaluation and on the amount of the merit or performance pay increase. One commenter argues that granting full seniority, and awarding equal pay, to returning service members penalizes workers remaining on the job who have obtained valuable training and experience while the service member was on military leave. One commenter argues that the escalator principle uses a "presumption" in favor of granting a salary increase, which it believes is inappropriate when advancements are based on measurable performance or merit evaluations. Finally, one commenter argues the escalator principle does not apply to merit or performance based salary increases because they are not seniority-based, and even if the principle applies, it should be pro rated and not retroactive.

The regulation's provision regarding rate of pay is consistent with general principles concerning the application of the escalator provision under the statute and case law, which require that a service member receive such compensation upon reemployment if there is a reasonable certainty that the compensation would have been granted. *See, e.g., McKinney v. Missouri-Kansas-Texas R.R. Co.,* 357 U.S. 265 (1958); *Tilton v. Missouri Pacific R.R. Co.,* 376 U.S. 169 (1964). A returning veteran cannot show within the reasonable certainty required by the Act that he or she would have enjoyed the advancement or increased compensation by virtue of continuing employment where the advancement or increased compensation depends on an employer's discretionary choice not exercised prior to the entry into service. *Tilton,* 376 U.S. at 180. Therefore, in response to those comments that object to this provision and its retroactive application for reasons of impracticality, burden, or unfairness, the Department

declines to modify the provision in reaction to these concerns, as the provision adheres to the obligations required under the statute and the long-standing case law governing its interpretation.

Consistent with section 1002.193 concerning a similar comment about missed promotional exams, the Department has amended section 1002.236 to include factors an employer should consider in timing the administration of a makeup test or examination for the purposes of determining applicable pay increases. The Department suggests that no fixed time will be appropriate to all cases, and in determining a reasonable time to schedule a makeup test or examination, employers should take into account a variety of factors, including but not limited to the length of time the returning employee was absent from work, the duties and responsibilities of the reemployment position, and the nature and responsibilities of the service member while serving in the uniformed service. *See* section 1002.236.

Finally, in response to comments stating that the escalator principle should not apply to merit pay increases, the Department emphasizes that what is critical is not whether the employer characterizes the compensation increases as merit-based, but whether the raise would have been attained with reasonable certainty if not for the service in the uniformed services. To clarify this point, the Department has amended section 1002.236 to reflect that when considering whether merit or performance increases would have been attained with reasonable certainty, an employer may examine the returning employee's own work history, his or her history of merit increases, and the work and pay history of employees in the same or similar position. *See* section 1002.236. Finally, in determining rate of pay, as in other situations, application of the escalator principle may leave the returning service member with less than he or she had before performing service. Thus, if nondiscriminatory adverse changes in the employment position's pay structure would with reasonable certainty have lowered the compensation rate during the period of service if he or she had remained continuously employed, the escalator principle may operate to diminish the returning service member's pay.

*Protection Against Discharge*

Section 4316(c) of USERRA provides service members special protection from discharge from civilian employment after returning from uniformed service. If the individual served over 180 days

before reemployment, then he or she may not be discharged from the employment position within one year after reemployment except for cause. 38 U.S.C. 4316(c)(1). If the individual served between 31 and 180 days in the military, he or she may not be discharged from the employment position within 180 days after reemployment except for cause. 38 U.S.C. 4316(c)(2). A reinstated service member whose duration of service lasted 30 days or less has no similar protection from discharge; however, the individual is protected by USERRA's anti-discrimination provisions, 38 U.S.C. 4311, as explained in sections 1002.18–.23. Section 1002.247 elaborates the general rules for protection against discharge based on the duration of service prior to reemployment.

Prohibiting a reemployed service member's discharge, except for cause, ensures that the service member has a reasonable amount of time to get accustomed to the employment position after a significant absence. A period of readjustment may be especially warranted if the service member has assumed a new employment position after the military service. The discharge protection also guards against an employer's bad faith or pro forma reinstatement followed by an unjustified termination of the reemployed service member. Moreover, the time period for special protection does not start until the service member has been fully reemployed and any benefits to which the employee is entitled have been restored. Even assuming the service member receives the benefit of the full protection period prior to dismissal, an employer nevertheless violates the Act if the reason for discharging the service member is impermissible under USERRA.

Section 4316(c) does not provide complete protection from discharge to a reemployed service member for the duration of the protected period. An employer may dismiss a reemployed service member even during the protected period for just cause. Depending on the circumstances of the specific case, just cause may include unacceptable or unprofessional public behavior, incompetent or inefficient performance of duties, or criminal acts. An employer may also discharge the service member for cause if the application of the escalator principle results in a legitimate layoff or in the elimination of the job position itself, provided the person would have faced the same consequences had he or she remained continuously employed. Section 1002.248 provides general

guidelines for establishing just cause to discharge a reemployed service member during the protected period, and places the burden of proof on the employer to demonstrate that it is reasonable to discharge the person. See H.R. Rep. No. 103–65, Pt. 1, at 35 (1993); S. Rep. No. 103–158, at 63 (1993).

The Department received six comments regarding these provisions. One commenter took issue with proposed section 1002.248's statement that a reemployed service member may be discharged either for cause or because of the application of the escalator principle. The commenter suggests that citing only two potential reasons for discharge is too limited, and there are other "legitimate nondiscriminatory reasons" for an employee's discharge. After considering the comment, the Department concludes that proposed section 1002.248 was unclear, and has amended the provision. Accordingly, to sustain an employee's discharge during the protected period, the employer bears the burden of proving either that the discharge was based on the employee's conduct or it was the result of some other legitimate nondiscriminatory reason that would have affected any employee in the reemployed service member's position, regardless of his or her protected status or activity. See Duarte v. Agilent Technologies, Inc., 366 F.Supp.2d 1039, 1046 (D.Colo. 2005). Other reasons for discharge may include the elimination of the employee's position, corporate reorganization or "downsizing," and layoff, provided that those reasons are legitimate, nondiscriminatory and non-pretextual.

A second comment on these provisions criticizes the use of the phrase "just cause" interchangeably with "cause" in the preamble, and suggests that the Department should refrain from using "just cause." The Department notes that the text of the rule employs only the term "cause," as does the statute, although the statute's drafters employed both terms in the legislative history. See S. Rep. 103–158 (1993) at 63. The Department intends that its use of the term "just cause" in the preamble is synonymous with its use of the term "cause" in the text of the rule, and concludes that the use of both terms is not misleading or confusing. A third comment objects to the Department placing the burden on the employer to prove that a discharge during the protected period was based on cause. The inclusion of this provision was based on the legislative history regarding USERRA's protection against discharge, which itself stated that the burden of proving that the

discharge was for cause belongs on the employer. See H.R. Rep. 103–65, Pt. I, at 35 (1993); S. Rep. 103–158, at 63 (1993). A fourth commenter suggests that section 1002.248 either provide a specific list of what events constitute cause for discharge, or refer to the application of State law for a definition of what constitutes cause. The Department must reject both suggestions. First, it is impossible to identify an exhaustive list of all events or conduct that would justify a discharge for cause. Second, for the purposes of the protection against discharge, the Department intends that USERRA's interpretation and enforcement rely not on the importation or application of State statute or common law, but instead on the development of Federal decisional law under the statute and these regulations. The fifth comment argued that a discharge for cause should apply only where an employer has an established formal grievance and appeal process. USERRA allows an employer to discharge a reemployed employee for cause, and does not require that the employer have a formal grievance and appeal procedure in order to exercise this right. However, as discussed above, in any case involving a discharge during the statutorily protected period, the employer has the burden of proving that the discharge was for cause. Consequently, this suggested change has not been made.

Finally, the last comment regarding these provisions resulted in a change to the text of the rule. The commenter requests that the provision should clarify that the prerequisite of notice to employees that certain conduct may result in discharge should include a reference that such notice may either be express or fairly implied, citing H.R. Rep. 103–65, Pt. I, at 35 (1993). The Department agrees that the legislative history supports the suggestion, and has made the requested revision. See section 1002.248.

*Pension Plan Benefits*

USERRA establishes specific rights for reemployed service members in their employee pension benefit plans; the Act's specific provisions for pension benefit plans supersede general provisions elsewhere in the statute. 38 U.S.C. 4318(a)(1)(A). USERRA defines an employee pension benefit plan in the same way that the term is defined under the Employee Retirement Income Security Act of 1974 (ERISA). See 29 U.S.C. Chapter 18; 38 U.S.C. 4318(a). The term "employee pension benefit plan" includes any plan, fund or program established or maintained by

an employer or by an employee organization, or by both, that provides retirement income or results in the deferral of income for a period of time extending to or beyond the termination of the employment covered by the plan. Profit sharing and stock bonus plans that meet this test are included. USERRA provides that once the service member is reemployed, he or she is treated as not having a break in service with the employer or employers maintaining the plan even though the service member was away from work performing military service.

Sections 1002.259 to .267 describe the types of employee pension benefit plans that come within the Act and the pension benefits that must be provided to reemployed service members. Although USERRA relies on the ERISA definition of an employee pension benefit plan, some plans excluded from ERISA coverage may be subject to USERRA. For example, USERRA (but not ERISA) extends coverage to plans sponsored by religious organizations and plans established under State or Federal law for governmental employees. Benefits paid pursuant to federally legislated programs such as Social Security or the Railroad Retirement Act, however, are not covered by USERRA. USERRA coverage also does not include benefits under the Thrift Savings Plan (TSP); the rights of reemployed service members to benefits under the TSP are governed by another Federal statute. See 5 U.S.C. 8432b. 38 U.S.C. 4318(a)(1)(B). Section 1002.260.

As sections 1002.259 to .267 illustrate, each period of uniformed service is treated as an uninterrupted period of employment with the employer(s) maintaining the pension plan in determining eligibility for participation in the plan, the non-forfeitability of accrued benefits, and the accrual of service credits, contributions and elective deferrals (as defined in section 402(g)(3) of the Internal Revenue Code) under the plan. 38 U.S.C. 4318(a)(2)(B). As a result, for purposes of calculating these pension benefits, or for determining the amount of contributions or deferrals to the plan, the reemployed service member is treated as though he or she had remained continuously employed for pension purposes.

The Department received a comment apparently suggesting that USERRA's provisions regarding employer pension obligations conflict with an employer's ability to terminate a pension plan under the Employee Retirement Income Security Act (ERISA). USERRA does not prohibit pension plan termination, and

therefore no change to the final rule is warranted.

The Department received one comment concerning pension plan entitlements of employees whose employers provide them with partial or full civilian pay while the employees are absent from employment to perform military service. This compensation is commonly referred to as "differential pay," and the amount and duration of the benefit varies widely. The commenter asked the Department to indicate whether employees who receive "differential pay" are entitled to make employee contributions or elective deferrals to their pension plan based on the differential pay received while absent from employment to perform military service. The Department notes that "differential pay" is not required by USERRA, and is a form of compensation from employers to employees.

The Department of the Treasury (Treasury Department) and the Internal Revenue Service (IRS) issued proposed regulations that address the ability of employees on military leave to make pension contributions based on differential pay. These proposed regulations can be found at 70 FR 31214–0 (May 31, 2005), and interpret the provisions of section 415 of the IRC, which governs benefits and contributions under qualified retirement plans. The Treasury Department's press release concerning the proposed rule states, in pertinent part:

Significantly, the proposed regulations will specifically provide that National Guard and Reserve members are permitted to continue to contribute to their employer's retirement plan while on active duty. . . The rules relating to post termination compensation and the associated clarifications on the ability to contribute to retirement plans for members of the National Guard and Reserve will also apply to section 403(b) tax deferred annuities and Section 457 eligible deferred compensation plans. Plan administrators may rely on today's proposed regulations immediately to allow service members to contribute to qualified retirement plans.

JS–2471, Office of Public Affairs, Department of the Treasury, May 25, 2005.

The Department received two comments regarding section 1002.259, which establishes the general principle that upon reemployment, an employee must be treated as not having a break in service with the employer for the purposes of "participation, vesting and accrual" of pension benefits. Both comments requested that the provision be broadened to include an employee's "eligibility" for pension benefits. The phrase "participation, vesting and accrual" includes an employee's

"eligibility" for pension benefits, and therefore no modification is needed in response to the commenters' suggestions.

Another commenter requested that the Department clarify the entitlement to pension credit in cases in which an employee permanently and lawfully loses reemployment rights, for instance, where an employee dies during the period of military service or where an employer is excused from its reemployment obligations based on a statutory defense under 38 U.S.C 4312(d)(1) (incorporated in section 1002.139). The commenter suggested that the final rule provide that if a person permanently and lawfully loses the right to reemployment during a period of military service, such person (or his or her estate) is entitled to receive pension credit for the period beginning with departure from pre-service employment and ending on the date reemployment rights are lost. Because section 4318(a) of USERRA states that pension entitlements do not accrue until the returning employee is reemployed, the Department declines to adopt the commenter's proposal.

As noted in Subpart C, above, section 1002.74 of the final rule provides that an employee is, in some cases, entitled to time off from employment prior to the beginning of a period of military service where such time off is "necessitated by" the employee's forthcoming service in the uniformed services. A commenter requested the Department clarify whether such period of time must also be considered service with the employer for purposes of determining the employee's USERRA pension entitlements upon reemployment following the service. The Department has responded by amending section 1002.259 to clarify that the entire period of absence due to or necessitated by service in the uniformed services is to be considered service with the employer upon reemployment for pension purposes. This period includes preparation time, as described above, and time following the completion of service within which a person may apply for reemployment and/or recover from an illness or injury incurred in or aggravated by the military service. See section 1002.259. The Department made a corresponding amendment to the final rule to clarify that the entire period of absence due to or necessitated by military service is to be considered in determining a person's entitlement to seniority and seniority benefits upon reemployment. See Subpart E, above, and section 1002.210.

Sections 1002.261 and 1002.262 clarify who must make the contribution

and/or deferral attributable to a particular period of military service and the timeframes within which payments are to be made to the plan. Section 1002.261 also describes how funding obligations differ depending on whether a plan is a defined benefit or defined contribution plan. The Department received one comment requesting the final rule indicate whether "cash balance" and similar "hybrid" plans should be considered defined benefit plans for USERRA purposes. The Department consulted with the IRS and the Treasury Department on this issue, and has been advised that, for their purposes, "cash balance" and other "hybrid" plans are considered defined benefit plans. The Department will apply the same treatment to these plans for USERRA's purposes.

The employer who reemploys the service member is responsible for funding any employer contribution to the plan to provide the benefits described in the Act and the regulation. 38 U.S.C. 4318(b)(1). Some plans do not require or permit employer contributions. In that case, the plan is funded by employee contributions or elective deferrals. Other plans provide that the employer will match a certain portion of the employee contribution or deferral. If employer contributions are contingent on employee contributions or elective deferrals, such as where the employer matches all or a portion of the employee deferral or contribution, the reemployed service member is entitled to the employer contribution only to the extent that he or she makes the employee contributions or elective deferrals to the plan. 38 U.S.C. 4318(b)(2).

USERRA is silent with respect to the amount of time the employer has to pay to the plan the contributions attributable to a reemployed service member's period of military service. In proposed section 1002.262, the Department required that employer contributions to a pension plan that are not contingent on employee contributions or elective deferrals must be made no later than 30 days after the date of the person's reemployment. An exception to this limit was provided in cases in which it was impossible or unreasonable for the employer to meet the timeframe, and, in that case, contributions were to be made as soon as practicable. Interested parties were requested to comment on this proposed requirement, and the Department specifically requested public comment on whether the proposed 30-day period is too long or too short.

The Department received eight comments on proposed section 1002.262, and only one commenter, the National Employment Lawyer's Association, favored the provision, suggesting that the 30-day period was reasonable in light of the exception for situations where it was impossible or unreasonable to comply. Other commenters included WorldatWork, Profit Sharing/401(k) Council of America, Investment Company Institute, Society for Human Resources Management, Hewitt Associates, and two law firms. Seven comments indicated that the 30-day period was too short, and requested that the period be extended. Three of the seven commenters suggested the period be expanded to ninety days following reemployment. A fourth comment proposed that employer contributions be made when they would normally be due for the plan year in which the employee is reemployed. Two additional commenters suggested the contributions be due no earlier than the end of the calendar quarter following the quarter in which the employee is reemployed. The final commenter suggested the contributions be due either when they can reasonably be segregated from the employer's general assets or at the beginning of the quarter following the quarter in which the employee is reemployed, whichever is earlier. Because the beginning of the quarter following reemployment could conceivably be the next day, the Department construes this commenter to have intended the inclusion of the statement, "whichever is later."

After weighing all these comments, the Department has amended section 1002.262(a) to provide that employer contributions to a pension plan that are not dependent on employee contributions must be made within ninety days following reemployment or when contributions are normally made for the year in which the military service was performed, whichever is later. In some cases involving an extended period of service, both timeframes may apply. For instance, assume a case in which employer contributions for a particular calendar year are made on February 15 of the following year. An employee leaves the employer to perform military service on May 1, 2004. The employee completes the service in early 2005, applies for reemployment, and is reemployed on February 10, 2005. In this case, pension contributions attributable to the period of the absence due to military service in 2004 (May 1–December 31) would be due 90 days after February 10, 2005, the date of reemployment, because that date is later than February 15, 2005, the date

contributions for 2004 are normally made. Pension contributions attributable to the period of the absence for military service in 2005 (January 1–February 9) would be due on February 15, 2006, because that date is later than the date that is 90 days following reemployment.

Where pension benefits are derived from employee contributions or elective deferrals, or from a combination of employee contributions or elective deferrals and matching employer contributions, the reemployed service member may make his or her contributions or deferrals during a time period starting with the date of reemployment and continuing for up to three times the length of the employee's immediate past period of military service, with the repayment period not to exceed five years. 38 U.S.C. 4318(b)(2); section 1002.262(b). No payment by the service member may exceed the amount that would have been required or permitted during the period of time had the service member remained continuously employed. 38 U.S.C. 4318(b)(2). Any permitted or required amount of employee contributions or elective deferrals would be adjusted for any employee contributions or elective deferrals made to the plan during the employee's period of service. Any employer contributions that are contingent on employee contributions or elective deferrals must be made according to the plan's requirements for employer matching contributions.

The Department invited comments as to whether this interpretation best effectuates the purpose of this provision, and received three general comments in response. One commenter requested the final rule specify that the employee make-up contributions be sequential, that is, that the first make-up payments be attributable to the earliest part of the absence to perform service. The Department declines to impose this requirement on all employers and pension plans, and instead suggests that employers and plan administrators develop reasonable rules for the allocation of make-up contributions that are appropriate for the type and size of the particular plan.

The second general comment asked that the Department indicate how to apply the provision in the case of a reemployed employee who began making up missed contributions or elective deferrals, and then entered a subsequent period of military service during the repayment period but before having made up all the missed contributions or elective deferrals. Specifically, the commenter proposed

**75282**   Federal Register / Vol. 70, No. 242 / Monday, December 19, 2005 / Rules and Regulations

that the repayment period should be tolled during the second period of military service, and then resumed when the person was reemployed following the subsequent service. USERRA provides that the repayment period for a particular period of military service begins upon reemployment. See 38 U.S.C. 4318(b)(2). Therefore, the Department concludes that if a person enters a second period of military service during the make-up period for a prior period of military service, USERRA does not require that the first makeup period be tolled; the repayment period for the first period of service will continue to run during the subsequent period of service. When the person returns from the second period of service, the repayment period for the second period would commence upon the "second" reemployment, and the person may also have any time remaining from the first repayment period. The Department notes, however, that USERRA does not prevent an employer or plan from voluntarily extending the first period in the event of an employee's second period of military service.

The third general comment concerning employee make-up of missed contributions or elective deferrals suggested that section 1002.262(b) be amended to provide a period of five years within which a reemployed employee may make up missed contributions or elective deferrals. The Department declines to adopt this recommendation, because the period permitted in section 1002.262(b) is based on the period established under the statute. See 38 U.S.C. 4318(b)(2).

Under USERRA, a reemployed service member has the right to make his or her contributions or elective deferrals, but is not required to do so. Elective deferrals can be made up only to the extent that the employee has compensation from the employer that can be deferred. Proposed section 1002.262 provided that, if an individual cannot make up missed contributions as an elective deferral because he or she does not have enough compensation from the employer to defer (for example, if the individual is no longer employed by the employer), the plan must provide an equivalent opportunity for the individual to receive the maximum employer matching contributions that were available under the plan during the period of uniformed service through a match of after-tax contributions. This provision generated ten separate comments from eight sources, including WorldAtWork, Profit Sharing/401(k) Council of America, National Employment Lawyers Association,

Investment Company Institute, and two law firms with expertise in the field, and none of the commenters expressed support for the provision. Four of the comments requested clarification with respect to four issues: the effect of the provision on the treatment of highly compensated employees; the effect of these contributions on non-discrimination testing provisions in various sections of the Internal Revenue Code; whether an employee who is terminated for cause based on conduct is entitled to this right; and issues associated with after-tax contributions generally.

The remaining commenters were opposed to this provision on various additional grounds. Commenters cited administrative costs in re-tooling administrative systems for plans that do not currently allow after-tax contributions, because pre- and after-tax contributions must be tracked and accounted for separately. Most significantly, commenters expressed concerns that compliance with the proposed provision might cause a plan to encounter problems with the IRC or tax regulations because of this rule's requirement that plans accept after-tax contributions from persons who are not employees. Finally, two commenters suggested that to avoid after-tax contributions to a former employer's pension plan and achieve the same result, the final rule should provide for establishment of an Individual Retirement Account by the former employee with matching contributions from the former employer.

After considering all the comments, the Department has concluded that it will remove from section 1002.262(b) of the final rule the provision that would have required a plan to permit a person to continue to make-up missed contributions or elective deferrals after leaving employment with the post-service employer. In construing the statute liberally in favor of service members, the Department's original view of section 4318(b)(2) of the Act was that service members should be permitted the entire period established by the statute for missed contributions, regardless of whether the service member remained employed during that period. This view was supported by the fact that neither the face of section 4318(b)(2), nor the legislative history, contains a limitation on the statutory period that requires a service member to remain reemployed in order to make up contributions. However, after considering the comments, the Department ultimately views section 4318(b)(2) as unclear on this point, in particular, because of its references to "a

person reemployed." Thus, this provision of the Act is better viewed as establishing a right to make up missed contributions that is conditioned upon continued employment following reemployment. This interpretation of section 4318(b)(2) is consistent with the statute as a whole, which generally establishes no rights or benefits that extend beyond the termination of employment or reemployment. Notwithstanding, if a reemployed employee leaves and then returns to employment with his or her post-service employer, the employee may resume repayments at his or her discretion regardless of the break in employment, so long as time remains in the statutory period (three times the length of the employee's immediate past period of military service, not to exceed five years).

Policy reasons further support the revision to this provision. VETS recognizes that the proposed section would have benefited a relatively small number of returning service members who were reemployed, sought to make up missed contributions, left employment with the post-service employer, and still wanted the opportunity to make up missed contributions. Comments from industry experts indicated that the costs to pension plans associated with the provision would be significant. In addition, industry experts noted that those plan costs were likely to be allocated to the plan, so that other plan participants, including other uniformed service members, may suffer some detriment to their pension entitlements. As a result of this extensive legal and policy analysis, and the conclusions reached above, the Department has modified this provision. See section 1002.262(b).

USERRA does not specify whether the returning service member is entitled to partial credit in return for making up part (but not all) of the missed employee contributions or elective deferrals, but it does not require that the employee make up the full amount. Given that returning service members sometimes face financial hardships on their return to civilian employment, and in view of the remedial purposes of USERRA, the Department interprets the Act to permit the employee to partially make up missed employee contributions (including required employee contributions to a defined benefit plan) or elective deferrals. In such a situation, the employer is required to make any contributions that are contingent on employee make-up contributions or elective deferrals only to the extent that the employee makes such partial

contributions or elective deferrals. See section 1002.262(c). For example, in a plan where the employee may or must contribute from zero to five percent of his or her compensation, and receive a commensurate employer match, the reemployed service member must be permitted to partially make up a missed contribution and receive the employer match. Where contributions from all employees are handled in a similar, consistent fashion under the plan, either the plan documents or the normal, established practices of the plan control the disposition of partial contributions or elective deferrals. See section 1002.262(e) and (f).

Section 1002.263 of the proposed rule provided that employees are not required to pay any interest when making up contributions or elective deferrals attributable to a period of military service. The Department received a comment asking whether employees are permitted to include interest when making up missed contributions or elective deferrals attributable to a period of military service. The statute requires that such employee payments must not exceed the amount the employee would have been permitted or required to contribute had the person remained continuously employed. See 38 U.S.C. 4318(b)(2). Based on the statute, the Department has amended section 1002.263 to clarify that employees are neither permitted nor required to pay interest when making up missed contributions or elective deferrals. See section 1002.263.

Under section 1002.264 in the proposed rule, if the service member has withdrawn his or her account balance from the employee pension benefit plan prior to entering military service, he or she must be allowed to repay the withdrawn amounts upon reemployment. The amount to be repaid also includes any interest that would have been earned had the monies not been withdrawn. Repayment entitles the individual to appropriate credit in the plan. The reemployed service member may repay his or her withdrawals during a time period starting with the date of reemployment and continuing for up to three times the length of the employee's immediate past period of military service, with the repayment period not to exceed five years; during the time period provided by 26 U.S.C. 411(a)(7)(C) (if applicable); or within such longer time period as may be agreed to between the employer and service member. Proposed section 1002.264 applied to defined benefit plans and defined contribution plans. The Department invited comments on

whether or how this section should apply to defined contribution plans.

Five commenters responded to the Department concerning this provision, including Profit Sharing/401(k) Council of America (PSCA), Investment Company Institute, Hewitt Associates, and Society for Human Resource Management. PSCA was generally supportive of the proposed section, but recommended the repayment period be amended to "be consistent with the requirements under the IRC." Three commenters were unequivocally opposed to the provision allowing for repayment of withdrawals. As with the first comment, these commenters were concerned that compliance with the proposed provision could cause plans to become disqualified under the IRC. Additionally, the commenters noted that plans would incur substantial costs in amending procedures to accommodate this repayment provision, which could involve after-tax payments being made in some cases. Additionally, one commenter requested the Department clarify the timing of the withdrawal, submitting that proposed section 1002.264 could be read to apply the repayment entitlement to withdrawals made far in advance of the military service and unrelated to that service.

After weighing all the comments, the Department has made significant revisions to section 1002.264. First, the Department concludes that this provision is more appropriately applied only to defined benefit plans. As in the case of the provision regarding the entitlement to make up missed contributions or elective deferrals in section 1002.262(b), VETS recognizes this provision would benefit relatively few returning service members who incurred the penalties and tax burden associated with a withdrawal from a defined contribution plan and wanted to repay that amount, generally through after-tax payments. VETS also recognizes that this provision similarly would have required defined contribution plans to incur the substantial costs of compliance in order to track and account for pre- and after-tax money separately, and that those costs could reduce the benefits paid to other plan participants, including other uniformed service members. Accordingly, the final rule will limit the entitlement to repay withdrawals to defined benefit plans. Second, the Department agrees with the comment above, and originally intended, that plan withdrawals covered under this provision would be limited to those made in connection with a period of military service. Accordingly, section

1002.264 has been revised to reflect this limitation. Third, for reasons similar to those stated above regarding the limitation on the entitlement to make up missed contributions or elective deferrals in section 1002.262(b), the entitlement to repay withdrawals will be conditioned upon the person being employed with their post-service employer. As is the case in section 1002.262(b), if a reemployed employee leaves and then returns to employment with the post-service employer, the employee may resume repayments at his or her discretion regardless of the break in post-service employment, so long as time remains in the repayment period. Finally, proposed section 1002.264(b), which allowed for repayment within the time period provided by 26 U.S.C. 411(a)(7)(C), has been deleted from the final rule because the Department has determined that its inclusion was confusing and ultimately unnecessary because the time period is already established by the Internal Revenue Code. See section 1002.264.

The final comment received concerning section 1002.264 recommended the repayment period be extended in cases where an employee is unable to repay in a timely manner for a reason related to the person's military service. The Department is not adopting this suggestion, as the current language allows for a longer repayment period that is agreed to by the employer and the employee. See section 1002.264. The Department expects that employers and employees will negotiate such longer periods in good faith.

Section 1002.265 specifies that a reemployed service member's pension entitlement may vary depending on the type of pension plan, and the Department received a single comment on this provision. In referring to the defined contribution plans provision, in which the reemployed person is not entitled to earnings experienced and forfeitures that occurred during military service, the commenter appears to confuse it with section 1002.264, related to withdrawal of funds from a plan. Because the meaning and intent of the comment are vague and unclear, the Department is unable to supply a response.

The employer must allocate its contribution on behalf of the employee in the same manner as contributions made for other employees during the period of the service member's service were allocated. However, under proposed section 1002.265, the employer is not required to allocate earnings experienced and forfeitures that occurred during the period of military service to the reemployed

service member. 38 U.S.C. 4318(b)(1). A commenter asked whether the amount of funds in the employee's pension account when the person leaves employment to perform military service should experience normal gains and losses (excluding forfeitures) during the period of absence to the same extent as the accounts of active employees. Funds left in the employee's account when he or she departs to perform military service accrue normal gains and losses (excluding forfeitures). However, the gains or losses that accrued during the person's absence for uniformed service are not applied to contributions made by the employer or the employee after reemployment.

Special rules apply to multiemployer plans. 38 U.S.C. 4318(b)(1). Section 1002.266 focuses on the operation of multiemployer plans. ERISA defines the term "multiemployer plan" as a plan to which more than one employer is required to contribute; which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer; and which satisfies regulations prescribed by the Secretary of Labor. 29 U.S.C. 1002(37). An individual's period of uniformed service that qualifies as employment for purposes of section 4318(a)(2) is also employment under the terms of the pension benefit plan; any applicable collective bargaining agreement under 29 U.S.C. 1145; or any similar Federal or State law requiring employers who contribute to multiemployer plans to make contributions as specified in plan documents.

With a multiemployer plan, a service member does not have to be reemployed by the same employer for whom he or she worked prior to the period of service in order to be reinstated in the pension plan. Proposed section 1002.266(c) stated that so long as the post-service employer is a contributing employer to the plan, the service member is entitled to be treated as though he or she experienced no break in service under the plan. One commenter contended that this provision is overly broad and should be limited based on the language of the statute, the legislative history, and the applicable case law. The commenter proposed that in cases in which the pre-service and post-service employer are different, but both employers participate in the same multiemployer pension plan, the pre- and post-service employers must be related by a common job referral or hiring scheme beyond their common participation in the plan.

USERRA bases the availability of pension protections on the

reemployment of a service member. 38 U.S.C. 4318(a)(2)(A) ("a person reemployed under this chapter shall be treated as not having incurred a break in service with the employer or employer's maintaining the plan"). The statute's legislative history indicates that term "employer" is to be construed broadly so that it encompasses not just the traditional single employer relationship, but also those employer relationships in which "a service member works for several employers in industries such as construction, longshoring, etc., where the employees are referred to employment." H.R. Rep. No. 103–65, Pt. I, at 21 (1993); accord S. Rep. No. 103–158, at 42 (1993) ("In addition to the traditional interpretations of the term, the Committee intends a broad construction of "employer" to include relationships in which an employee works for multiple employers within an industry or is referred to employment in such industries as construction or longshoring.")

Both the House and the Senate reports cite *Imel v. Laborers Pension Trust Fund for Northern California*, 904 F.2d 1327 (9th Cir.), cert. denied, 489 U.S. 939 (1990), as a leading case on the pension obligations where the pre- and post-service employers are different. In Imel, the court imposed liability on the multiemployer plan to provide pension credit to the plaintiff for his years of military service where the pre-service and post-service employers were dissimilar. The court found that the two employers were operating in the same Northern California construction industry which, broadly construed, was Imel's employer, and that the two employers both utilized, and were therefore connected by, their common use of the union's job referral practice. Id. at 1330, 1333.

The Department concludes that this legislative history suggests that mere participation by different pre- and post-service employers in a common multiemployer plan is not enough to invoke pension liability for service-related absences. Accordingly, the Department has amended section 1002.266(c) to reflect that in cases in which an employee is reemployed by an employer that is different from his or her pre-service employer, and the pre- and post-service employer contribute to the same multiemployer pension plan, the two employers must be connected by a common job referral plan or practice in order for USERRA's pension obligations to attach to the post-service employer. See section 1002.266(c).

Section 1002.266 describes the allocation of the employer's obligation to fund employer contributions for

reemployed service members participating in multiemployer plans. Initially, the benefits liability is to be allocated as specified by the sponsor maintaining the plan. 38 U.S.C. 4318(b)(1)(A). Both of the bargaining parties, usually the union(s) and the employers, and the plan trustees of a multiemployer plan are sponsors of the plan. The initial allocation by the plan sponsor(s) is likely to vary from plan to plan. For purposes of USERRA, if the plan documents make no provision to allocate the obligation to contribute, then the individual's last employer before the service period is liable for the employer contributions. In the event that entity no longer exists or functions, the plan must nevertheless provide coverage to the service member. 38 U.S.C. 4318(b)(1)(B).

By authorizing the plan sponsors to designate how the contribution is to be paid, Congress intended to give employers, employee organizations and plan trustees (all of whom are plan sponsors) flexibility in structuring the payment obligation to suit the plan's particular circumstances. "The Committee intends that multiemployer pension plan trustees or bargaining parties should be able to adopt uniform standard rules under which another employer, such as the last employer for which the individual worked before going into the uniformed service or the employer for which the returning service member had the most service during a given period following release from the uniformed service, may be considered the 'reemploying' employer for purposes of the pension provisions of Chapter 43. The Committee also intends for multi-employer pension plan trustees to have the right to determine that it would be more appropriate not to make any individual employer liable for such costs and thus to be able to adopt rules under which returning service members' reconstructed benefits would be funded out of plan contributions and other assets without imposing a specific additional funding obligation on any one employer." S. Rep. No. 103–158, at 65 (1993). With respect to both multiemployer and single employer plans, however, the Committee indicated: "It is the intent of the Committee that, with respect to allocations to individual account plans under section 3(34) of ERISA, allocations to the accounts of returning service members not be accomplished by reducing the account balances of other plan participants." Id.

The Department received one comment concerning funding obligations of defined contribution

multiemployer pension plans. The commenter requested the Department explain how such plans "might be expected" to fund obligations, particularly given Congress's intent that funding obligations not be met by reducing the account balances of other plan participants. The commenter points out that, unlike single-employer plans, multiemployer defined contribution plans often will not have a designated source of funds that is sufficient to fund a plan's USERRA obligations, particularly in cases in which such obligations are significant, such as when employees return following an extended absence to perform military service. While forfeitures and interest provide a source of funds that might be utilized to fund USERRA obligations, that source may not always be enough. The commenter submits that in some cases, the only way in which a multiemployer defined contribution plan can fund its obligations under USERRA might be to reduce the account balance of other participants in the plan. While the Department acknowledges this possibility, it nevertheless expects plans to comport with USERRA's intent that the funding of obligations required by USERRA should avoid a reduction in the account balances of other plan participants, and plans should develop reasonable procedures to achieve this result to the greatest extent possible.

If an employer participating in a multiemployer plan reemploys an individual who is entitled to pension benefits attributable to military service, then the employer must notify the plan administrator of the reemployment within 30 days. 38 U.S.C. 4318(c). USERRA requires this notice because multiemployer plan administrators may not be aware that a contributing employer has reemployed a person who may have a pension claim arising from his or her military service. In contrast, administrators of single employer pension plans are more likely to have access to such information. This notice requirement is implemented by section 1002.266(b).

The Department received one comment recommending that in the multiemployer context, section 1002.266 should require that "non-obvious entities," such as hiring halls, share the obligation to notify the plan of the reemployment. The commenter points out that in cases in which the reemploying employer is different from the pre-service employer, the reemploying employer may be unaware that it has reemployed the person pursuant to USERRA and therefore will be unable to fulfill its notice obligation.

As noted above, the Department has modified section 1002.266(c) to reflect that in cases in which different pre-service and post-service employers participate in a multiemployer plan, they must also be linked by a common means or practice of hiring the employee, such as common participation in a union hiring hall. In addition, the Department agrees with the comment that in these cases, the post-service employer may be unable to comply with its 30-day notice obligation to the plan until it knows that it has reemployed a person pursuant to USERRA. Accordingly, the Department has modified section 1002.266(b) to provide that the 30-day period within which notice to the plan must be made does not begin until the reemploying employer has knowledge that the employee was reemployed under USERRA. In addition, the amended provision further states that the returning service member should notify the employer upon reemployment that he or she has been reemployed following a period of military service. The Department declines to adopt the recommendation to require that non-employers such as hiring halls provide notice to plans, because the statute places that obligation only upon the reemploying employer. See 38 U.S.C. 4318(c).

Section 4318(b)(3) of the statute describes the method for calculating the reemployed service member's compensation for the period of military service to determine the amount the employer and service member must contribute under the plan. 38 U.S.C. 4318(b)(3). Section 1002.267 provides that the compensation the reemployed service member would have earned had he or she remained continuously employed provides the usual benchmark. If that amount cannot be determined with reasonable certainty (for example, where the compensation rate varies based on commissions or tips), the compensation rate may be based on the service member's average compensation rate during the 12-month period before the service period. For an employee who worked fewer than 12 months before entering the service, the entire employment period just prior to the service period may be used.

The Department received three comments regarding this provision. One commenter recommended this provision should apply only where the employee's absence for military service was a year or more in duration. The Department declines to adopt this recommendation, which would create a hierarchy of entitlements based on the duration of service that is not supported by the

statute. The Department received two comments concerning the method in which the employee's imputed compensation during the period of absence for military service should be calculated. One of the commenters proposed the rule state that pay raises that would have been awarded during the period of service be included in the calculation. The other suggested the rule state that any seasonal variations in compensation be included in the calculation. The Department concludes that section 1002.267 adequately addresses these issues, and therefore no change is necessary.

Although a service member who is not reemployed under the Act would not be entitled to pension benefits for his or her period of service, any vested accrued benefit in the plan to which the service member was entitled prior to entering military service would remain intact whether or not he or she was reemployed. Joint Explanatory Statement on H.R. 995, 103–353, at 2507 (1994); H.R. Rep. No. 103–65, Pt. I, at 36–37 (1993). The terms of the plan document control the manner and timing of distributions of vested accrued benefits from the plan if the service member is not reemployed by a participant employer.

USERRA provides specific guidance on certain aspects of the reemployed service member's pension plan rights. At the same time, employers, fiduciaries and plan administrators must also comply with other laws that regulate plan administration but are beyond the scope of these proposed regulations. Federal and State laws governing the establishment and operation of pension plans, such as ERISA or the Internal Revenue Code of 1986, as amended, and the regulations of the Pension Benefit Guaranty Corporation, continue to apply in the context of providing benefits under USERRA. Thus, for example, while section 4318(b)(1)(A) provides that liability for funding multiemployer pension plan benefits for a reemployed service member shall be allocated as the plan sponsor specifies, laws other than USERRA govern the technical aspects of the allocation.

## Subpart F—Compliance Assistance, Enforcement and Remedies

### Compliance Assistance

USERRA authorizes the Secretary of Labor to provide assistance to any person regarding the employment and reemployment rights and benefits provided under the statute. 38 U.S.C. 4321. The Secretary acts through the Veterans' Employment and Training Service (VETS). USERRA promotes the

resolution of complaints without resort to litigation. In order to facilitate this process, section 4321 allows VETS to request assistance from other Federal and State agencies and volunteers engaged in similar or related activities. Section 1002.277 describes VETS' authority to provide assistance to both employees and employers. VETS' assistance is not contingent upon the filing of a USERRA complaint.

The Department received two comments concerning its assistance in USERRA cases. The first commenter suggested that the regulation explicitly provide in section 1002.277, which states that that the "Secretary of Labor, through [VETS], provides assistance to any person or entity with respect to [USERRA]," that the Secretary is "required" to provide such assistance. The Department concludes that in stating that the Secretary "shall provide" such assistance, USERRA's directive is mandatory, and the proposed rule adequately reflects the mandate. A second commenter requested that the assistance provided to the Department by the National Committee for Employer Support of the Guard and Reserve (ESGR) be mentioned in the final rule. The ESGR is an agency within the Office of the Assistant Secretary of Defense for Reserve Affairs, and was established to promote cooperation and understanding between Reserve component members and their civilian employers and to assist in the resolution of conflicts arising from an employee's military commitment. The Department works closely with ESGR in its administration of USERRA, and the ESGR provides valuable service to this Department in this regard. However, the Department concludes it is not necessary to amend the text of the rule to include this acknowledgement.

*Investigation and Referral*

Section 1002.288 implements USERRA's section 4322, which authorizes VETS to enforce an individual's USERRA rights. Any person claiming rights or benefits under USERRA may file a complaint with VETS if his or her employer fails or refuses to comply with the provisions of USERRA, or indicates that it will not comply in the future. 38 U.S.C. 4322(a). This avenue, however, is optional. Nothing in section 4322 requires an individual to file a complaint with VETS, to request assistance from VETS, or to await notification from VETS of the right to bring an enforcement action. *Palmatier v. Michigan Dept. of State Police,* 1996 WL 925856 (W.D. Mich. 1996). Invoking VETS' enforcement

authority is an alternative provided by the statute once an employee decides to file a USERRA complaint. *See Gagnon v. Sprint Corp.,* 284 F.3d 839, 854 (8th Cir.), cert. denied 537 U.S. 1001 (2002). *See also* sections 1002.288 and 1002.303. Alternatively, the individual may file a complaint directly in the appropriate United States district court or State court in cases involving a private sector or State employer, respectively (or the Merit Systems Protection Board in cases involving a Federal executive agency). *See* 38 U.S.C. 4323(b) (direct action against State or private employer); 38 U.S.C. 4324(b) (direct action against Federal executive agency). The Office of Personnel Management has issued a separate body of regulations that implement USERRA for employees of Federal executive agencies. *See* 5 CFR Part 353.

Section 1002.288 also implements the statutory criteria for the form of a complaint. 38 U.S.C. 4322(b). Any complaint submitted to VETS must be in writing, using VETS Form 1010, which may be found at http:// www.dol.gov/libraryforms/forms/vets/ vets-1010.pdf. In addition, VETS has recently developed an electronic Form 1010, which can be accessed through the USERRA e-laws Advisor on its Web site at: *http://www.dol.gov/vets.* Claimants may complete and submit the "e1010" online, and they will be automatically notified that their complaint has been received and forwarded to the appropriate VETS staff member. The Department has amended section 1002.288 to include the option of electronic filing of the form 1010.

The regulation also contains the procedures for processing a complaint. See section 1002.289. VETS provides technical assistance to a potential claimant upon request, and his or her employer if appropriate. 38 U.S.C. 4322(c). Technical assistance is not limited to filing a complaint; it also includes responding to requests for information on specific issues that are not yet part of a formal USERRA complaint. Once an individual files a complaint, VETS must conduct an investigation. If the agency determines that a violation of USERRA has occurred, VETS undertakes "reasonable efforts" to effectuate compliance by the employer (or other entity) with its USERRA obligations. Section 1002.289-.290; 38 U.S.C. 4322(d). VETS notifies the claimant of the outcome of the investigation and the claimant's right to request that VETS refer the case to the Attorney General. See 38 U.S.C. 4322(e), 4323.

The Department received one comment concerning its efforts to

achieve compliance with USERRA, specifically regarding its obligation to notify the claimant of the results of a USERRA investigation. The commenter voiced disapproval that the Department "communicate[s] the results of its investigation to complaining employees but not to employers." The comment requests that the final rule be modified to provide that VETS will inform both the employee and the employer of the results of its investigation. Section 4322(e) of USERRA requires that the Department "shall notify the person who submitted the complaint" of the results of the investigation if the Department is unable to resolve the complaint, and section 1002.290 reflects this mandate. Further, in those cases in which VETS' investigation indicates that a violation of USERRA has occurred, VETS must make reasonable efforts to resolve the complaint by ensuring that the employer comes into compliance. See 38 U.S.C. 4322(d). As a practical matter, efforts to achieve compliance would necessitate notice to the employer and an opportunity to discuss the investigative findings.

Section 1002.289 sets forth VETS' authority to use subpoenas in connection with USERRA investigations. VETS may (i) require by subpoena the attendance and testimony of witnesses and the production of documents relating to any matter under investigation; and (ii) enforce the subpoena by requesting the Attorney General to apply to a district court for an appropriate order. 38 U.S.C. 4326(a)-(b). VETS' subpoena authority does not apply to the judicial or legislative branch of the Federal Government. 38 U.S.C. 4326(d).

*Enforcement of Rights and Benefits Against a State or Private Employer*

Section 4323 establishes the procedures for enforcing USERRA rights against a State or private employer. "State" includes the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and other territories of the United States. 38 U.S.C. 4303(14). The political subdivisions of a State (counties, municipalities and school districts), however, are private employers for enforcement purposes. 38 U.S.C. 4323(j). Although USERRA does not define "private employer," the term includes all employers other than the Federal Government or a State. Sections 1002.303 to .314 implement section 4323 of the Act.

An aggrieved individual may initiate a USERRA action either by filing an action in court or by filing a complaint

with VETS. If a complaint is filed with VETS and voluntary compliance cannot be achieved, the claimant may request VETS to refer the complaint to the Attorney General. 38 U.S.C. 4323(a)(1). If the Attorney General considers the complaint meritorious, the Attorney General may represent the claimant and file a complaint in the appropriate U.S. district court. In cases where representation is provided by the Attorney General, the complainant is the plaintiff if the case is brought against a private employer, including a political subdivision of a State; however, if the complaint involves a State employer, it is brought in the name of the United States. A claimant may also proceed directly to the courts in the following circumstances: (i) The claimant foregoes informal resolution by VETS; (ii) the claimant declines referral of the complaint to the Attorney General after an unsuccessful informal resolution; or, (iii) the Attorney General refuses to represent the claimant after referral. 38 U.S.C. 4323(a)(2). Sections 1002.303 and .304 implement these provisions.

Section 4323 establishes requirements for several aspects of the judicial process involving USERRA complaints, which are explained in sections 1002.305 through 1002.311. The United States district courts have jurisdiction over actions against a State or private employer brought by the United States, and actions against a private employer by a person. For actions brought by a person against a State, the action may be brought in a State court of competent jurisdiction. 38 U.S.C. 4323(b); section 1002.305. Venue for an action between the United States and a State lies in any Federal district in which the State exercises authority or carries out functions. Venue for an action against a private employer lies in any Federal district in which the employer maintains a place of business. 38 U.S.C. 4323(c); section 1002.307. Only persons claiming rights or benefits under USERRA (or the United States acting on their behalf) have standing to initiate a USERRA action. 38 U.S.C. 4323(f). Section 1002.308 therefore prohibits employers or other entities (such as pension plans or unions) from initiating actions. See H.R. Rep. No. 103–65, Pt. I, at 39 (1993). As for the respondents necessary to maintain an action, the statute requires only the employer or prospective employer to be named as necessary parties, and section 1002.239 implements this provision. 38 U.S.C. 4323(g); see H.R. Rep. No. 103–65, Pt. I, at 39 (1993).

No fees or court costs may be imposed on the claimant. In addition, the court may award a prevailing claimant his or her attorney's fee, expert witness fees, and other litigation expenses. 38 U.S.C. 4323(h); section 1002.310.

No State statute of limitations applies to a USERRA proceeding. 38 U.S.C. 4323(i). Section 1002.311 provides that an unreasonable delay by the claimant in asserting his or her rights that causes prejudice to the employer may result in dismissal of the claim under the doctrine of laches. See H.R. Rep. No. 103–65, Pt. I, at 39 (1993). The legislative history relies in part on a Sixth Circuit decision, which held that any limitation upon a former employee's right to sue is derived from the equitable doctrine of laches rather than an analogous State statute of limitations. See *Stevens* v. *Tennessee Valley Authority*, 712 F.2d 1047, 1049 (6th Cir. 1983) (decided under the predecessor Veterans' Reemployment Rights Act).

The Department has long taken the position that no Federal statute of limitations applied to actions under USERRA. USERRA's provision that State statutes of limitations are inapplicable, together with USERRA's legislative history, show that the Congress intended that the only time-related defense that may be asserted in defending against a USERRA claim is the equitable doctrine of laches. 38 U.S.C. 4323(i); see S. Rep. No. 103–158, at 70 (1993); H.R. Rep. No. 103–65, Pt. I, at 39 (1993). However, a Federal district court has ruled that USERRA claims are subject to a four-year statute of limitations enacted prior to the enactment of USERRA that imposes a general limitations period for all Federal causes of action where no statute of limitations is "otherwise provided by law," 28 U.S.C. 1658. *Rogers* v. *City of San Antonio*, 2003 WL 1566502, *7 (W.D. Tex.) (applying section 1658 because "USERRA was essentially a new Act" designed to replace entirely the VRRA in order to "clarify, simplify, and where necessary, strengthen the existing veterans'" employment and reemployment rights provisions"), reversed on other grounds, *Rogers* v. *City of San Antonio*, 392 F.3d 758, 772 fn. 36, 773 (5th Cir. 2004) (court declined to consider whether no statute of limitations applies to USERRA, noting the Department of Labor's position in its Notice of Proposed Rule Making, because the plaintiffs argued at the district court level that the four-year limitations period applied and therefore waived the no-limitations argument in the proceedings below).

Another recent district court decision, *Akhdary* v. *City of Chattanooga*, No. 1:01–CV–106, 2002 WL 32060140 (E.D. Tenn. May 22, 2002), held that 28 U.S.C. 1658 does not apply to USERRA claims. The recent decision of the United States Supreme Court in *Jones* v. *R.R. Donnelley & Sons Co.*, 541 U.S. 369(2004) is not dispositive because USERRA "otherwise provides by law" that no statute of limitations applies, and, because, with respect to some USERRA claims, the cause of action previously existed under the VRRA and consequently predates the effective date of 28 U.S.C. 1658.

The Department received seven comments concerning the applicability of a Federal statute of limitations to actions under USERRA. Commenters included the National Employment Lawyers Association (NELA), ORC Worldwide, Equal Employment Advisory Council, Society for Human Resource Management, Food Marketing Institute, U.S. Chamber of Commerce, and a law firm. NELA recommended that the Department declare in the final rule that 28 U.S.C. 1658 does not apply to actions under USERRA, and that the Department rejects those court decisions to the contrary. The remaining six commenters opposed the Department's position on the issue for various reasons: Two comments argued that the proposed provision exceeds the Department's regulatory authority because it is outside of any statutory authority and because it is "vague and unclear"; one comment suggested deleting the provision pending resolution of the matter by the courts; and the three remaining comments submitted that 28 U.S.C. 1658 conclusively applies to actions under USERRA.

After considering these comments, the Department will continue to adhere to its view that section 1658 does not apply to USERRA for two reasons. First, as noted above, because USERRA "otherwise provides by law" adequate guidance on the statute of limitations issue, the residual limitations period in section 1658 is inapplicable. See, e.g., *Miller* v. *City of Indianapolis*, 281 F.3d 648, 653–654 (7th Cir. 2002) (court held that laches barred claims under USERRA; parties did not argue the application of § 1658 and the court did not raise its applicability). In addition, as noted above, the Wallace court specifically rejected the argument that a Federal statute of limitations applied to a claim under USERRA's predecessor, the Vietnam Era Veterans' Readjustment Assistance Act (VEVRAA), which includes the same Congressional intent that no limitations period other than laches should apply. *Wallace* v. *Hardee's of Oxford*, 874 F. Supp. 374, 376–77 (M.D. Ala. 1995). The court

reasoned that Congress enacted the bar on use of State statutes of limitations specifically to overrule case law on that issue. The Wallace court further concluded that Congress did not enact a bar on use of Federal statutes of limitations because there was no need—no court had ever applied a Federal limitations statute to decide a claim under USERRA. Id.

The Department views the Supreme Court's interpretation of section 1658 in R.R. Donnelley as supportive of the argument that the four-year limitations period should apply only to statutes whose claims have been resolved through the borrowed application of State statutes of limitations, a category that does not include USERRA. In R.R. Donnelley, the Court relied heavily on Congress's purpose in enacting section 1658, and looked beyond the terms of the phrase "arising under" to examine "the context in which [section 1658] was enacted and the purposes it was designed to accomplish." Id. at 377. The Court concluded that "a central purpose" of section 1658 was to minimize the occasions for the practice of borrowing State statutes of limitations. Id. at 380, fn. 13 (citing H.R. Rep. No. 101–734 at 24 (1990)). The Court's holding thus "best serves Congress" interest in alleviating the uncertainty inherent in the practice of borrowing State statutes of limitations while at the same time protecting settled interests." Id. at 382.

Unlike statutes to which section 1658 was intended to apply, USERRA has no "void" that has "created so much unnecessary work for federal judges." Id at 380. Because USERRA already prohibits borrowing of State statutes of limitations, it is not the type of statute Congress had in mind when it enacted section 1658. In fact, courts have "borrowed" from USERRA and its predecessors in order to determine an appropriate statute of limitations for claims under other statutes. See, e.g., Stevens, 712 F.2d at 1056 ("borrowing" from the most analogous Federal statute, VRRA, to determine that laches rather than State limitations period applies to action under the Veteran's Preference Act). These decisions indicate that USERRA offers enough guidance on the statute of limitations issue that it should fall within the "otherwise provided by law" exception to section 1658.

The second basis for the argument that section 1658 does not apply to claims under USERRA is also found in the R.R. Donnelley case. In R.R. Donnelley, the Court determined that the limitations statute governs a cause of action "if the plaintiff's claim against the defendant was made possible by a

post-1990 enactment." R.R. Donnelley, 541 U.S. at 382. Many, and possibly most, claims arising under 1994's USERRA were possible under USERRA's predecessor statutes and therefore not "made possible by a post-1990 enactment" within the meaning of R.R. Donnelley. USERRA is simply a Congressional reaffirmation of decades-old law governing reemployment rights of service members, and contains few new causes of action, See, e.g., Akhdary v. City of Chattanooga, 2002 WL 32060140, *6 (E.D. Tenn. 2002) (section 1658 does not apply to claims under USERRA because USERRA amends the preexisting law of the VRRA). But see Rogers v. City of San Antonio.

Although the Department will continue to advance the view that section 1658 does not apply to cases arising under USERRA, there are conflicting decisions regarding the applicability of section 1658 to USERRA, and the issue will ultimately be resolved by the courts. Until the issue is resolved, potential USERRA plaintiffs would be well advised to file USERRA claims within section 1658's four-year period. Accordingly, the Department has amended section 1002.311 to acknowledge that at least one court has held that 28 U.S.C. 1658 applies to actions under USERRA, and that individuals asserting rights under USERRA should determine whether the issue of the applicability of the Federal four-year statute of limitations has been resolved and, in any event, act promptly to preserve their rights under USERRA.

Finally on the issue of time-barred claims, Rep. John Boehner, Chairman of the U.S. House of Representatives Committee on Education and the Workforce, requested the final rule provide some explanation of the "equitable doctrine of laches," which is the common-law principle applicable to USERRA cases that serves to bar untimely actions. Section 1002.311, which states that USERRA claims may be barred as untimely if "an individual unreasonably delays asserting his or her rights, and that unreasonable delay causes prejudice to the employer," adequately incorporates the principles that govern the doctrine of laches.

With respect to remedies, the court has broad authority to protect the rights and benefits of persons covered by USERRA. The court may order the employer to comply with USERRA's provisions; compensate the claimant for lost wages and/or benefits; and pay additional, liquidated, damages equivalent to the lost wages/benefits if it determines that the employer's violation is willful. 38 U.S.C. 4323(d)(1). The legislative history establishes that

"a violation shall be considered to be willful if the employer or potential employer 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [provisions of this chapter].'" H.R. Rep. No. 103–65, Pt. I, at 38 (1993), quoting Hazen Paper Co. v. Biggins, 507 U.S. 604, 617 (1993) (holding that a violation of the ADEA is willful if the employee either knew or showed reckless disregard for whether the statute prohibited its conduct); see also Fink v. City of New York, 129 F.Supp.2d 511, 523–25; Duarte v. Agilent Technologies, Inc., 366 F.Supp.2d 1039, 1048. Section 1002.312 lists the possible remedies allowed under section 4323(d). Section 1002.313 states that compensation consisting of lost wages, benefits or liquidated damages derived from any action brought on behalf of the United States shall be paid directly to the aggrieved individual. Finally, the court may use its equity powers to enforce the rights guaranteed by USERRA. 38 U.S.C. 4323(e); section 1002.314.

The Department received one comment broadly concerning the issues of enforcement and court procedures, arguing that the proposed regulations were attempting to create substantive rights not provided for by USERRA and that are "inconsistent with a number of federal statutes and court decisions." In addition, the comment states that through the regulations, the Department is attempting to "establish jurisdiction, venue, statutes of limitation, * * * [and] provide remedies not set forth by statute." In registering its complaint, the commenter fails to specify the allegedly conflicting "federal statutes and court decisions" to which it refers. Moreover, following a thorough review during the rule-making process and the preparation for publication of the final rule, the Department is confident that every provision in the final rule has a sound basis in the statute's directives, its legislative intent, and in case law under USERRA.

### Effective Date and Compliance Deadlines

These regulations impose no new legal requirements but explain existing ones, in some cases for the first time. In the Notice of Proposed Rulemaking, the Department proposed that these regulations be effective 30 days after publication of the final rule, and requested comment on whether this would allow adequate time for covered parties to come into full compliance. The Department noted at that time that it expected that most employers were already in full compliance. However, to

the extent that these regulations clarify USERRA's requirements and require adjustments in employer policies and practices, the Department expressed its intent to allow a reasonable amount of time for the transition to take place.

The Department received eight comments concerning the proposed effective date of the final rule following its publication. One of the commenters, an employer association, agreed that the 30-day effective date was reasonable. Three commenters recommended adoption of a 90-day effective date. The remaining four commenters recommended longer periods that ranged from 180 days to the end of the benefits plan year following the plan year in which the final rule is published. In addition, one commenter who proposed a 90-day effective date indicated that the additional time is necessary to permit small businesses the opportunity to "study" the regulations. All commenters proposing an expansion of time based their recommendations on the need for employers and plan administrators to have sufficient time to make adjustments to health and benefit plans necessitated by provisions in the proposed rule.

As noted in Subparts D and E, above, the Department has made several significant revisions to the health and pension plan provisions. After considering the comments from health and pension plan experts, the Department concludes that these modifications have eliminated the administrative burden associated with those sections of the proposed rule. As a result, the Department anticipates that significant plan adjustments, as raised in the comments, will not be necessary. In addition, as stated above, the regulations impose no new legal requirements but merely explain existing ones; small and large businesses alike should not require additional time to "study" and come into compliance with a statute to which they have been subject for many years. For all these reasons, the Department has retained the provision that states that the rule will become effective 30 days after publication of the final rule.

## VI. Procedural Determinations

### A. Paperwork Reduction Act

Under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501, et seq.), Federal agencies must seek Office of Management and Budget (OMB) approval for all collections of information (i.e., paperwork). As part of the approval process, agencies must solicit comment from affected parties with regard to the collections of information, including the cost and burden-hour estimates made for these collections by the agencies. The paperwork cost and burden-hour estimates that an agency submits to OMB are termed an "Information Collection Request" (ICR).

In the proposed rule, VETS requested the public to comment on the information-collection (i.e., reporting and recordkeeping) requirements contained in the ICR that it submitted to OMB (69 FR 56282). The following chart describes these requirements.

COMPARISON OF FINAL RULE AND STATUTORY LANGUAGE CONTAINING PAPERWORK REQUIREMENTS

| Final provision and language | Statutory provision and language |
|---|---|
| 1002.85(a) The employee or an appropriate officer of the uniformed service in which his or her service is to be performed, must notify the employer that the employee intends to leave the employment position to perform service in the uniformed services. * * * <br> 1002.85(c) The employee's notice to the employer may be either verbal or written. | 4312(a)(1) [Reemployment rights and benefits available if] the person (or an appropriate officer of the uniformed service in which such service is performed) has given advance written or verbal notice of such service to such person's employer[.] |
| 1002.115 * * * Upon completing service in the uniformed services, the employee must notify the pre-service employer of his or her intent to return to the employment position by either reporting to work or submitting a timely application for reemployment. <br> 1002.118 * * * The employee may apply orally or in writing. | 4312(a)(3) [Reemployment rights and benefits available if] the person reports to, or submits an application for reemployment to, such employer in accordance with the provisions of subsection (e). |
| 1002.193 * * * The employer must determine the seniority rights, status, and rate of pay as though the employee had been continuously employed during the period of service. | 4313(a)(2)(A) [A person entitled to reemployment shall be promptly reemployed] in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or a position of like seniority, status and pay [with certain exceptions]. |
| 1002.266(b) * * * An employer that contributes to a multiemployer plan and that reemploys the employee * * * must provide written notice of reemployment to the plan administrator. * * * | 4318(c) Any employer who reemploys a person under this chapter and who is an employer contributing to a multiemployer plan * * * under which benefits are or may be payable to such person by reason of the obligations set forth in this chapter, shall * * * provide information, in writing, of such reemployment to the administrator of the plan. |
| 1002.288 A complaint may be filed with VETS either in writing, using VETS Form 1010, or electronically, using VETS Form e1010 * * * [and] must include the name and address of the employer, a summary of the basis for the complaint, and a request for relief. | 4322(b) Such complaint shall be in writing, be in such form as [VETS] may prescribe, include the name and address of the employer against whom the complaint is filed, and contain a summary of the allegations that form the basis of for the complaint. |

Note: VETS Form 1010 currently is approved by OMB, #1293–0002, expiration date March 2007.

The following four paragraphs describe the burden and cost estimates for the paperwork requirements described in this chart.

Notifying employers of departure from employment (1002.85). Based on its extensive industry knowledge, VETS determined that, in the overwhelming majority of cases, employees will provide this information orally, and that it will take them only a few seconds to complete the necessary communication. In view of the brief period of communication involved, VETS believes that this information-collection provision will impose a de minimus burden on employees and employers; therefore, VETS claims no burden for this activity.

Notifying employers of plan to return to pre-service employment (1002.115). Similar to the previous paragraph, VETS estimates that in the vast majority of instances in which employees communicate the required notice to employers, they will do so orally and

will take only a few seconds to complete the task. Therefore, VETS considers this information-collection provision to be de minimus, and claims no burden for this activity.

*Determining reemployment positions (1002.193).* Estimates made by the Department of Defense indicate that 50,000 to 125,000 service members covered by USERRA will demobilize in the coming year. For the purpose of making burden-hour and cost estimates for this provision, VETS assumes that the maximum number of service members (i.e., 125,000) will demobilize each year, and that all of these service members plan to resume their pre-service employment positions (a highly unlikely possibility). Using its extensive experience with the same provision in the USERRA statute, VETS estimates that a secretary (at an hourly wage rate of $18.99, including benefits) takes about 20 minutes (.33 hour) to compile and review the necessary information (i.e., seniority rights, status, and rate of pay) and to make a preliminary determination regarding a returning service member's reemployment position, and that a supervisor (at an hourly wage rate of $22.97, including benefits) requires an average of 10 minutes (.17 hour) to review this information and approve the final determination. Therefore, this provision will result in an annual employer burden of 62,500 hours at a cost of $1,271,451.

*Notifying plan administrators of reemployment (1002.266(b)).* Data compiled by the Department of Labor from 1998 indicate that about 6 percent of all private-wage and salary workers participate in multiemployer defined-benefit plans. As noted previously, 50,000 to 125,000 service members covered by USERRA will demobilize in the coming year. If 6 percent of these uniformed-service members reenroll in a multiemployer pension plan after demobilization, then this information-collection provision will apply to 7,500 of these returning service members. Based on its previous experience with this provision in the USERRA statute, VETS determined that it takes about 30 minutes (.5 hours) for a secretary to type and mail a standardized letter to a plan administrator that provides the administrator with notification of an employee's reemployment status. Therefore, the annual burden-hour and cost estimates for the proposed information-collection provision are 3,750 hours and $71,213.

VETS received no public comment on the four proposed collections of information, nor is any other record evidence available indicating that the Agency's cost and burden-hour estimates as described in the proposal are incorrect or need revision. Therefore, VETS did not revise any of the proposed collections of information contained in the ICR for this final rule.

In the final rule, the Department added the following statement to section 1002.171: "The employer should counsel the employee about these options and the consequences of selecting one or the other." The use of the verb "should" makes this provision advisory, i.e., the employer has discretion in determining whether to communicate information about the available options to an employee. Therefore, this provision is not enforceable, and will not be enforced, by VETS. Consequently, the Agency is not including this provision in its estimate of the paperwork burden attributable to this final rule.

The first four paperwork requirements described in the Table above have been approved by OMB, # 1293–0011, which expires December, 2008. The final paperwork requirement relating to VETS Form 1010, was previously approved by OMB, # 1293–0002, which expires March, 2007.

*B. Final Economic Analysis and Regulatory Flexibility Certification*

VETS is treating this final rule as a "significant regulatory action" within the meaning of Executive Order 12866 (58 FR 51735; September 30, 1993) ("Order"), because of its importance to the public and the Department's priorities. However, because this final rule is not "economically significant" as defined in section 3(f)(1) of EO 12866 as discussed below, it does not require a full economic-impact analysis under section 6(a)(3)(C) of the Order. Additionally, the rule will impose no additional costs on any private or public sector entity, and will not meet any of the criteria for an economically significant or major rule specified by the Order or relevant statutes. Consequently, the final rule is not a "major rule" under the Unfunded Mandates Reform Act, 2 U.S.C. 1501, et seq., or Section 801 of the Small Business Regulatory Enforcement Fairness Act (SBREFA), 5 U.S.C. 801.

One commenter took exception to the cost determinations made by VETS in the proposed rule. This commenter had concerns about the cost of the proposed regulations for small businesses. In expressing these concerns, the commenter asserted:

Because there is no size limitation in the USERRA, these regulations will apply to employers of any size. To say that this regulation will impose no costs at all on employers is unrealistic * * *. To the extent that employers have handled [compliance with USERRA] differently because of ambiguity, these changes will likely have a cost impact which will apply to all employers, even the smallest. Merely by publishing these regulations, employers will be on more notice about their obligations and[,] therefore[,] will be more likely to come into compliance.

The Agency concludes that this commenter misunderstood its use of the term "cost" as used in this context. Accordingly, VETS used the term in the proposal to describe additional costs, over and above the costs of complying with USERRA, that employers would bear in complying with the proposed regulations. In addition, the commenter noted that compliance with the proposed standard may increase employer costs because some employers may have misinterpreted the USERRA provisions, or because additional employers may come into compliance. However, VETS believes that employers have an existing statutory obligation to comply with USERRA, and any increase in compliance, or alteration in the manner of compliance, that results from the final rule only ensures that employers are meeting these statutory obligations. Consequently, the final regulations will afford service members with all of the benefits to which they are entitled under USERRA.

Another commenter objected to the statement in the proposal that the regulations would "impose no new legal requirements" and "would not impose any additional costs on employers" (Ex. 60). Accordingly, this commenter asserted that proposed section 1002.266(c) would increase compliance costs by holding contributing employers to a multiemployer pension plan responsible for the participation, vesting, and benefit-accrual protections to which returning service members would be entitled, even though they were not the pre-service employers of that employee. The Agency has responded to this comment in Subpart E of Section V ("Section-by-Section Summary of Final Rule and Discussion of Comments") of this preamble. Based on this response, VETS believes that final section 1002.266(c) will not increase the cost to employers of complying with these final regulations.

In the proposed rule, VETS noted that the Senate Committee report accompanying the passage of USERRA noted that the "[Congressional Budget Office] estimates that the enactment of [section 9 of USERRA, transitioning from the predecessor veterans' reemployment rights law to USERRA] would entail no significant cost." (See

S. Rep. No. 103–158, at 82 (1993)). The same report states further on page 84, under the heading "Regulatory Impact Statement," that:

[T]he Committee [on Veterans' Affairs] has made an evaluation of the regulatory impact which would be incurred in carrying out the Committee bill. The Committee finds that the enactment of the bill would not entail any significant new regulation of individuals or business * * *.

In this regard, USERRA is the latest in a series of laws protecting veterans' employment and reemployment rights going back to the Selective Training and Service Act of 1940. USERRA's immediate predecessor was the Veterans' Reemployment Rights Act ("VRRA"). USERRA continued the fundamental protections of the VRRA and the case law interpreting the VRRA while clarifying that law, and VETS considers that by recodifying and clarifying longstanding statutory and case law under the VRRA, USERRA did not impose new economic burdens on employers.

This final rule implements USERRA, and while it imposes no new costs, VETS considers that it may provide some economic benefits. For example, delays may occur when employers respond to employee claims and inquiries concerning USERRA due to confusion or ambiguity as to the correct interpretation of USERRA. Moreover, some employee claims are contested in part because of a lack of employer knowledge about the statute. The final rule should reduce these costs by: providing employers with accurate information necessary to respond efficiently and effectively to employee claims; potentially reducing the number of contested claims and the resulting need for administrative resolution or legal action; expediting the settlement of outstanding claims because employers and employees will have an enhanced knowledge of their rights and responsibilities under USERRA; and reducing the number of inquiries made by employers and employees to administrative agencies such as VETS and the Office of Personnel Management. In addition, by lessening the possibility of contested claims, the final rule also will reduce the likelihood that employees will receive liquidated damages from employers should the claims prove successful.

VETS noted in the proposal that it:

[E]xpects the rule to benefit both pension- and health-plan sponsors and participants by helping to dispel plan administrators' uncertainty about compliance with USERRA provisions, and by reducing delays and the risk of inadvertent noncompliance. The rule may assist participants and beneficiaries to

better understand their USERRA rights as well, thereby averting disputes and lost opportunities to elect continuing health-plan coverage, or to obtain reinstated pension-plan coverage.

VETS maintains these views with respect to this final rule. Therefore, based on this discussion and the record evidence, VETS concludes that the final rule will not impose any additional costs on employers. Consequently, this final rule requires no final economic analysis. Furthermore, because the final rule imposes no costs on employers, VETS certifies that it will not have a significant impact on a substantial number of small businesses; accordingly, the Agency need not prepare a final regulatory flexibility analysis. In this regard, VETS finds that the economic burden of the final rule is equitably distributed across businesses, including small businesses, because the number of employees covered by the final rule will vary in proportion to the size of the business (i.e., small businesses have proportionally fewer covered employees than medium or large businesses).

### C. Unfunded Mandates

The Congressional Budget Office ("CBO") determined that State and local governments would incur no cost resulting from passage of USERRA (see S. Rep. No. 103–158, at 84 (1993)). Consequently, under this final rule, State and local governments will incur an obligation to comply with USERRA to the same extent as private employers; therefore, when USERRA (and this final rule) impose no cost on private employers, they also impose no cost on State and local government employers. The House Committee Report for USERRA (H.R. Rep. No. 103–65, Pt. I, at 49–51 (1993)) contained similar CBO language. However, the CBO determined that, because of changes to Thrift Savings Plan provisions, the cost for the Federal government to comply with USERRA are about $1 million in FY 1994 and 1995, and zero cost thereafter.

The Agency reviewed this final rule according to the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1501 et seq.) and Executive Order 12875 (58 FR 58093; October 26, 1993). Based on the CBO determinations described in the previous paragraph, the Agency has determined that this final rule does not include any Federal mandate that will result in increased expenditures by State, local, or tribal governments in the aggregate of more than $100 million, or increased expenditures by the private sector of more than $100 million. Therefore, the Agency concludes that this final rule: (1) Will not affect State,

local, or tribal entities significantly or uniquely; (2) does not contain an unfunded mandate requiring consultation with these entities; and (3) will not impose substantial direct compliance costs on Native American tribal governments. Accordingly, this final rule does not mandate that State, local, or tribal governments adopt new, unfunded regulatory obligations.

### D. Federalism

This final rule does not have federalism implications as specified under Executive Order 13132 (64 FR 43255; August 10, 1999) because it has no substantial direct effect on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Section 4302 of USERRA provides that its provisions supersede any and all laws of the States as they relate to any rights and benefits provided under USERRA if such State laws reduce, limit, or eliminate in any manner any right or benefit provided by USERRA. Accordingly, the requirements implemented by this final rule do not alter these fundamental statutory provisions with respect to military service members' and veterans' employment and reemployment rights and benefits. Therefore, this final rule has no implications for the States, or for the relationship or distribution of power between the national government and the States.

### E. Congressional Review Act and Executive Order 12866

Consistent with the Congressional Review Act, 5 U.S.C. 801, et seq., the Department will submit to Congress and to the Comptroller General of the United States, a report regarding the issuance of this Final Rule prior to the effective date set forth at the outset of this document.

OMB has determined that this rule is not a "major rule" as defined by the Congressional Review Act (Section 804 of the Small Business Regulatory Enforcement Fairness Act of 1996), and that it is not "economically significant," as defined by Executive Order 12866, as it will not have an economic impact of $100 million in any one year. USERRA is the latest in a series of laws protecting service members' employment and reemployment rights dating back to 1940, and USERRA continues the fundamental protections contained in those longstanding statutes. As the Senate Committee report accompanying the passage of USERRA noted, the Congressional Budget Office determined that the enactment of USERRA would impose no new economic burdens on

employers. See S. Rep. No. 103–158, at 82 (1993). Similarly, the Senate Report's Regulatory Impact Statement concluded that USERRA's regulatory impact "would not entail any significant new regulation of individuals or business* * *." As would be expected, therefore, the vast majority of these regulations simply restate statutory requirements that would be self-implementing, even in the absence of the regulatory action. Accordingly, USERRA and promulgation of this rule impose no additional costs on employers or on any private or public sector entity that would approach the $100 million threshold.

As noted above, VETS received two comments regarding its conclusion in the proposed rule that the regulation would not impose any additional costs on the regulated community. One comment suggested that the final rule would increase compliance costs to employers because the clarifications contained in the rule may result in modifications to employers' compliance strategies and the novelty of the rule may increase overall compliance. VETS recognizes that the rule may lead to an increase in compliance, but the complexity inherent in assessing the economic costs and benefits of this rule and the relative paucity of data associated with implementation costs provide insufficient information to estimate what the effect of additional compliance might be. However, as discussed below, VETS does not consider that such costs would approach the $100 million threshold, and no commenter suggested that it would.

One of the primary effects of USERRA is that employees who have been absent from civilian employment due to military service will be reinstated to the appropriate reemployment position. Because employees absent from employment for military service are not required to be compensated by their civilian employer during that service, and because temporary replacements hired during the period of military service may be displaced by returning service members, costs to employers in complying with the reinstatement obligation will reflect insubstantial administrative expenditures. An additional effect of USERRA is its reduction of employment discrimination against members of the uniformed service, which presents no additional costs to compliant employers and offers an intangible economic good to the economy, which is moved toward a discrimination-free model. Similarly, USERRA's provision that employees may continue their employment-based health coverage during uniformed service specifies that employees must pay for that benefit at no more than 102% of the cost of the premium, so that employers' premium and administrative costs of maintaining the coverage are minimized.

USERRA's requirement that employers reasonably accommodate employees returning from service with a service-related illness or injury presents some costs to employers. However, when costs to the economy associated with a similar requirement under the Americans with Disabilities Act, 42 U.S.C 12101, were evaluated, those costs were calculated to be well below the $100 million threshold, in part due to increased productivity resulting from the optimization of investment in human capital. See 56 FR 8578, 8582–8584 (Feb. 28, 1991). Moreover, by comparison, the ADA's "reasonable accommodation" requirement is broader than USERRA's in that it is not limited to the provision of reasonable accommodations only to employees returning from service with service-related illnesses or injuries. Accordingly, reasonable accommodation costs to employers under USERRA should be less significant than similar costs generated by implementation of the ADA.

USERRA's provision that employers maintain their obligation to provide pension benefits to employees absent from employment due to military service as if there were no break in service does impose costs on employers and plans. However, VETS estimates that such costs will be incurred by a small percentage of covered employers, and that the resulting impact on the economy from this provision is not great. A second comment suggested that the rule imposed additional pension-related costs on post-service employers beyond those costs already imposed by the statute. However, VETS has narrowed the provision of the rule at issue in the comment, and concludes that the provision includes no additional regulatory costs beyond those associated with statutory compliance. As a final note, the benefits of USERRA and this implementing regulation include outcomes that cannot be readily and precisely monetized or quantified but that greatly outweigh any minimal additional costs. As noted above, these include the societal benefit of nondiscrimination in employment. Further, by protecting employment and reemployment rights of service members, USERRA and this regulation remove disincentives to enlistment and promote a national defense. After considering all comments, the conclusion that this rule presents minimal additional costs to private or public sector entities remains sound. Accordingly, this regulation is not a major rule for purposes of the Congressional Review Act, nor economically significant for purposes of Executive Order 12866.

## VII. Statutory and Rulemaking Background

The Uniformed Services Employment and Reemployment Rights Act (USERRA), Pub. L. 103–353, 108 Stat. 3150 (codified at 38 U.S.C. 4301–4333), became law on October 13, 1994, replacing the Veterans' Reemployment Rights Act (VRRA). Congress enacted USERRA, in part, to clarify the ambiguities of the VRRA and strengthen the rights of service members and veterans. USERRA's guiding principle is that a person who leaves civilian employment to perform service in the uniformed services is entitled to return to that job with the seniority, status, and rate of pay that would have accrued during the absence, provided the person meets USERRA's eligibility criteria. USERRA applies to voluntary or involuntary military service in peacetime as well as wartime. Its provisions apply to virtually all employers, regardless of size. USERRA also codifies 55 years of accumulated case law and clarifies previously existing rights and obligations. For most purposes, USERRA applies to reemployments initiated on or after December 12, 1994. Congress enacted amendments to the Act in 1996, 1998, 2000, and 2004.

## VIII. Statutory Authority

This regulation is proposed pursuant to the authority in section 4331(a) of USERRA (Pub. L. 103–353, 108 Stat. 3150, 38 U.S.C. 4331(a)).

## List of Subjects in 20 CFR Part 1002

Labor, Veterans, Pensions.

## Final Regulation

■ For the reasons set out in the preamble, the Department revises Part 1002 of Chapter IX of Title 20 of the Code of Federal Regulations implementing the provisions of USERRA as follows:

## PART 1002—REGULATIONS UNDER THE UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT OF 1994

**Subpart A—Introduction to the Regulations Under the Uniformed Services Employment and Reemployment Rights Act of 1994**

**General Provisions**

Sec.
1002.1   What is the purpose of this part?
1002.2   Is USERRA a new law?
1002.3   When did USERRA become effective?
1002.4   What is the role of the Secretary of Labor under USERRA?
1002.5   What definitions apply to USERRA?
1002.6   What types of service in the uniformed services are covered by USERRA?
1002.7   How does USERRA relate to other laws, public and private contracts, and employer practices?

**Subpart B—Anti-Discrimination and Anti-Retaliation**

**Protection From Employer Discrimination and Retaliation**

1002.18   What status or activity is protected from employer discrimination by USERRA?
1002.19   What activity is protected from employer retaliation by USERRA?
1002.20   Does USERRA protect an individual who does not actually perform service in the uniformed services?
1002.21   Do the Act's prohibitions against discrimination and retaliation apply to all employment positions?
1002.22   Who has the burden of proving discrimination or retaliation in violation of USERRA?
1002.23   What must the individual show to carry the burden of proving that the employer discriminated or retaliated against him or her?

**Subpart C—Eligibility for Reemployment**

**General Eligibility Requirements for Reemployment**

1002.32   What criteria must the employee meet to be eligible under USERRA for reemployment after service in the uniformed services?
1002.33   Does the employee have to prove that the employer discriminated against him or her in order to be eligible for reemployment?

**Coverage of Employers and Positions**

1002.34   Which employers are covered by USERRA?
1002.35   Is a successor in interest an employer covered by USERRA?
1002.36   Can an employer be liable as a successor in interest if it was unaware that an employee may claim reemployment rights when the employer acquired the business?
1002.37   Can one employee be employed in one job by more than one employer?
1002.38   Can a hiring hall be an employer?
1002.39   Are States (and their political subdivisions), the District of Columbia,

the Commonwealth of Puerto Rico, and United States territories, considered employers?
1002.40   Does USERRA protect against discrimination in initial hiring decisions?
1002.41   Does an employee have rights under USERRA even though he or she holds a temporary, part-time, probationary, or seasonal employment position?
1002.42   What rights does an employee have under USERRA if he or she is on layoff, on strike, or on a leave of absence?
1002.43   Does an individual have rights under USERRA even if he or she is an executive, managerial, or professional employee?
1002.44   Does USERRA cover an independent contractor?

**Coverage of Service in the Uniformed Services**

1002.54   Are all military fitness examinations considered "service in the uniformed services?"
1002.55   Is all funeral honors duty considered "service in the uniformed services?"
1002.56   What types of service in the National Disaster Medical System are considered "service in the uniformed services?"
1002.57   Is all service as a member of the National Guard considered "service in the uniformed services?"
1002.58   Is service in the commissioned corps of the Public Health Service considered "service in the uniformed services?"
1002.59   Are there any circumstances in which special categories of persons are considered to perform "service in the uniformed services?"
1002.60   Does USERRA cover an individual attending a military service academy?
1002.61   Does USERRA cover a member of the Reserve Officers Training Corps?
1002.62   Does USERRA cover a member of the Commissioned Corps of the National Oceanic and Atmospheric Administration, the Civil Air Patrol, or the Coast Guard Auxiliary?

**Absence From a Position of Employment Necessitated by Reason of Service in the Uniformed Services**

1002.73   Does service in the uniformed services have to be an employee's sole reason for leaving an employment position in order to have USERRA reemployment rights?
1002.74   Must the employee begin service in the uniformed services immediately after leaving his or her employment position in order to have USERRA reemployment rights?

**Requirement of Notice**

1002.85   Must the employee give advance notice to the employer of his or her service in the uniformed services?
1002.86   When is the employee excused from giving advance notice of service in the uniformed services?
1002.87   Is the employee required to get permission from his or her employer

before leaving to perform service in the uniformed services?
1002.88   Is the employee required to tell his or her civilian employer that he or she intends to seek reemployment after completing uniformed service before the employee leaves to perform service in the uniformed services?

**Period of Service**

1002.99   Is there a limit on the total amount of service in the uniformed services that an employee may perform and still retain reemployment rights with the employer?
1002.100   Does the five-year service limit include all absences from an employment position that are related to service in the uniformed services?
1002.101   Does the five-year service limit include periods of service that the employee performed when he or she worked for a previous employer?
1002.102   Does the five-year service limit include periods of service that the employee performed before USERRA was enacted?
1002.103   Are there any types of service in the uniformed services that an employee can perform that do not count against USERRA's five-year service limit?
1002.104   Is the employee required to accommodate his or her employer's needs as to the timing, frequency or duration of service?

**Application for Reemployment**

1002.115   Is the employee required to report to or submit a timely application for reemployment to his or her pre-service employer upon completing the period of service in the uniformed services?
1002.116   Is the time period for reporting back to an employer extended if the employee is hospitalized for, or convalescing from, an illness or injury incurred in, or aggravated during, the performance of service?
1002.117   Are there any consequences if the employee fails to report for or submit a timely application for reemployment?
1002.118   Is an application for reemployment required to be in any particular form?
1002.119   To whom must the employee submit the application for reemployment?
1002.120   If the employee seeks or obtains employment with an employer other than the pre-service employer before the end of the period within which a reemployment application must be filed, will that jeopardize reemployment rights with the pre-service employer?
1002.121   Is the employee required to submit documentation to the employer in connection with the application for reemployment?
1002.122   Is the employer required to reemploy the employee if documentation establishing the employee's eligibility does not exist or is not readily available?
1002.123   What documents satisfy the requirement that the employee establish eligibility for reemployment after a period of service of more than thirty days?

**Character of Service**

1002.134  What type of discharge or separation from service is required for an employee to be entitled to reemployment under USERRA?

1002.135  What types of discharge or separation from uniformed service will make the employee ineligible for reemployment under USERRA?

1002.136  Who determines the characterization of service?

1002.137  If the employee receives a disqualifying discharge or release from uniformed service and it is later upgraded, will reemployment rights be restored?

1002.138  If the employee receives a retroactive upgrade in the characterization of service, will that entitle him or her back to claim back wages and benefits lost as of the date of separation from service?

**Employer Statutory Defenses**

1002.139  Are there any circumstances in which the pre-service employer is excused from its obligation to reemploy the employee following a period of uniformed service? What statutory defenses are available to the employer in an action or proceeding for reemployment benefits?

**Subpart D—Rights, Benefits, and Obligations of Persons Absent from Employment Due to Service in the Uniformed Services**

**Furlough and Leave of Absence**

1002.149  What is the employee's status with his or her civilian employer while performing service in the uniformed services?

1002.150  Which non-seniority rights and benefits is the employee entitled to during a period of service?

1002.151  If the employer provides full or partial pay to the employee while he or she is on military leave, is the employer required to also provide the non-seniority rights and benefits ordinarily granted to similarly situated employees on furlough or leave of absence?

1002.152  If employment is interrupted by a period of service in the uniformed services, are there any circumstances under which the employee is not entitled to the non-seniority rights and benefits ordinarily granted to similarly situated employees on furlough or leave of absence?

1002.153  If employment is interrupted by a period of service in the uniformed services, is the employee permitted upon request to use accrued vacation, annual or similar leave with pay during the service? Can the employer require the employee to use accrued leave during a period of service?

**Health Plan Coverage**

1002.163  What types of health plans are covered by USERRA?

1002.164  What health plan coverage must the employer provide for the employee under USERRA?

1002.165  How does the employee elect continuing health plan coverage?

1002.166  How much must the employee pay in order to continue health plan coverage?

1002.167  What actions may a plan administrator take if the employee does not elect or pay for continuing coverage in a timely manner?

1002.168  If the employee's coverage was terminated at the beginning of or during service, does his or her coverage have to be reinstated upon reemployment?

1002.169  Can the employee elect to delay reinstatement of health plan coverage until a date after the date he or she is reemployed?

1002.170  In a multiemployer health plan, how is liability allocated for employer contributions and benefits arising under USERRA's health plan provisions?

1002.171  How does the continuation of health plan coverage apply to a multiemployer plan that provides health plan coverage through a health benefits account system?

**Subpart E—Reemployment Rights and Benefits**

**Prompt Reemployment**

1002.180  When is an employee entitled to be reemployed by his or her civilian employer?

1002.181  How is "prompt reemployment" defined?

**Reemployment Position**

1002.191  What position is the employee entitled to upon reemployment?

1002.192  How is the specific reemployment position determined?

1002.193  Does the reemployment position include elements such as seniority, status, and rate of pay?

1002.194  Can the application of the escalator principle result in adverse consequences when the employee is reemployed?

1002.195  What other factors can determine the reemployment position?

1002.196  What is the employee's reemployment position if the period of service was less than 91 days?

1002.197  What is the reemployment position if the employee's period of service in the uniformed services was more than 90 days?

1002.198  What efforts must the employer make to help the employee become qualified for the reemployment position?

1002.199  What priority must the employer follow if two or more returning employees are entitled to reemployment in the same position?

**Seniority Rights and Benefits**

1002.210  What seniority rights does an employee have when reemployed following a period of uniformed service?

1002.211  Does USERRA require the employer to use a seniority system?

1002.212  How does a person know whether a particular right or benefit is a seniority-based right or benefit?

1002.213  How can the employee demonstrate a reasonable certainty that

he or she would have received the seniority right or benefit if he or she had remained continuously employed during the period of service?

**Disabled Employees**

1002.225  Is the employee entitled to any specific reemployment benefits if he or she has a disability that was incurred in, or aggravated during, the period of service?

1002.226  If the employee has a disability that was incurred in, or aggravated during, the period of service, what efforts must the employer make to help him or her become qualified for the reemployment position?

**Rate of Pay**

1002.236  How is the employee's rate of pay determined when he or she returns from a period of service?

**Protection Against Discharge**

1002.247  Does USERRA provide the employee with protection against discharge?

1002.248  What constitutes cause for discharge under USERRA?

**Pension Plan Benefits**

1002.259  How does USERRA protect an employee's pension benefits?

1002.260  What pension benefit plans are covered under USERRA?

1002.261  Who is responsible for funding any plan obligation to provide the employee with pension benefits?

1002.262  When is the employer required to make the plan contribution that is attributable to the employee's period of uniformed service?

1002.263  Does the employee pay interest when he or she makes up missed contributions or elective deferrals?

1002.264  Is the employee allowed to repay a previous distribution from a pension benefits plan upon being reemployed?

1002.265  If the employee is reemployed with his or her pre-service employer, is the employee's pension benefit the same as if he or she had remained continuously employed?

1002.266  What are the obligations of a multiemployer pension benefit plan under USERRA?

1002.267  How is compensation during the period of service calculated in order to determine the employee's pension benefits, if benefits are based on compensation?

**Subpart F—Compliance Assistance, Enforcement and Remedies**

**Compliance Assistance**

1002.277  What assistance does the Department of Labor provide to employees and employers concerning employment, reemployment, or other rights and benefits under USERRA?

**Investigation and Referral**

1002.288  How does an individual file a USERRA complaint?

1002.289  How will VETS investigate a USERRA complaint?

1002.290   Does VETS have the authority to order compliance with USERRA?
1002.291   What actions may an individual take if the complaint is not resolved by VETS?
1002.292   What can the Attorney General do about the complaint?

**Enforcement of Rights and Benefits Against a State or Private Employer**

1002.303   Is an individual required to file his or her complaint with VETS?
1002.304   If an individual files a complaint with VETS and VETS' efforts do not resolve the complaint, can the individual pursue the claim on his or her own?
1002.305   What court has jurisdiction in an action against a State or private employer?
1002.306   Is a National Guard civilian technician considered a State or Federal employee for purposes of USERRA?
1002.307   What is the proper venue in an action against a State or private employer?
1002.308   Who has legal standing to bring an action under USERRA?
1002.309   Who is a necessary party in an action under USERRA?
1002.310   How are fees and court costs charged or taxed in an action under USERRA?
1002.311   Is there a statute of limitations in an action under USERRA?
1002.312   What remedies may be awarded for a violation of USERRA?
1002.313   Are there special damages provisions that apply to actions initiated in the name of the United States?
1002.314   May a court use its equity powers in an action or proceeding under the Act?

**Authority:** Veterans Benefits Improvement Act of 2004 (VBIA) Pub. L. 108–454 (Dec. 10, 2004).

**Subpart A—Introduction to the Regulations under the Uniformed Services Employment and Reemployment Rights Act of 1994**

**General Provisions**

**§ 1002.1   What is the purpose of this part?**

This part implements the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA" or "the Act"). 38 U.S.C. 4301–4334. USERRA is a law that establishes certain rights and benefits for employees, and duties for employers. USERRA affects employment, reemployment, and retention in employment, when employees serve or have served in the uniformed services. There are five subparts to these regulations. Subpart A gives an introduction to the USERRA regulations. Subpart B describes USERRA's anti-discrimination and anti-retaliation provisions. Subpart C explains the steps that must be taken by a uniformed service member who wants to return to his or her previous civilian employment. Subpart D describes the rights, benefits, and obligations of persons absent from employment due to service in the uniformed services, including rights and obligations related to health plan coverage. Subpart E describes the rights, benefits, and obligations of the returning veteran or service member. Subpart F explains the role of the Department of Labor in enforcing and giving assistance under USERRA. These regulations implement USERRA as it applies to States, local governments, and private employers. Separate regulations published by the Federal Office of Personnel Management implement USERRA for Federal executive agency employers and employees.

**§ 1002.2   Is USERRA a new law?**

USERRA is the latest in a series of laws protecting veterans' employment and reemployment rights going back to the Selective Training and Service Act of 1940. USERRA's immediate predecessor was commonly referred to as the Veterans' Reemployment Rights Act (VRRA), which was enacted as section 404 of the Vietnam Era Veterans' Readjustment Assistance Act of 1974. In enacting USERRA, Congress emphasized USERRA's continuity with the VRRA and its intention to clarify and strengthen that law. Congress also emphasized that Federal laws protecting veterans' employment and reemployment rights for the past fifty years had been successful and that the large body of case law that had developed under those statutes remained in full force and effect, to the extent it is consistent with USERRA. USERRA authorized the Department of Labor to publish regulations implementing the Act for State, local government, and private employers. USERRA also authorized the Office of Personnel Management to issue regulations implementing the Act for Federal executive agencies (other than some Federal intelligence agencies). USERRA established a separate program for employees of some Federal intelligence agencies.

**§ 1002.3   When did USERRA become effective?**

USERRA became law on October 13, 1994. USERRA's reemployment provisions apply to members of the uniformed services seeking civilian reemployment on or after December 12, 1994. USERRA's anti-discrimination and anti-retaliation provisions became effective on October 13, 1994.

**§ 1002.4   What is the role of the Secretary of Labor under USERRA?**

(a) USERRA charges the Secretary of Labor (through the Veterans' Employment and Training Service) with providing assistance to any person with respect to the employment and reemployment rights and benefits to which such person is entitled under the Act. More information about the Secretary's role in providing this assistance is contained in Subpart F.

(b) USERRA also authorizes the Secretary of Labor to issue regulations implementing the Act with respect to States, local governments, and private employers. These regulations are issued under this authority.

(c) The Secretary of Labor delegated authority to the Assistant Secretary for Veterans' Employment and Training for administering the veterans' reemployment rights program by Secretary's Order 1–83 (February 3, 1983) and for carrying out the functions and authority vested in the Secretary pursuant to USERRA by memorandum of April 22, 2002 (67 FR 31827).

**§ 1002.5   What definitions apply to USERRA?**

(a) *Attorney General* means the Attorney General of the United States or any person designated by the Attorney General to carry out a responsibility of the Attorney General under USERRA.

(b) *Benefit, benefit of employment, or rights and benefits* means any advantage, profit, privilege, gain, status, account, or interest (other than wages or salary for work performed) that accrues to the employee because of an employment contract, employment agreement, or employer policy, plan, or practice. The term includes rights and benefits under a pension plan, health plan, or employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or the location of employment.

(c) *Employee* means any person employed by an employer. The term also includes any person who is a citizen, national or permanent resident alien of the United States who is employed in a workplace in a foreign country by an employer that is an entity incorporated or organized in the United States, or that is controlled by an entity organized in the United States. "Employee" includes the former employees of an employer.

(d)(1) *Employer*, except as provided in paragraphs (d)(2) and (3) of this section, means any person, institution, organization, or other entity that pays salary or wages for work performed, or

that has control over employment opportunities, including—

(i) A person, institution, organization, or other entity to whom the employer has delegated the performance of employment-related responsibilities, except in the case that such entity has been delegated functions that are purely ministerial in nature, such as maintenance of personnel files or the preparation of forms for submission to a government agency;

(ii) The Federal Government;

(iii) A State;

(iv) Any successor in interest to a person, institution, organization, or other entity referred to in this definition; and,

(v) A person, institution, organization, or other entity that has denied initial employment in violation of 38 U.S.C. 4311, USERRA's anti-discrimination and anti-retaliation provisions.

(2) In the case of a National Guard technician employed under 32 U.S.C. 709, the term "employer" means the adjutant general of the State in which the technician is employed.

(3) An employee pension benefit plan as described in section 3(2) of the Employee Retirement Income Security Act of 1974 (ERISA)(29 U.S.C. 1002(2)) is considered an employer for an individual that it does not actually employ only with respect to the obligation to provide pension benefits.

(e) *Health plan* means an insurance policy, insurance contract, medical or hospital service agreement, membership or subscription contract, or other arrangement under which health services for individuals are provided or the expenses of such services are paid.

(f) *National Disaster Medical System (NDMS) is an agency within the Federal Emergency Management Agency, Department of Homeland Security, established by the* Public Health Security and Bioterrorism Preparedness and Response Act of 2002, Public Law 107–188. *The NDMS* provides medical-related assistance to respond to the needs of victims of public health emergencies. Participants in the NDMS are volunteers who serve as intermittent Federal employees when activated. For purposes of USERRA coverage only, these persons are treated as members of the uniformed services when they are activated to provide assistance in response to a public health emergency or to be present for a short period of time when there is a risk of a public health emergency, or when they are participating in authorized training. See 42 U.S.C. 300hh–11(e).

(g) *Notice*, when the employee is required to give advance notice of service, means any written or verbal

notification of an obligation or intention to perform service in the uniformed services provided to an employer by the employee who will perform such service, or by the uniformed service in which the service is to be performed.

(h) *Qualified*, with respect to an employment position, means having the ability to perform the essential tasks of the position.

(i) *Reasonable efforts*, in the case of actions required of an employer, means actions, including training provided by an employer that do not place an undue hardship on the employer.

(j) *Secretary* means the Secretary of Labor or any person designated by the Secretary of Labor to carry out an activity under USERRA and these regulations, unless a different office is expressly indicated in the regulation.

(k) *Seniority* means longevity in employment together with any benefits of employment that accrue with, or are determined by, longevity in employment.

(l) *Service in the uniformed services* means the performance of duty on a voluntary or involuntary basis in a uniformed service under competent authority. Service in the uniformed services includes active duty, active and inactive duty for training, National Guard duty under Federal statute, and a period for which a person is absent from a position of employment for an examination to determine the fitness of the person to perform such duty. The term also includes a period for which a person is absent from employment to perform funeral honors duty as authorized by law (10 U.S.C. 12503 or 32 U.S.C. 115). The Public Health Security and Bioterrorism Preparedness and Response Act of 2002, Pub. L. 107–188, provides that service as an intermittent disaster-response appointee upon activation of the National Disaster Medical System (NDMS) or as a participant in an authorized training program is deemed "service in the uniformed services." 42 U.S.C. 300hh–11(e)(3).

(m) *State* means each of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and other territories of the United States (including the agencies and political subdivisions thereof); however, for purposes of enforcement of rights under 38 U.S.C. 4323, a political subdivision of a State is a private employer.

(n) *Undue hardship*, in the case of actions taken by an employer, means an action requiring significant difficulty or expense, when considered in light of—

(1) The nature and cost of the action needed under USERRA and these regulations;

(2) The overall financial resources of the facility or facilities involved in the provision of the action; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility;

(3) The overall financial resources of the employer; the overall size of the business of an employer with respect to the number of its employees; the number, type, and location of its facilities; and,

(4) The type of operation or operations of the employer, including the composition, structure, and functions of the work force of such employer; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the employer.

(o) *Uniformed services* means the Armed Forces; the Army National Guard and the Air National Guard when engaged in active duty for training, inactive duty training, or full-time National Guard duty; the commissioned corps of the Public Health Service; and any other category of persons designated by the President in time of war or national emergency. For purposes of USERRA coverage only, service as an intermittent disaster response appointee of the NDMS when federally activated or attending authorized training in support of their Federal mission is deemed "service in the uniformed services," although such appointee is not a member of the "uniformed services" as defined by USERRA.

§ 1002.6   What types of service in the uniformed services are covered by USERRA?

USERRA's definition of "service in the uniformed services" covers all categories of military training and service, including duty performed on a voluntary or involuntary basis, in time of peace or war. Although most often understood as applying to National Guard and reserve military personnel, USERRA also applies to persons serving in the active components of the Armed Forces. Certain types of service specified in 42 U.S.C. 300hh-11 by members of the National Disaster Medical System are covered by USERRA.

§ 1002.7   How does USERRA relate to other laws, public and private contracts, and employer practices?

(a) USERRA establishes a floor, not a ceiling, for the employment and reemployment rights and benefits of

those it protects. In other words, an employer may provide greater rights and benefits than USERRA requires, but no employer can refuse to provide any right or benefit guaranteed by USERRA.

(b) USERRA supersedes any State law (including any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates in any manner any right or benefit provided by USERRA, including the establishment of additional prerequisites to the exercise of any USERRA right or the receipt of any USERRA benefit. For example, an employment contract that determines seniority based only on actual days of work in the place of employment would be superseded by USERRA, which requires that seniority credit be given for periods of absence from work due to service in the uniformed services.

(c) USERRA does not supersede, nullify or diminish any Federal or State law (including any local law or ordinance), contract, agreement, policy, plan, practice, or other matter that establishes an employment right or benefit that is more beneficial than, or is in addition to, a right or benefit provided under the Act. For example, although USERRA does not require an employer to pay an employee for time away from work performing service, an employer policy, plan, or practice that provides such a benefit is permissible under USERRA.

(d) If an employer provides a benefit that exceeds USERRA's requirements in one area, it cannot reduce or limit other rights or benefits provided by USERRA. For example, even though USERRA does not require it, an employer may provide a fixed number of days of paid military leave per year to employees who are members of the National Guard or Reserve. The fact that it provides such a benefit, however, does not permit an employer to refuse to provide an unpaid leave of absence to an employee to perform service in the uniformed services in excess of the number of days of paid military leave.

## Subpart B—Anti-Discrimination and Anti-Retaliation

### Protection From Employer Discrimination and Retaliation

§ 1002.18  What status or activity is protected from employer discrimination by USERRA?

An employer must not deny initial employment, reemployment, retention in employment, promotion, or any benefit of employment to an individual on the basis of his or her membership, application for membership, performance of service, application for

service, or obligation for service in the uniformed services.

§ 1002.19  What activity is protected from employer retaliation by USERRA?

An employer must not retaliate against an individual by taking any adverse employment action against him or her because the individual has taken an action to enforce a protection afforded any person under USERRA; testified or otherwise made a statement in or in connection with a proceeding under USERRA; assisted or participated in a USERRA investigation: or, exercised a right provided for by USERRA.

§ 1002.20  Does USERRA protect an individual who does not actually perform service in the uniformed services?

Yes. Employers are prohibited from taking actions against an individual for any of the activities protected by the Act, whether or not he or she has performed service in the uniformed services.

§ 1002.21  Do the Act's prohibitions against discrimination and retaliation apply to all employment positions?

The prohibitions against discrimination and retaliation apply to all covered employers (including hiring halls and potential employers, see sections 1002.36 and .38) and employment positions, including those that are for a brief, nonrecurrent period, and for which there is no reasonable expectation that the employment position will continue indefinitely or for a significant period. However, USERRA's reemployment rights and benefits do not apply to such brief, nonrecurrent positions of employment.

§ 1002.22  Who has the burden of proving discrimination or retaliation in violation of USERRA?

The individual has the burden of proving that a status or activity protected by USERRA was one of the reasons that the employer took action against him or her, in order to establish that the action was discrimination or retaliation in violation of USERRA. If the individual succeeds in proving that the status or activity protected by USERRA was one of the reasons the employer took action against him or her, the employer has the burden to prove the affirmative defense that it would have taken the action anyway.

§ 1002.23  What must the individual show to carry the burden of proving that the employer discriminated or retaliated against him or her?

(a) In order to prove that the employer discriminated or retaliated against the individual, he or she must first show

that the employer's action was motivated by one or more of the following:

(1) Membership or application for membership in a uniformed service;

(2) Performance of service, application for service, or obligation for service in a uniformed service;

(3) Action taken to enforce a protection afforded any person under USERRA;

(4) Testimony or statement made in or in connection with a USERRA proceeding;

(5) Assistance or participation in a USERRA investigation; or,

(6) Exercise of a right provided for by USERRA.

(b) If the individual proves that the employer's action was based on one of the prohibited motives listed in paragraph (a) of this section, the employer has the burden to prove the affirmative defense that the action would have been taken anyway absent the USERRA-protected status or activity.

## Subpart C—Eligibility For Reemployment

### General Eligibility Requirements for Reemployment

§ 1002.32  What criteria must the employee meet to be eligible under USERRA for reemployment after service in the uniformed services?

(a) In general, if the employee has been absent from a position of civilian employment by reason of service in the uniformed services, he or she will be eligible for reemployment under USERRA by meeting the following criteria:

(1) The employer had advance notice of the employee's service;

(2) The employee has five years or less of cumulative service in the uniformed services in his or her employment relationship with a particular employer;

(3) The employee timely returns to work or applies for reemployment; and,

(4) The employee has not been separated from service with a disqualifying discharge or under other than honorable conditions.

(b) These general eligibility requirements have important qualifications and exceptions, which are described in detail in §§ 1002.73 through 1002.138. If the employee meets these eligibility criteria, then he or she is eligible for reemployment unless the employer establishes one of the defenses described in § 1002.139. The employment position to which the employee is entitled is described in §§ 1002.191 through 1002.199.

**§ 1002.33 Does the employee have to prove that the employer discriminated against him or her in order to be eligible for reemployment?**

No. The employee is not required to prove that the employer discriminated against him or her because of the employee's uniformed service in order to be eligible for reemployment.

**Coverage of Employers and Positions**

**§ 1002.34 Which employers are covered by USERRA?**

(a) USERRA applies to all public and private employers in the United States, regardless of size. For example, an employer with only one employee is covered for purposes of the Act.

(b) USERRA applies to foreign employers doing business in the United States. A foreign employer that has a physical location or branch in the United States (including U.S. territories and possessions) must comply with USERRA for any of its employees who are employed in the United States.

(c) An American company operating either directly or through an entity under its control in a foreign country must also comply with USERRA for all its foreign operations, unless compliance would violate the law of the foreign country in which the workplace is located.

**§ 1002.35 Is a successor in interest an employer covered by USERRA?**

USERRA's definition of "employer" includes a successor in interest. In general, an employer is a successor in interest where there is a substantial continuity in operations, facilities, and workforce from the former employer. The determination whether an employer is a successor in interest must be made on a case-by-case basis using a multi-factor test that considers the following:

(a) Whether there has been a substantial continuity of business operations from the former to the current employer;

(b) Whether the current employer uses the same or similar facilities, machinery, equipment, and methods of production;

(c) Whether there has been a substantial continuity of employees;

(d) Whether there is a similarity of jobs and working conditions;

(e) Whether there is a similarity of supervisors or managers; and,

(f) Whether there is a similarity of products or services.

**§ 1002.36 Can an employer be liable as a successor in interest if it was unaware that an employee may claim reemployment rights when the employer acquired the business?**

Yes. In order to be a successor in interest, it is not necessary for an employer to have notice of a potential reemployment claim at the time of merger, acquisition, or other form of succession.

**§ 1002.37 Can one employee be employed in one job by more than one employer?**

Yes. Under USERRA, an employer includes not only the person or entity that pays an employee's salary or wages, but also includes a person or entity that has control over his or her employment opportunities, including a person or entity to whom an employer has delegated the performance of employment-related responsibilities. For example, if the employee is a security guard hired by a security company and he or she is assigned to a work site, the employee may report both to the security company and to the site owner. In such an instance, both employers share responsibility for compliance with USERRA. If the security company declines to assign the employee to a job because of a uniformed service obligation (for example, National Guard duties), then the security company could be in violation of the reemployment requirements and the anti-discrimination provisions of USERRA. Similarly, if the employer at the work site causes the employee's removal from the job position because of his or her uniformed service obligations, then the work site employer could be in violation of the reemployment requirements and the anti-discrimination provisions of USERRA.

**§ 1002.38 Can a hiring hall be an employer?**

Yes. In certain occupations (for example, longshoreman, stagehand, construction worker), the employee may frequently work for many different employers. A hiring hall operated by a union or an employer association typically assigns the employee to the jobs. In these industries, it may not be unusual for the employee to work his or her entire career in a series of short-term job assignments. The definition of "employer" includes a person, institution, organization, or other entity to which the employer has delegated the performance of employment-related responsibilities. A hiring hall therefore is considered the employee's employer if the hiring and job assignment functions have been delegated by an employer to the hiring hall. As the

employer, a hiring hall has reemployment responsibilities to its employees. USERRA's anti-discrimination and anti-retaliation provisions also apply to the hiring hall.

**§ 1002.39 Are States (and their political subdivisions), the District of Columbia, the Commonwealth of Puerto Rico, and United States territories, considered employers?**

Yes. States and their political subdivisions, such as counties, parishes, cities, towns, villages, and school districts, are considered employers under USERRA. The District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, and territories of the United States, are also considered employers under the Act.

**§ 1002.40 Does USERRA protect against discrimination in initial hiring decisions?**

Yes. The Act's definition of employer includes a person, institution, organization, or other entity that has denied initial employment to an individual in violation of USERRA's anti-discrimination provisions. An employer need not actually employ an individual to be his or her "employer" under the Act, if it has denied initial employment on the basis of the individual's membership, application for membership, performance of service, application for service, or obligation for service in the uniformed services. Similarly, the employer would be liable if it denied initial employment on the basis of the individual's action taken to enforce a protection afforded to any person under USERRA, his or her testimony or statement in connection with any USERRA proceeding, assistance or other participation in a USERRA investigation, or the exercise of any other right provided by the Act. For example, if the individual has been denied initial employment because of his or her obligations as a member of the National Guard or Reserves, the company or entity denying employment is an employer for purposes of USERRA. Similarly, if an entity withdraws an offer of employment because the individual is called upon to fulfill an obligation in the uniformed services, the entity withdrawing the employment offer is an employer for purposes of USERRA.

**§ 1002.41 Does an employee have rights under USERRA even though he or she holds a temporary, part-time, probationary, or seasonal employment position?**

USERRA rights are not diminished because an employee holds a temporary, part-time, probationary, or seasonal employment position. However, an employer is not required to reemploy an employee if the employment he or she

left to serve in the uniformed services was for a brief, nonrecurrent period and there is no reasonable expectation that the employment would have continued indefinitely or for a significant period. The employer bears the burden of proving this affirmative defense.

### § 1002.42   What rights does an employee have under USERRA if he or she is on layoff, on strike, or on a leave of absence?

(a) If an employee is laid off with recall rights, on strike, or on a leave of absence, he or she is an employee for purposes of USERRA. If the employee is on layoff and begins service in the uniformed services, or is laid off while performing service, he or she may be entitled to reemployment on return if the employer would have recalled the employee to employment during the period of service. Similar principles apply if the employee is on strike or on a leave of absence from work when he or she begins a period of service in the uniformed services.

(b) If the employee is sent a recall notice during a period of service in the uniformed services and cannot resume the position of employment because of the service, he or she still remains an employee for purposes of the Act. Therefore, if the employee is otherwise eligible, he or she is entitled to reemployment following the conclusion of the period of service even if he or she did not respond to the recall notice.

(c) If the employee is laid off before or during service in the uniformed services, and the employer would not have recalled him or her during that period of service, the employee is not entitled to reemployment following the period of service simply because he or she is a covered employee. Reemployment rights under USERRA cannot put the employee in a better position than if he or she had remained in the civilian employment position.

### § 1002.43   Does an individual have rights under USERRA even if he or she is an executive, managerial, or professional employee?

Yes. USERRA applies to all employees. There is no exclusion for executive, managerial, or professional employees.

### § 1002.44   Does USERRA cover an independent contractor?

(a) No. USERRA does not provide protections for an independent contractor.

(b) In deciding whether an individual is an independent contractor, the following factors need to be considered:

(1) The extent of the employer's right to control the manner in which the individual's work is to be performed;

(2) The opportunity for profit or loss that depends upon the individual's managerial skill;

(3) Any investment in equipment or materials required for the individual's tasks, or his or her employment of helpers;

(4) Whether the service the individual performs requires a special skill;

(5) The degree of permanence of the individual's working relationship; and,

(6) Whether the service the individual performs is an integral part of the employer's business.

(c) No single one of these factors is controlling, but all are relevant to determining whether an individual is an employee or an independent contractor.

### Coverage of Service in the Uniformed Services

### § 1002.54   Are all military fitness examinations considered "service in the uniformed services?"

Yes. USERRA's definition of "service in the uniformed services" includes a period for which an employee is absent from a position of employment for the purpose of an examination to determine his or her fitness to perform duty in the uniformed services. Military fitness examinations can address more than physical or medical fitness, and include evaluations for mental, educational, and other types of fitness. Any examination to determine an employee's fitness for service is covered, whether it is an initial or recurring examination. For example, a periodic medical examination required of a Reserve component member to determine fitness for continued service is covered.

### § 1002.55   Is all funeral honors duty considered "service in the uniformed services?"

(a) USERRA's definition of "service in the uniformed services" includes a period for which an employee is absent from employment for the purpose of performing authorized funeral honors duty under 10 U.S.C. 12503 (members of Reserve ordered to perform funeral honors duty) or 32 U.S.C. 115 (Member of Air or Army National Guard ordered to perform funeral honors duty).

(b) Funeral honors duty performed by persons who are not members of the uniformed services, such as members of veterans' service organizations, is not "service in the uniformed services."

### § 1002.56   What types of service in the National Disaster Medical System are considered "service in the uniformed services?"

Under a provision of the Public Health Security and Bioterrorism Preparedness and Response Act of 2002,

42 U.S.C. 300hh 11(e)(3), "service in the uniformed services" includes service performed as an intermittent disaster-response appointee upon activation of the National Disaster Medical System or participation in an authorized training program, even if the individual is not a member of the uniformed services.

### § 1002.57   Is all service as a member of the National Guard considered "service in the uniformed services?"

The National Guard has a dual status. It is a Reserve component of the Army, or, in the case of the Air National Guard, of the Air Force. Simultaneously, it is a State military force subject to call-up by the State Governor for duty not subject to Federal control, such as emergency duty in cases of floods or riots. National Guard members may perform service under either Federal or State authority, but only Federal National Guard service is covered by USERRA.

(a) National Guard service under Federal authority is protected by USERRA. Service under Federal authority includes active duty performed under Title 10 of the United States Code. Service under Federal authority also includes duty under Title 32 of the United States Code, such as active duty for training, inactive duty training, or full-time National Guard duty.

(b) National Guard service under authority of State law is not protected by USERRA. However, many States have laws protecting the civilian job rights of National Guard members who serve under State orders. Enforcement of those State laws is not covered by USERRA or these regulations.

### § 1002.58   Is service in the commissioned corps of the Public Health Service considered "service in the uniformed services?"

Yes. Service in the commissioned corps of the Public Health Service (PHS) is "service in the uniformed services" under USERRA.

### § 1002.59   Are there any circumstances in which special categories of persons are considered to perform "service in the uniformed services?"

Yes. In time of war or national emergency the President has authority to designate any category of persons as a "uniformed service" for purposes of USERRA. If the President exercises this authority, service as a member of that category of persons would be "service in the uniformed services" under USERRA.

**§ 1002.60   Does USERRA cover an individual attending a military service academy?**

Yes. Attending a military service academy is considered uniformed service for purposes of USERRA. There are four service academies: The United States Military Academy (West Point, New York), the United States Naval Academy (Annapolis, Maryland), the United States Air Force Academy (Colorado Springs, Colorado), and the United States Coast Guard Academy (New London, Connecticut).

**§ 1002.61   Does USERRA cover a member of the Reserve Officers Training Corps?**

Yes, under certain conditions.

(a) Membership in the Reserve Officers Training Corps (ROTC) or the Junior ROTC is not "service in the uniformed services." However, some Reserve and National Guard enlisted members use a college ROTC program as a means of qualifying for commissioned officer status. National Guard and Reserve members in an ROTC program may at times, while participating in that program, be receiving active duty and inactive duty training service credit with their unit. In these cases, participating in ROTC training sessions is considered "service in the uniformed services," and qualifies a person for protection under USERRA's reemployment and anti-discrimination provisions.

(b) Typically, an individual in a College ROTC program enters into an agreement with a particular military service that obligates such individual to either complete the ROTC program and accept a commission or, in case he or she does not successfully complete the ROTC program, to serve as an enlisted member. Although an individual does not qualify for reemployment protection, except as specified in (a) above, he or she is protected under USERRA's anti-discrimination provisions because, as a result of the agreement, he or she has applied to become a member of the uniformed services and has incurred an obligation to perform future service.

**§ 1002.62   Does USERRA cover a member of the Commissioned Corps of the National Oceanic and Atmospheric Administration, the Civil Air Patrol, or the Coast Guard Auxiliary?**

No. Although the Commissioned Corps of the National Oceanic and Atmospheric Administration (NOAA) is a "uniformed service" for some purposes, it is not included in USERRA's definition of this term. Service in the Civil Air Patrol and the Coast Guard Auxiliary similarly is not considered "service in the uniformed services" for purposes of USERRA. Consequently, service performed in the Commissioned Corps of the National Oceanic and Atmospheric Administration (NOAA), the Civil Air Patrol, and the Coast Guard Auxiliary is not protected by USERRA.

**Absence From a Position of Employment Necessitated by Reason of Service in the Uniformed Services**

**§ 1002.73   Does service in the uniformed services have to be an employee's sole reason for leaving an employment position in order to have USERRA reemployment rights?**

No. If absence from a position of employment is necessitated by service in the uniformed services, and the employee otherwise meets the Act's eligibility requirements, he or she has reemployment rights under USERRA, even if the employee uses the absence for other purposes as well. An employee is not required to leave the employment position for the sole purpose of performing service in the uniformed services. For example, if the employee is required to report to an out of State location for military training and he or she spends off-duty time during that assignment moonlighting as a security guard or visiting relatives who live in that State, the employee will not lose reemployment rights simply because he or she used some of the time away from the job to do something other than attend the military training. Also, if an employee receives advance notification of a mobilization order, and leaves his or her employment position in order to prepare for duty, but the mobilization is cancelled, the employee will not lose any reemployment rights.

**§ 1002.74   Must the employee begin service in the uniformed services immediately after leaving his or her employment position in order to have USERRA reemployment rights?**

No. At a minimum, an employee must have enough time after leaving the employment position to travel safely to the uniformed service site and arrive fit to perform the service. Depending on the specific circumstances, including the duration of service, the amount of notice received, and the location of the service, additional time to rest, or to arrange affairs and report to duty, may be necessitated by reason of service in the uniformed services. The following examples help to explain the issue of the period of time between leaving civilian employment and beginning of service in the uniformed services:

(a) If the employee performs a full overnight shift for the civilian employer and travels directly from the work site to perform a full day of uniformed service, the employee would not be considered fit to perform the uniformed service. An absence from that work shift is necessitated so that the employee can report for uniformed service fit for duty.

(b) If the employee is ordered to perform an extended period of service in the uniformed services, he or she may require a reasonable period of time off from the civilian job to put his or her personal affairs in order, before beginning the service. Taking such time off is also necessitated by the uniformed service.

(c) If the employee leaves a position of employment in order to enlist or otherwise perform service in the uniformed services and, through no fault of his or her own, the beginning date of the service is delayed, this delay does not terminate any reemployment rights.

**Requirement of Notice**

**§ 1002.85   Must the employee give advance notice to the employer of his or her service in the uniformed services?**

(a) Yes. The employee, or an appropriate officer of the uniformed service in which his or her service is to be performed, must notify the employer that the employee intends to leave the employment position to perform service in the uniformed services, with certain exceptions described below. In cases in which an employee is employed by more than one employer, the employee, or an appropriate office of the uniformed service in which his or her service is to be performed, must notify each employer that the employee intends to leave the employment position to perform service in the uniformed services, with certain exceptions described below.

(b) The Department of Defense USERRA regulations at 32 CFR 104.3 provide that an "appropriate officer" can give notice on the employee's behalf. An "appropriate officer" is a commissioned, warrant, or non-commissioned officer authorized to give such notice by the military service concerned.

(c) The employee's notice to the employer may be either verbal or written. The notice may be informal and does not need to follow any particular format.

(d) Although USERRA does not specify how far in advance notice must be given to the employer, an employee should provide notice as far in advance as is reasonable under the circumstances. In regulations promulgated by the Department of Defense under USERRA, 32 CFR 104.6(a)(2)(i)(B), the Defense

Department "strongly recommends that advance notice to civilian employers be provided at least 30 days prior to departure for uniformed service when it is feasible to do so."

### §1002.86   When is the employee excused from giving advance notice of service in the uniformed services?

The employee is required to give advance notice of pending service unless giving such notice is prevented by military necessity, or is otherwise impossible or unreasonable under all the circumstances.

(a) Only a designated authority can make a determination of "military necessity," and such a determination is not subject to judicial review. Guidelines for defining "military necessity" appear in regulations issued by the Department of Defense at 32 CFR 104.3. In general, these regulations cover situations where a mission, operation, exercise or requirement is classified, or could be compromised or otherwise adversely affected by public knowledge. In certain cases, the Secretary of Homeland Security, in consultation with the Secretary of Defense, can make a determination that giving of notice by intermittent disaster-response appointees of the National Disaster Medical System is precluded by "military necessity." See 42 U.S.C. 300hh–11(e)(3)(B).

(b) It may be impossible or unreasonable to give advance notice under certain circumstances. Such circumstances may include the unavailability of the employee's employer or the employer's representative, or a requirement that the employee report for uniformed service in an extremely short period of time.

### §1002.87   Is the employee required to get permission from his or her employer before leaving to perform service in the uniformed services?

No. The employee is not required to ask for or get his or her employer's permission to leave to perform service in the uniformed services. The employee is only required to give the employer notice of pending service.

### §1002.88   Is the employee required to tell his or her civilian employer that he or she intends to seek reemployment after completing uniformed service before the employee leaves to perform service in the uniformed services?

No. When the employee leaves the employment position to begin a period of service, he or she is not required to tell the civilian employer that he or she intends to seek reemployment after completing uniformed service. Even if the employee tells the employer before entering or completing uniformed service that he or she does not intend to seek reemployment after completing the uniformed service, the employee does not forfeit the right to reemployment after completing service. The employee is not required to decide in advance of leaving the civilian employment position whether he or she will seek reemployment after completing uniformed service.

### Period of Service

### §1002.99   Is there a limit on the total amount of service in the uniformed services that an employee may perform and still retain reemployment rights with the employer?

Yes. In general, the employee may perform service in the uniformed services for a cumulative period of up to five (5) years and retain reemployment rights with the employer. The exceptions to this rule are described below.

### §1002.100   Does the five-year service limit include all absences from an employment position that are related to service in the uniformed services?

No. The five-year period includes only the time the employee spends actually performing service in the uniformed services. A period of absence from employment before or after performing service in the uniformed services does not count against the five-year limit. For example, after the employee completes a period of service in the uniformed services, he or she is provided a certain amount of time, depending upon the length of service, to report back to work or submit an application for reemployment. The period between completing the uniformed service and reporting back to work or seeking reemployment does not count against the five-year limit.

### §1002.101   Does the five-year service limit include periods of service that the employee performed when he or she worked for a previous employer?

No. An employee is entitled to a leave of absence for uniformed service for up to five years with each employer for whom he or she works. When the employee takes a position with a new employer, the five-year period begins again regardless of how much service he or she performed while working in any previous employment relationship. If an employee is employed by more than one employer, a separate five-year period runs as to each employer independently, even if those employers share or co-determine the employee's terms and conditions of employment.

### §1002.102   Does the five-year service limit include periods of service that the employee performed before USERRA was enacted?

It depends. USERRA provides reemployment rights to which an employee may become entitled beginning on or after December 12, 1994, but any uniformed service performed before December 12, 1994, that was counted against the service limitations of the previous law (the Veterans Reemployment Rights Act), also counts against USERRA's five-year limit.

### §1002.103   Are there any types of service in the uniformed services that an employee can perform that do not count against USERRA's five-year service limit?

(a) USERRA creates the following exceptions to the five-year limit on service in the uniformed services:

(1) Service that is required beyond five years to complete an initial period of obligated service. Some military specialties require an individual to serve more than five years because of the amount of time or expense involved in training. If the employee works in one of those specialties, he or she has reemployment rights when the initial period of obligated service is completed;

(2) If the employee was unable to obtain orders releasing him or her from service in the uniformed services before the expiration of the five-year period, and the inability was not the employee's fault;

(3)(i) Service performed to fulfill periodic National Guard and Reserve training requirements as prescribed by 10 U.S.C. 10147 and 32 U.S.C. 502(a) and 503; and,

(ii) Service performed to fulfill additional training requirements determined and certified by a proper military authority as necessary for the employee's professional development, or to complete skill training or retraining;

(4) Service performed in a uniformed service if he or she was ordered to or retained on active duty under:

(i) 10 U.S.C. 688 (involuntary active duty by a military retiree);

(ii) 10 U.S.C. 12301(a) (involuntary active duty in wartime);

(iii) 10 U.S.C. 12301(g) (retention on active duty while in captive status);

(iv) 10 U.S.C. 12302 (involuntary active duty during a national emergency for up to 24 months);

(v) 10 U.S.C. 12304 (involuntary active duty for an operational mission for up to 270 days);

(vi) 10 U.S.C. 12305 (involuntary retention on active duty of a critical person during time of crisis or other specific conditions);

(vii) 14 U.S.C. 331 (involuntary active duty by retired Coast Guard officer);

(viii) 14 U.S.C. 332 (voluntary active duty by retired Coast Guard officer);

(ix) 14 U.S.C. 359 (involuntary active duty by retired Coast Guard enlisted member);

(x) 14 U.S.C. 360 (voluntary active duty by retired Coast Guard enlisted member);

(xi) 14 U.S.C. 367 (involuntary retention of Coast Guard enlisted member on active duty); and

(xii) 14 U.S.C. 712 (involuntary active duty by Coast Guard Reserve member for natural or man-made disasters).

(5) Service performed in a uniformed service if the employee was ordered to or retained on active duty (other than for training) under any provision of law because of a war or national emergency declared by the President or the Congress, as determined by the Secretary concerned;

(6) Service performed in a uniformed service if the employee was ordered to active duty (other than for training) in support of an operational mission for which personnel have been ordered to active duty under 10 U.S.C. 12304, as determined by a proper military authority;

(7) Service performed in a uniformed service if the employee was ordered to active duty in support of a critical mission or requirement of the uniformed services as determined by the Secretary concerned; and,

(8) Service performed as a member of the National Guard if the employee was called to respond to an invasion, danger of invasion, rebellion, danger of rebellion, insurrection, or the inability of the President with regular forces to execute the laws of the United States.

(b) Service performed to mitigate economic harm where the employee's employer is in violation of its employment or reemployment obligations to him or her.

§1002.104   Is the employee required to accommodate his or her employer's needs as to the timing, frequency or duration of service?

No. The employee is not required to accommodate his or her employer's interests or concerns regarding the timing, frequency, or duration of uniformed service. The employer cannot refuse to reemploy the employee because it believes that the timing, frequency or duration of the service is unreasonable. However, the employer is permitted to bring its concerns over the timing, frequency, or duration of the employee's service to the attention of the appropriate military authority. Regulations issued by the Department of

Defense at 32 CFR 104.4 direct military authorities to provide assistance to an employer in addressing these types of employment issues. The military authorities are required to consider requests from employers of National Guard and Reserve members to adjust scheduled absences from civilian employment to perform service.

Application for Reemployment

§1002.115   Is the employee required to report to or submit a timely application for reemployment to his or her pre-service employer upon completing the period of service in the uniformed services?

Yes. Upon completing service in the uniformed services, the employee must notify the pre-service employer of his or her intent to return to the employment position by either reporting to work or submitting a timely application for reemployment. Whether the employee is required to report to work or submit a timely application for reemployment depends upon the length of service, as follows:

(a) *Period of service less than 31 days or for a period of any length for the purpose of a fitness examination.* If the period of service in the uniformed services was less than 31 days, or the employee was absent from a position of employment for a period of any length for the purpose of an examination to determine his or her fitness to perform service, the employee must report back to the employer not later than the beginning of the first full regularly-scheduled work period on the first full calendar day following the completion of the period of service, and the expiration of eight hours after a period allowing for safe transportation from the place of that service to the employee's residence. For example, if the employee completes a period of service and travel home, arriving at ten o'clock in the evening, he or she cannot be required to report to the employer until the beginning of the next full regularly-scheduled work period that begins at least eight hours after arriving home, i.e., no earlier than six o'clock the next morning. If it is impossible or unreasonable for the employee to report within such time period through no fault of his or her own, he or she must report to the employer as soon as possible after the expiration of the eight-hour period.

(b) *Period of service more than 30 days but less than 181 days.* If the employee's period of service in the uniformed services was for more than 30 days but less than 181 days, he or she must submit an application for reemployment (written or verbal) with the employer not later than 14 days after

completing service. If it is impossible or unreasonable for the employee to apply within 14 days through no fault of his or her own, he or she must submit the application not later than the next full calendar day after it becomes possible to do so.

(c) *Period of service more than 180 days.* If the employee's period of service in the uniformed services was for more than 180 days, he or she must submit an application for reemployment (written or verbal) not later than 90 days after completing service.

§1002.116   Is the time period for reporting back to an employer extended if the employee is hospitalized for, or convalescing from, an illness or injury incurred in, or aggravated during, the performance of service?

Yes. If the employee is hospitalized for, or convalescing from, an illness or injury incurred in, or aggravated during, the performance of service, he or she must report to or submit an application for reemployment to the employer at the end of the period necessary for recovering from the illness or injury. This period may not exceed two years from the date of the completion of service, except that it must be extended by the minimum time necessary to accommodate circumstances beyond the employee's control that make reporting within the period impossible or unreasonable. This period for recuperation and recovery extends the time period for reporting to or submitting an application for reemployment to the employer, and is not applicable following reemployment.

§1002.117   Are there any consequences if the employee fails to report for or submit a timely application for reemployment?

(a) If the employee fails to timely report for or apply for reemployment, he or she does not automatically forfeit entitlement to USERRA's reemployment and other rights and benefits. Rather, the employee becomes subject to the conduct rules, established policy, and general practices of the employer pertaining to an absence from scheduled work.

(b) If reporting or submitting an employment application to the employer is impossible or unreasonable through no fault of the employee, he or she may report to the employer as soon as possible (in the case of a period of service less than 31 days) or submit an application for reemployment to the employer by the next full calendar day after it becomes possible to do so (in the case of a period of service from 31 to 180 days), and the employee will be considered to have timely reported or applied for reemployment.

**§ 1002.118  Is an application for reemployment required to be in any particular form?**

An application for reemployment need not follow any particular format. The employee may apply orally or in writing. The application should indicate that the employee is a former employee returning from service in the uniformed services and that he or she seeks reemployment with the pre-service employer. The employee is permitted but not required to identify a particular reemployment position in which he or she is interested.

**§ 1002.119  To whom must the employee submit the application for reemployment?**

The application must be submitted to the pre-service employer or to an agent or representative of the employer who has apparent responsibility for receiving employment applications. Depending upon the circumstances, such a person could be a personnel or human resources officer, or a first-line supervisor. If there has been a change in ownership of the employer, the application should be submitted to the employer's successor-in-interest.

**§ 1002.120  If the employee seeks or obtains employment with an employer other than the pre-service employer before the end of the period within which a reemployment application must be filed, will that jeopardize reemployment rights with the pre-service employer?**

No. The employee has reemployment rights with the pre-service employer provided that he or she makes a timely reemployment application to that employer. The employee may seek or obtain employment with an employer other than the pre-service employer during the period of time within which a reemployment application must be made, without giving up reemployment rights with the pre-service employer. However, such alternative employment during the application period should not be of a type that would constitute cause for the employer to discipline or terminate the employee following reemployment. For instance, if the employer forbids employees from working concurrently for a direct competitor during employment, violation of such a policy may constitute cause for discipline or even termination.

**§ 1002.121  Is the employee required to submit documentation to the employer in connection with the application for reemployment?**

Yes, if the period of service exceeded 30 days and if requested by the employer to do so. If the employee submits an application for reemployment after a period of service of more than 30 days, he or she must, upon the request of the employer, provide documentation to establish that:

(a) The reemployment application is timely;

(b) The employee has not exceeded the five-year limit on the duration of service (subject to the exceptions listed at § 1002.103); and,

(c) The employee's separation or dismissal from service was not disqualifying.

**§ 1002.122  Is the employer required to reemploy the employee if documentation establishing the employee's eligibility does not exist or is not readily available?**

Yes. The employer is not permitted to delay or deny reemployment by demanding documentation that does not exist or is not readily available. The employee is not liable for administrative delays in the issuance of military documentation. If the employee is reemployed after an absence from employment for more than 90 days, the employer may require that he or she submit the documentation establishing entitlement to reemployment before treating the employee as not having had a break in service for pension purposes. If the documentation is received after reemployment and it shows that the employee is not entitled to reemployment, the employer may terminate employment and any rights or benefits that the employee may have been granted.

**§ 1002.123  What documents satisfy the requirement that the employee establish eligibility for reemployment after a period of service of more than thirty days?**

(a) Documents that satisfy the requirements of USERRA include the following:

(1) DD (Department of Defense) 214 Certificate of Release or Discharge from Active Duty;

(2) Copy of duty orders prepared by the facility where the orders were fulfilled carrying an endorsement indicating completion of the described service;

(3) Letter from the commanding officer of a Personnel Support Activity or someone of comparable authority;

(4) Certificate of completion from military training school;

(5) Discharge certificate showing character of service; or,

(6) Copy of extracts from payroll documents showing periods of service;

(7) Letter from National Disaster Medical System (NDMS) Team Leader or Administrative Officer verifying dates and times of NDMS training or Federal activation.

(b) The types of documents that are necessary to establish eligibility for reemployment will vary from case to case. Not all of these documents are available or necessary in every instance to establish reemployment eligibility.

**Character of Service**

**§ 1002.134  What type of discharge or separation from service is required for an employee to be entitled to reemployment under USERRA?**

USERRA does not require any particular form of discharge or separation from service. However, even if the employee is otherwise eligible for reemployment, he or she will be disqualified if the characterization of service falls within one of four categories. USERRA requires that the employee not have received one of these types of discharge.

**§ 1002.135  What types of discharge or separation from uniformed service will make the employee ineligible for reemployment under USERRA?**

Reemployment rights are terminated if the employee is:

(a) Separated from uniformed service with a dishonorable or bad conduct discharge;

(b) Separated from uniformed service under other than honorable conditions, as characterized by regulations of the uniformed service;

(c) A commissioned officer dismissed as permitted under 10 U.S.C. 1161(a) by sentence of a general court-martial; in commutation of a sentence of a general court-martial; or, in time of war, by order of the President; or,

(d) A commissioned officer dropped from the rolls under 10 U.S.C. 1161(b) due to absence without authority for at least three months; separation by reason of a sentence to confinement adjudged by a court-martial; or, a sentence to confinement in a Federal or State penitentiary or correctional institution.

**§ 1002.136  Who determines the characterization of service?**

The branch of service in which the employee performs the tour of duty determines the characterization of service.

**§ 1002.137  If the employee receives a disqualifying discharge or release from uniformed service and it is later upgraded, will reemployment rights be restored?**

Yes. A military review board has the authority to prospectively or retroactively upgrade a disqualifying discharge or release. A retroactive upgrade would restore reemployment rights providing the employee otherwise meets the Act's eligibility criteria.

**§ 1002.138    If the employee receives a retroactive upgrade in the characterization of service, will that entitle him or her to claim back wages and benefits lost as of the date of separation from service?**

No. A retroactive upgrade allows the employee to obtain reinstatement with the former employer, provided the employee otherwise meets the Act's eligibility criteria. Back pay and other benefits such as pension plan credits attributable to the time period between discharge and the retroactive upgrade are not required to be restored by the employer in this situation.

**Employer Statutory Defenses**

**§ 1002.139    Are there any circumstances in which the pre-service employer is excused from its obligation to reemploy the employee following a period of uniformed service? What statutory defenses are available to the employer in an action or proceeding for reemployment benefits?**

(a) Even if the employee is otherwise eligible for reemployment benefits, the employer is not required to reemploy him or her if the employer establishes that its circumstances have so changed as to make reemployment impossible or unreasonable. For example, an employer may be excused from reemploying the employee where there has been an intervening reduction in force that would have included that employee. The employer may not, however, refuse to reemploy the employee on the basis that another employee was hired to fill the reemployment position during the employee's absence, even if reemployment might require the termination of that replacement employee;

(b) Even if the employee is otherwise eligible for reemployment benefits, the employer is not required to reemploy him or her if it establishes that assisting the employee in becoming qualified for reemployment would impose an undue hardship, as defined in § 1002.5(n) and discussed in § 1002.198, on the employer; or,

(c) Even if the employee is otherwise eligible for reemployment benefits, the employer is not required to reemploy him or her if it establishes that the employment position vacated by the employee in order to perform service in the uniformed services was for a brief, nonrecurrent period and there was no reasonable expectation that the employment would continue indefinitely or for a significant period.

(d) The employer defenses included in this section are affirmative ones, and the employer carries the burden to prove by a preponderance of the evidence that any one or more of these defenses is applicable.

**Subpart D—Rights, Benefits, and Obligations of Persons Absent from Employment Due to Service in the Uniformed Services**

**Furlough and Leave of Absence**

**§ 1002.149    What is the employee's status with his or her civilian employer while performing service in the uniformed services?**

During a period of service in the uniformed services, the employee is deemed to be on furlough or leave of absence from the civilian employer. In this status, the employee is entitled to the non-seniority rights and benefits generally provided by the employer to other employees with similar seniority, status, and pay that are on furlough or leave of absence. Entitlement to these non-seniority rights and benefits is not dependent on how the employer characterizes the employee's status during a period of service. For example, if the employer characterizes the employee as "terminated" during the period of uniformed service, this characterization cannot be used to avoid USERRA's requirement that the employee be deemed on furlough or leave of absence, and therefore entitled to the non-seniority rights and benefits generally provided to employees on furlough or leave of absence.

**§ 1002.150    Which non-seniority rights and benefits is the employee entitled to during a period of service?**

(a) The non-seniority rights and benefits to which an employee is entitled during a period of service are those that the employer provides to similarly situated employees by an employment contract, agreement, policy, practice, or plan in effect at the employee's workplace. These rights and benefits include those in effect at the beginning of the employee's employment and those established after employment began. They also include those rights and benefits that become effective during the employee's period of service and that are provided to similarly situated employees on furlough or leave of absence.

(b) If the non-seniority benefits to which employees on furlough or leave of absence are entitled vary according to the type of leave, the employee must be given the most favorable treatment accorded to any comparable form of leave when he or she performs service in the uniformed services. In order to determine whether any two types of leave are comparable, the duration of the leave may be the most significant factor to compare. For instance, a two-day funeral leave will not be "comparable" to an extended leave for

service in the uniformed service. In addition to comparing the duration of the absences, other factors such as the purpose of the leave and the ability of the employee to choose when to take the leave should also be considered.

(c) As a general matter, accrual of vacation leave is considered to be a non-seniority benefit that must be provided by an employer to an employee on a military leave of absence only if the employer provides that benefit to similarly situated employees on comparable leaves of absence.

**§ 1002.151    If the employer provides full or partial pay to the employee while he or she is on military leave, is the employer required to also provide the non-seniority rights and benefits ordinarily granted to similarly situated employees on furlough or leave of absence?**

Yes. If the employer provides additional benefits such as full or partial pay when the employee performs service, the employer is not excused from providing other rights and benefits to which the employee is entitled under the Act.

**§ 1002.152    If employment is interrupted by a period of service in the uniformed services, are there any circumstances under which the employee is not entitled to the non-seniority rights and benefits ordinarily granted to similarly situated employees on furlough or leave of absence?**

If employment is interrupted by a period of service in the uniformed services and the employee knowingly provides written notice of intent not to return to the position of employment after service in the uniformed services, he or she is not entitled to those non-seniority rights and benefits. The employee's written notice does not waive entitlement to any other rights to which he or she is entitled under the Act, including the right to reemployment after service.

**§ 1002.153    If employment is interrupted by a period of service in the uniformed services, is the employee permitted upon request to use accrued vacation, annual or similar leave with pay during the service? Can the employer require the employee to use accrued leave during a period of service?**

(a) If employment is interrupted by a period of service, the employee must be permitted upon request to use any accrued vacation, annual, or similar leave with pay during the period of service, in order to continue his or her civilian pay. However, the employee is not entitled to use sick leave that accrued with the civilian employer during a period of service in the uniformed services, unless the employer

allows employees to use sick leave for any reason, or allows other similarly situated employees on comparable furlough or leave of absence to use accrued paid sick leave. Sick leave is usually not comparable to annual or vacation leave; it is generally intended to provide income when the employee or a family member is ill and the employee is unable to work.

(b) The employer may not require the employee to use accrued vacation, annual, or similar leave during a period of service in the uniformed services.

## Health Plan Coverage

**§ 1002.163   What types of health plans are covered by USERRA?**

(a) USERRA defines a health plan to include an insurance policy or contract, medical or hospital service agreement, membership or subscription contract, or arrangement under which the employee's health services are provided or the expenses of those services are paid.

(b) USERRA covers group health plans as defined in the Employee Retirement Income Security Act of 1974 (ERISA) at 29 U.S.C. 1191b(a). USERRA applies to group health plans that are subject to ERISA, and plans that are not subject to ERISA, such as those sponsored by State or local governments or religious organizations for their employees.

(c) USERRA covers multiemployer plans maintained pursuant to one or more collective bargaining agreements between employers and employee organizations. USERRA applies to multiemployer plans as they are defined in ERISA at 29 U.S.C. 1002(37). USERRA contains provisions that apply specifically to multiemployer plans in certain situations.

**§ 1002.164   What health plan coverage must the employer provide for the employee under USERRA?**

If the employee has coverage under a health plan in connection with his or her employment, the plan must permit the employee to elect to continue the coverage for a certain period of time as described below:

(a) When the employee is performing service in the uniformed services, he or she is entitled to continuing coverage for himself or herself (and dependents if the plan offers dependent coverage) under a health plan provided in connection with the employment. The plan must allow the employee to elect to continue coverage for a period of time that is the lesser of:

(1) The 24-month period beginning on the date on which the employee's

absence for the purpose of performing service begins; or,

(2) The period beginning on the date on which the employee's absence for the purpose of performing service begins, and ending on the date on which he or she fails to return from service or apply for a position of employment as provided under sections 1002.115–123 of these regulations.

(b) USERRA does not require the employer to establish a health plan if there is no health plan coverage in connection with the employment, or, where there is a plan, to provide any particular type of coverage.

(c) USERRA does not require the employer to permit the employee to initiate new health plan coverage at the beginning of a period of service if he or she did not previously have such coverage.

**§ 1002.165   How does the employee elect continuing health plan coverage?**

USERRA does not specify requirements for electing continuing coverage. Health plan administrators may develop reasonable requirements addressing how continuing coverage may be elected, consistent with the terms of the plan and the Act's exceptions to the requirement that the employee give advance notice of service in the uniformed services. For example, the employee cannot be precluded from electing continuing health plan coverage under circumstances where it is impossible or unreasonable for him or her to make a timely election of coverage.

**§ 1002.166   How much must the employee pay in order to continue health plan coverage?**

(a) If the employee performs service in the uniformed service for fewer than 31 days, he or she cannot be required to pay more than the regular employee share, if any, for health plan coverage.

(b) If the employee performs service in the uniformed service for 31 or more days, he or she may be required to pay no more than 102% of the full premium under the plan, which represents the employer's share plus the employee's share, plus 2% for administrative costs.

(c) USERRA does not specify requirements for methods of paying for continuing coverage. Health plan administrators may develop reasonable procedures for payment, consistent with the terms of the plan.

**§ 1002.167   What actions may a plan administrator take if the employee does not elect or pay for continuing coverage in a timely manner?**

The actions a plan administrator may take regarding the provision or

cancellation of an employee's continuing coverage depend on whether the employee is excused from the requirement to give advance notice, whether the plan has established reasonable rules for election of continuation coverage, and whether the plan has established reasonable rules for the payment for continuation coverage.

(a) *No notice of service and no election of continuation coverage:* If an employer provides employment-based health coverage to an employee who leaves employment for uniformed service without giving advance notice of service, the plan administrator may cancel the employee's health plan coverage upon the employee's departure from employment for uniformed service. However, in cases in which an employee's failure to give advance notice of service was excused under the statute because it was impossible, unreasonable, or precluded by military necessity, the plan administrator must reinstate the employee's health coverage retroactively upon his or her election to continue coverage and payment of all unpaid amounts due, and the employee must incur no administrative reinstatement costs. In order to qualify for an exception to the requirement of timely election of continuing health care, an employee must first be excused from giving notice of service under the statute.

(b) *Notice of service but no election of continuing coverage:* Plan administrators may develop reasonable requirements addressing how continuing coverage may be elected. Where health plans are also covered under the Consolidated Omnibus Budget Reconciliation Act of 1985, 26 U.S.C. 4980B (COBRA), it may be reasonable for a health plan administrator to adopt COBRA-compliant rules regarding election of continuing coverage, as long as those rules do not conflict with any provision of USERRA or this rule. If an employer provides employment-based health coverage to an employee who leaves employment for uniformed service for a period of service in excess of 30 days after having given advance notice of service but without making an election regarding continuing coverage, the plan administrator may cancel the employee's health plan coverage upon the employee's departure from employment for uniformed service, but must reinstate coverage without the imposition of administrative reinstatement costs under the following conditions:

(1) Plan administrators who have developed reasonable rules regarding the period within which an employee

may elect continuing coverage must permit retroactive reinstatement of uninterrupted coverage to the date of departure if the employee elects continuing coverage and pays all unpaid amounts due within the periods established by the plan;

(2) In cases in which plan administrators have not developed rules regarding the period within which an employee may elect continuing coverage, the plan must permit retroactive reinstatement of uninterrupted coverage to the date of departure upon the employee's election and payment of all unpaid amounts at any time during the period established in section 1002.164(a).

(c) *Election of continuation coverage without timely payment:* Health plan administrators may adopt reasonable rules allowing cancellation of coverage if timely payment is not made. Where health plans are covered under COBRA, it may be reasonable for a health plan administrator to adopt COBRA-compliant rules regarding payment for continuing coverage, as long as those rules do not conflict with any provision of USERRA or this rule.

**§ 1002.168   If the employee's coverage was terminated at the beginning of or during service, does his or her coverage have to be reinstated upon reemployment?**

(a) If health plan coverage for the employee or a dependent was terminated by reason of service in the uniformed services, that coverage must be reinstated upon reemployment. An exclusion or waiting period may not be imposed in connection with the reinstatement of coverage upon reemployment, if an exclusion or waiting period would not have been imposed had coverage not been terminated by reason of such service.

(b) USERRA permits a health plan to impose an exclusion or waiting period as to illnesses or injuries determined by the Secretary of Veterans Affairs to have been incurred in, or aggravated during, performance of service in the uniformed services. The determination that the employee's illness or injury was incurred in, or aggravated during, the performance of service may only be made by the Secretary of Veterans Affairs or his or her representative. Other coverage, for injuries or illnesses that are not service-related (or for the employee's dependents, if he or she has dependent coverage), must be reinstated subject to paragraph (a) of this section.

**§ 1002.169   Can the employee elect to delay reinstatement of health plan coverage until a date after the date he or she is reemployed?**

USERRA requires the employer to reinstate health plan coverage upon request at reemployment. USERRA permits but does not require the employer to allow the employee to delay reinstatement of health plan coverage until a date that is later than the date of reemployment.

**§ 1002.170   In a multiemployer health plan, how is liability allocated for employer contributions and benefits arising under USERRA's health plan provisions?**

Liability under a multiemployer plan for employer contributions and benefits in connection with USERRA's health plan provisions must be allocated either as the plan sponsor provides, or, if the sponsor does not provide, to the employee's last employer before his or her service. If the last employer is no longer functional, liability for continuing coverage is allocated to the health plan.

**§ 1002.171   How does the continuation of health plan benefits apply to a multiemployer plan that provides health plan coverage through a health benefits account system?**

(a) Some employees receive health plan benefits provided pursuant to a multiemployer plan that utilizes a health benefits account system in which an employee accumulates prospective health benefit eligibility, also commonly referred to as "dollar bank," "credit bank," and "hour bank" plans. In such cases, where an employee with a positive health benefits account balance elects to continue the coverage, the employee may further elect either option below:

(1) The employee may expend his or her health account balance during an absence from employment due to service in the uniformed services in lieu of paying for the continuation of coverage as set out in § 1002.166. If an employee's health account balance becomes depleted during the applicable period provided for in § 1002.164(a), the employee must be permitted, at his or her option, to continue coverage pursuant to § 1002.166. Upon reemployment, the plan must provide for immediate reinstatement of the employee as required by § 1002.168, but may require the employee to pay the cost of the coverage until the employee earns the credits necessary to sustain continued coverage in the plan.

(2) The employee may pay for continuation coverage as set out in § 1002.166, in order to maintain intact his or her account balance as of the

beginning date of the absence from employment due to service in the uniformed services. This option permits the employee to resume usage of the account balance upon reemployment.

(b) Employers or plan administrators providing such plans should counsel employees of their options set out in this subsection.

**Subpart E—Reemployment Rights and Benefits**

**Prompt Reemployment**

**§ 1002.180   When is an employee entitled to be reemployed by his or her civilian employer?**

The employer must promptly reemploy the employee when he or she returns from a period of service if the employee meets the Act's eligibility criteria as described in Subpart C of these regulations.

**§ 1002.181   How is "prompt reemployment" defined?**

"Prompt reemployment" means as soon as practicable under the circumstances of each case. Absent unusual circumstances, reemployment must occur within two weeks of the employee's application for reemployment. For example, prompt reinstatement after a weekend National Guard duty generally means the next regularly scheduled working day. On the other hand, prompt reinstatement following several years of active duty may require more time, because the employer may have to reassign or give notice to another employee who occupied the returning employee's position.

**Reemployment Position**

**§ 1002.191   What position is the employee entitled to upon reemployment?**

As a general rule, the employee is entitled to reemployment in the job position that he or she would have attained with reasonable certainty if not for the absence due to uniformed service. This position is known as the escalator position. The principle behind the escalator position is that, if not for the period of uniformed service, the employee could have been promoted (or, alternatively, demoted, transferred, or laid off) due to intervening events. The escalator principle requires that the employee be reemployed in a position that reflects with reasonable certainty the pay, benefits, seniority, and other job perquisites, that he or she would have attained if not for the period of service. Depending upon the specific circumstances, the employer may have the option, or be required, to reemploy

the employee in a position other than the escalator position.

## § 1002.192  How is the specific reemployment position determined?

In all cases, the starting point for determining the proper reemployment position is the escalator position, which is the job position that the employee would have attained if his or her continuous employment had not been interrupted due to uniformed service. Once this position is determined, the employer may have to consider several factors before determining the appropriate reemployment position in any particular case. Such factors may include the employee's length of service, qualifications, and disability, if any. The reemployment position may be either the escalator position; the pre-service position; a position comparable to the escalator or pre-service position; or, the nearest approximation to one of these positions.

## § 1002.193  Does the reemployment position include elements such as seniority, status, and rate of pay?

(a) Yes. The reemployment position includes the seniority, status, and rate of pay that an employee would ordinarily have attained in that position given his or her job history, including prospects for future earnings and advancement. The employer must determine the seniority rights, status, and rate of pay as though the employee had been continuously employed during the period of service. The seniority rights, status, and pay of an employment position include those established (or changed) by a collective bargaining agreement, employer policy, or employment practice. The sources of seniority rights, status, and pay include agreements, policies, and practices in effect at the beginning of the employee's service, and any changes that may have occurred during the period of service. In particular, the employee's status in the reemployment position could include opportunities for advancement, general working conditions, job location, shift assignment, rank, responsibility, and geographical location.

(b) If an opportunity for promotion, or eligibility for promotion, that the employee missed during service is based on a skills test or examination, then the employer should give him or her a reasonable amount of time to adjust to the employment position and then give a skills test or examination. No fixed amount of time for permitting adjustment to reemployment will be deemed reasonable in all cases. However, in determining a reasonable amount of time to permit an employee to adjust to reemployment before scheduling a makeup test or examination, an employer may take into account a variety of factors, including but not limited to the length of time the returning employee was absent from work, the level of difficulty of the test itself, the typical time necessary to prepare or study for the test, the duties and responsibilities of the reemployment position and the promotional position, and the nature and responsibilities of the service member while serving in the uniformed service. If the employee is successful on the makeup exam and, based on the results of that exam, there is a reasonable certainty that he or she would have been promoted, or made eligible for promotion, during the time that the employee served in the uniformed service, then the promotion or eligibility for promotion must be made effective as of the date it would have occurred had employment not been interrupted by uniformed service.

## § 1002.194  Can the application of the escalator principle result in adverse consequences when the employee is reemployed?

Yes. The Act does not prohibit lawful adverse job consequences that result from the employee's restoration on the seniority ladder. Depending on the circumstances, the escalator principle may cause an employee to be reemployed in a higher or lower position, laid off, or even terminated. For example, if an employee's seniority or job classification would have resulted in the employee being laid off during the period of service, and the layoff continued after the date of reemployment, reemployment would reinstate the employee to layoff status. Similarly, the status of the reemployment position requires the employer to assess what would have happened to such factors as the employee's opportunities for advancement, working conditions, job location, shift assignment, rank, responsibility, and geographical location, if he or she had remained continuously employed. The reemployment position may involve transfer to another shift or location, more or less strenuous working conditions, or changed opportunities for advancement, depending upon the application of the escalator principle.

## § 1002.195  What other factors can determine the reemployment position?

Once the employee's escalator position is determined, other factors may allow, or require, the employer to reemploy the employee in a position other than the escalator position. These factors, which are explained in §§ 1002.196 through 1002.199, are:

(a) The length of the employee's most recent period of uniformed service;

(b) The employee's qualifications; and,

(c) Whether the employee has a disability incurred or aggravated during uniformed service.

## § 1002.196  What is the employee's reemployment position if the period of service was less than 91 days?

Following a period of service in the uniformed services of less than 91 days, the employee must be reemployed according to the following priority:

(a) The employee must be reemployed in the escalator position. He or she must be qualified to perform the duties of this position. The employer must make reasonable efforts to help the employee become qualified to perform the duties of this position.

(b) If the employee is not qualified to perform the duties of the escalator position after reasonable efforts by the employer, the employee must be reemployed in the position in which he or she was employed on the date that the period of service began. The employee must be qualified to perform the duties of this position. The employer must make reasonable efforts to help the employee become qualified to perform the duties of this position.

(c) If the employee is not qualified to perform the duties of the escalator position or the pre-service position, after reasonable efforts by the employer, he or she must be reemployed in any other position that is the nearest approximation first to the escalator position and then to the pre-service position. The employee must be qualified to perform the duties of this position. The employer must make reasonable efforts to help the employee become qualified to perform the duties of this position.

## § 1002.197  What is the reemployment position if the employee's period of service in the uniformed services was more than 90 days?

Following a period of service of more than 90 days, the employee must be reemployed according to the following priority:

(a) The employee must be reemployed in the escalator position or a position of like seniority, status, and pay. He or she must be qualified to perform the duties of this position. The employer must make reasonable efforts to help the employee become qualified to perform the duties of this position.

(b) If the employee is not qualified to perform the duties of the escalator

position or a like position after reasonable efforts by the employer, the employee must be reemployed in the position in which he or she was employed on the date that the period of service began or in a position of like seniority, status, and pay. The employee must be qualified to perform the duties of this position. The employer must make reasonable efforts to help the employee become qualified to perform the duties of this position.

(c) If the employee is not qualified to perform the duties of the escalator position, the pre-service position, or a like position, after reasonable efforts by the employer, he or she must be reemployed in any other position that is the nearest approximation first to the escalator position and then to the pre-service position. The employee must be qualified to perform the duties of this position. The employer must make reasonable efforts to help the employee become qualified to perform the duties of this position.

### §1002.198  What efforts must the employer make to help the employee become qualified for the reemployment position?

The employee must be qualified for the reemployment position. The employer must make reasonable efforts to help the employee become qualified to perform the duties of this position. The employer is not required to reemploy the employee on his or her return from service if he or she cannot, after reasonable efforts by the employer, qualify for the appropriate reemployment position.

(a)(1) "Qualified" means that the employee has the ability to perform the essential tasks of the position. The employee's inability to perform one or more non-essential tasks of a position does not make him or her unqualified.

(2) Whether a task is essential depends on several factors, and these factors include but are not limited to:

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions developed before the hiring process begins;

(iii) The amount of time on the job spent performing the function;

(iv) The consequences of not requiring the individual to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

(b) Only after the employer makes reasonable efforts, as defined in § 1002.5(i), may it determine that the employee is not qualified for the

reemployment position. These reasonable efforts must be made at no cost to the employee.

### §1002.199  What priority must the employer follow if two or more returning employees are entitled to reemployment in the same position?

If two or more employees are entitled to reemployment in the same position and more than one employee has reported or applied for employment in that position, the employee who first left the position for uniformed service has the first priority on reemployment in that position. The remaining employee (or employees) is entitled to be reemployed in a position similar to that in which the employee would have been reemployed according to the rules that normally determine a reemployment position, as set out in §§ 1002.196 and 1002.197.

### Seniority Rights and Benefits

### §1002.210  What seniority rights does an employee have when reemployed following a period of uniformed service?

The employee is entitled to the seniority and seniority-based rights and benefits that he or she had on the date the uniformed service began, plus any seniority and seniority-based rights and benefits that the employee would have attained if he or she had remained continuously employed. In determining entitlement to seniority and seniority-based rights and benefits, the period of absence from employment due to or necessitated by uniformed service is not considered a break in employment. The rights and benefits protected by USERRA upon reemployment include those provided by the employer and those required by statute. For example, under USERRA, a reemployed service member would be eligible for leave under the Family and Medical Leave Act of 1993, 29 U.S.C. 2601–2654 (FMLA), if the number of months and the number of hours of work for which the service member was employed by the civilian employer, together with the number of months and the number of hours of work for which the service member would have been employed by the civilian employer during the period of uniformed service, meet FMLA's eligibility requirements. In the event that a service member is denied FMLA leave for failing to satisfy the FMLA's hours of work requirement due to absence from employment necessitated by uniformed service, the service member may have a cause of action under USERRA but not under the FMLA.

### §1002.211  Does USERRA require the employer to use a seniority system?

No. USERRA does not require the employer to adopt a formal seniority system. USERRA defines seniority as longevity in employment together with any employment benefits that accrue with, or are determined by, longevity in employment. In the absence of a formal seniority system, such as one established through collective bargaining, USERRA looks to the custom and practice in the place of employment to determine the employee's entitlement to any employment benefits that accrue with, or are determined by, longevity in employment.

### §1002.212  How does a person know whether a particular right or benefit is a seniority-based right or benefit?

A seniority-based right or benefit is one that accrues with, or is determined by, longevity in employment. Generally, whether a right or benefit is seniority-based depends on three factors:

(a) Whether the right or benefit is a reward for length of service rather than a form of short-term compensation for work performed;

(b) Whether it is reasonably certain that the employee would have received the right or benefit if he or she had remained continuously employed during the period of service; and,

(c) Whether it is the employer's actual custom or practice to provide or withhold the right or benefit as a reward for length of service. Provisions of an employment contract or policies in the employee handbook are not controlling if the employer's actual custom or practice is different from what is written in the contract or handbook.

### §1002.213  How can the employee demonstrate a reasonable certainty that he or she would have received the seniority right or benefit if he or she had remained continuously employed during the period of service?

A reasonable certainty is a high probability that the employee would have received the seniority or seniority-based right or benefit if he or she had been continuously employed. The employee does not have to establish that he or she would have received the benefit as an absolute certainty. The employee can demonstrate a reasonable certainty that he or she would have received the seniority right or benefit by showing that other employees with seniority similar to that which the employee would have had if he or she had remained continuously employed received the right or benefit. The employer cannot withhold the right or benefit based on an assumption that a

series of unlikely events could have prevented the employee from gaining the right or benefit.

## Disabled Employees

### § 1002.225 Is the employee entitled to any specific reemployment benefits if he or she has a disability that was incurred in, or aggravated during, the period of service?

Yes. A disabled service member is entitled, to the same extent as any other individual, to the escalator position he or she would have attained but for uniformed service. If the employee has a disability incurred in, or aggravated during, the period of service in the uniformed services, the employer must make reasonable efforts to accommodate that disability and to help the employee become qualified to perform the duties of his or her reemployment position. If the employee is not qualified for reemployment in the escalator position because of a disability after reasonable efforts by the employer to accommodate the disability and to help the employee to become qualified, the employee must be reemployed in a position according to the following priority. The employer must make reasonable efforts to accommodate the employee's disability and to help him or her to become qualified to perform the duties of one of these positions:

(a) A position that is equivalent in seniority, status, and pay to the escalator position; or,

(b) A position that is the nearest approximation to the equivalent position, consistent with the circumstances of the employee's case, in terms of seniority, status, and pay. A position that is the nearest approximation to the equivalent position may be a higher or lower position, depending on the circumstances.

### § 1002.226 If the employee has a disability that was incurred in, or aggravated during, the period of service, what efforts must the employer make to help him or her become qualified for the reemployment position?

(a) USERRA requires that the employee be qualified for the reemployment position regardless of any disability. The employer must make reasonable efforts to help the employee to become qualified to perform the duties of this position. The employer is not required to reemploy the employee on his or her return from service if he or she cannot, after reasonable efforts by the employer, qualify for the appropriate reemployment position.

(b) "Qualified" has the same meaning here as in § 1002.198.

## Rate of Pay

### § 1002.236 How is the employee's rate of pay determined when he or she returns from a period of service?

The employee's rate of pay is determined by applying the same escalator principles that are used to determine the reemployment position, as follows:

(a) If the employee is reemployed in the escalator position, the employer must compensate him or her at the rate of pay associated with the escalator position. The rate of pay must be determined by taking into account any pay increases, differentials, step increases, merit increases, or periodic increases that the employee would have attained with reasonable certainty had he or she remained continuously employed during the period of service. In addition, when considering whether merit or performance increases would have been attained with reasonable certainty, an employer may examine the returning employee's own work history, his or her history of merit increases, and the work and pay history of employees in the same or similar position. For example, if the employee missed a merit pay increase while performing service, but qualified for previous merit pay increases, then the rate of pay should include the merit pay increase that was missed. If the merit pay increase that the employee missed during service is based on a skills test or examination, then the employer should give the employee a reasonable amount of time to adjust to the reemployment position and then give him or her the skills test or examination. No fixed amount of time for permitting adjustment to reemployment will be deemed reasonable in all cases. However, in determining a reasonable amount of time to permit an employee to adjust to reemployment before scheduling a makeup test or examination, an employer may take into account a variety of factors, including but not limited to the length of time the returning employee was absent from work, the level of difficulty of the test itself, the typical time necessary to prepare or study for the test, the duties and responsibilities of the reemployment position and the promotional position, and the nature and responsibilities of the service member while serving in the uniformed service. The escalator principle also applies in the event a pay reduction occurred in the reemployment position during the period of service. Any pay adjustment must be made effective as of the date it would have occurred had the

employee's employment not been interrupted by uniformed service.

(b) If the employee is reemployed in the pre-service position or another position, the employer must compensate him or her at the rate of pay associated with the position in which he or she is reemployed. As with the escalator position, the rate of pay must be determined by taking into account any pay increases, differentials, step increases, merit increases, or periodic increases that the employee would have attained with reasonable certainty had he or she remained continuously employed during the period of service.

## Protection Against Discharge

### § 1002.247 Does USERRA provide the employee with protection against discharge?

Yes. If the employee's most recent period of service in the uniformed services was more than 30 days, he or she must not be discharged except for cause—

(a) For 180 days after the employee's date of reemployment if his or her most recent period of uniformed service was more than 30 days but less than 181 days; or,

(b) For one year after the date of reemployment if the employee's most recent period of uniformed service was more than 180 days.

### § 1002.248 What constitutes cause for discharge under USERRA?

The employee may be discharged for cause based either on conduct or, in some circumstances, because of the application of other legitimate nondiscriminatory reasons.

(a) In a discharge action based on conduct, the employer bears the burden of proving that it is reasonable to discharge the employee for the conduct in question, and that he or she had notice, which was express or can be fairly implied, that the conduct would constitute cause for discharge.

(b) If, based on the application of other legitimate nondiscriminatory reasons, the employee's job position is eliminated, or the employee is placed on layoff status, either of these situations would constitute cause for purposes of USERRA. The employer bears the burden of proving that the employee's job would have been eliminated or that he or she would have been laid off.

## Pension Plan Benefits

### § 1002.259 How does USERRA protect an employee's pension benefits?

On reemployment, the employee is treated as not having a break in service with the employer or employers

maintaining a pension plan, for purposes of participation, vesting and accrual of benefits, by reason of the period of absence from employment due to or necessitated by service in the uniformed services.

(a) Depending on the length of the employee's period of service, he or she is entitled to take from one to ninety days following service before reporting back to work or applying for reemployment (See § 1002.115). This period of time must be treated as continuous service with the employer for purposes of determining participation, vesting and accrual of pension benefits under the plan.

(b) If the employee is hospitalized for, or convalescing from, an illness or injury incurred in, or aggravated during, service, he or she is entitled to report to or submit an application for reemployment at the end of the time period necessary for him or her to recover from the illness or injury. This period, which may not exceed two years from the date the employee completed service, except in circumstances beyond his or her control, must be treated as continuous service with the employer for purposes of determining the participation, vesting and accrual of pension benefits under the plan.

### § 1002.260    What pension benefit plans are covered under USERRA?

(a) The Employee Retirement Income Security Act of 1974 (ERISA) defines an employee pension benefit plan as a plan that provides retirement income to employees, or defers employee income to a period extending to or beyond the termination of employment. Any such plan maintained by the employer or employers is covered under USERRA. USERRA also covers certain pension plans not covered by ERISA, such as those sponsored by a State, government entity, or church for its employees.

(b) USERRA does not cover pension benefits under the Federal Thrift Savings Plan; those benefits are covered under 5 U.S.C. 8432b.

### § 1002.261    Who is responsible for funding any plan obligation to provide the employee with pension benefits?

With the exception of multiemployer plans, which have separate rules discussed below, the employer is liable to the pension benefit plan to fund any obligation of the plan to provide benefits that are attributable to the employee's period of service. In the case of a defined contribution plan, once the employee is reemployed, the employer must allocate the amount of its make-up contribution for the employee, if any; his or her make-up employee

contributions, if any; and his or her elective deferrals, if any; in the same manner and to the same extent that it allocates the amounts for other employees during the period of service. In the case of a defined benefit plan, the employee's accrued benefit will be increased for the period of service once he or she is reemployed and, if applicable, has repaid any amounts previously paid to him or her from the plan and made any employee contributions that may be required to be made under the plan.

### § 1002.262    When is the employer required to make the plan contribution that is attributable to the employee's period of uniformed service?

(a) The employer is not required to make its contribution until the employee is reemployed. For employer contributions to a plan in which the employee is not required or permitted to contribute, the employer must make the contribution attributable to the employee's period of service no later than ninety days after the date of reemployment, or when plan contributions are normally due for the year in which the service in the uniformed services was performed, whichever is later. If it is impossible or unreasonable for the employer to make the contribution within this time period, the employer must make the contribution as soon as practicable.

(b) If the employee is enrolled in a contributory plan he or she is allowed (but not required) to make up his or her missed contributions or elective deferrals. These makeup contributions or elective deferrals must be made during a time period starting with the date of reemployment and continuing for up to three times the length of the employee's immediate past period of uniformed service, with the repayment period not to exceed five years. Makeup contributions or elective deferrals may only be made during this period and while the employee is employed with the post-service employer.

(c) If the employee's plan is contributory and he or she does not make up his or her contributions or elective deferrals, he or she will not receive the employer match or the accrued benefit attributable to his or her contribution because the employer is required to make contributions that are contingent on or attributable to the employee's contributions or elective deferrals only to the extent that the employee makes up his or her payments to the plan. Any employer contributions that are contingent on or attributable to the employee's make-up contributions or elective deferrals must be made

according to the plan's requirements for employer matching contributions.

(d) The employee is not required to make up the full amount of employee contributions or elective deferrals that he or she missed making during the period of service. If the employee does not make up all of the missed contributions or elective deferrals, his or her pension may be less than if he or she had done so.

(e) Any vested accrued benefit in the pension plan that the employee was entitled to prior to the period of uniformed service remains intact whether or not he or she chooses to be reemployed under the Act after leaving the uniformed service.

(f) An adjustment will be made to the amount of employee contributions or elective deferrals the employee will be able to make to the pension plan for any employee contributions or elective deferrals he or she actually made to the plan during the period of service.

### § 1002.263    Does the employee pay interest when he or she makes up missed contributions or elective deferrals?

No. The employee is not required or permitted to make up a missed contribution in an amount that exceeds the amount he or she would have been permitted or required to contribute had he or she remained continuously employed during the period of service.

### § 1002.264    Is the employee allowed to repay a previous distribution from a pension benefits plan upon being reemployed?

Yes, provided the plan is a defined benefit plan. If the employee received a distribution of all or part of the accrued benefit from a defined benefit plan in connection with his or her service in the uniformed services before he or she became reemployed, he or she must be allowed to repay the withdrawn amounts when he or she is reemployed. The amount the employee must repay includes any interest that would have accrued had the monies not been withdrawn. The employee must be allowed to repay these amounts during a time period starting with the date of reemployment and continuing for up to three times the length of the employee's immediate past period of uniformed service, with the repayment period not to exceed five years (or such longer time as may be agreed to between the employer and the employee), provided the employee is employed with the post-service employer during this period.

**§ 1002.265   If the employee is reemployed with his or her pre-service employer, is the employee's pension benefit the same as if he or she had remained continuously employed?**

The amount of the employee's pension benefit depends on the type of pension plan.

(a) In a non-contributory defined benefit plan, where the amount of the pension benefit is determined according to a specific formula, the employee's benefit will be the same as though he or she had remained continuously employed during the period of service.

(b) In a contributory defined benefit plan, the employee will need to make up contributions in order to have the same benefit as if he or she had remained continuously employed during the period of service.

(c) In a defined contribution plan, the benefit may not be the same as if the employee had remained continuously employed, even though the employee and the employer make up any contributions or elective deferrals attributable to the period of service, because the employee is not entitled to forfeitures and earnings or required to experience losses that accrued during the period or periods of service.

**§ 1002.266   What are the obligations of a multiemployer pension benefit plan under USERRA?**

A multiemployer pension benefit plan is one to which more than one employer is required to contribute, and which is maintained pursuant to one or more collective bargaining agreements between one or more employee organizations and more than one employer. The Act uses ERISA's definition of a multiemployer plan. In addition to the provisions of USERRA that apply to all pension benefit plans, there are provisions that apply specifically to multiemployer plans, as follows:

(a) The last employer that employed the employee before the period of service is responsible for making the employer contribution to the multiemployer plan, if the plan sponsor does not provide otherwise. If the last employer is no longer functional, the plan must nevertheless provide coverage to the employee.

(b) An employer that contributes to a multiemployer plan and that reemploys the employee pursuant to USERRA must provide written notice of reemployment to the plan administrator within 30 days after the date of reemployment. The returning service member should notify the reemploying employer that he or she has been reemployed pursuant to USERRA. The 30-day period within which the reemploying employer must provide written notice pursuant to this subsection does not begin until the employer has knowledge that the employee was reemployed pursuant to USERRA.

(c) The employee is entitled to the same employer contribution whether he or she is reemployed by the pre-service employer or by a different employer contributing to the same multiemployer plan, provided that the pre-service employer and the post-service employer share a common means or practice of hiring the employee, such as common participation in a union hiring hall.

**§ 1002.267   How is compensation during the period of service calculated in order to determine the employee's pension benefits, if benefits are based on compensation?**

In many pension benefit plans, the employee's compensation determines the amount of his or her contribution or the retirement benefit to which he or she is entitled.

(a) Where the employee's rate of compensation must be calculated to determine pension entitlement, the calculation must be made using the rate of pay that the employee would have received but for the period of uniformed service.

(b)(1) Where the rate of pay the employee would have received is not reasonably certain, such as where compensation is based on commissions earned, the average rate of compensation during the 12-month period prior to the period of uniformed service must be used.

(2) Where the rate of pay the employee would have received is not reasonably certain and he or she was employed for less than 12 months prior to the period of uniformed service, the average rate of compensation must be derived from this shorter period of employment that preceded the service.

## Subpart F—Compliance Assistance, Enforcement and Remedies

### Compliance Assistance

**§ 1002.277   What assistance does the Department of Labor provide to employees and employers concerning employment, reemployment, or other rights and benefits under USERRA?**

The Secretary, through the Veterans' Employment and Training Service (VETS), provides assistance to any person or entity with respect to employment and reemployment rights and benefits under USERRA. This assistance includes a wide range of compliance assistance outreach activities, such as responding to inquiries; conducting USERRA briefings and Webcasts; issuing news releases; and, maintaining the elaws USERRA Advisor (located at *http://www.dol.gov/elaws/userra.htm*), the e-VETS Resource Advisor and other web-based materials (located at *http://www.dol.gov/vets*), which are designed to increase awareness of the Act among affected persons, the media, and the general public. In providing such assistance, VETS may request the assistance of other Federal and State agencies, and utilize the assistance of volunteers.

### Investigation and Referral

**§ 1002.288   How does an individual file a USERRA complaint?**

If an individual is claiming entitlement to employment rights or benefits or reemployment rights or benefits and alleges that an employer has failed or refused, or is about to fail or refuse, to comply with the Act, the individual may file a complaint with VETS or initiate a private legal action in a court of law (see § 1002.303). A complaint may be filed with VETS either in writing, using VETS Form 1010, or electronically, using VETS Form e1010 (instructions and the forms can be accessed at *http://www.dol.gov/elaws/vets/userra/1010.asp*). A complaint must include the name and address of the employer, a summary of the basis for the complaint, and a request for relief.

**§ 1002.289   How will VETS investigate a USERRA complaint?**

(a) In carrying out any investigation, VETS has, at all reasonable times, reasonable access to and the right to interview persons with information relevant to the investigation. VETS also has reasonable access to, for purposes of examination, the right to copy and receive any documents of any person or employer that VETS considers relevant to the investigation.

(b) VETS may require by subpoena the attendance and testimony of witnesses and the production of documents relating to any matter under investigation. In case of disobedience of or resistance to the subpoena, the Attorney General may, at VETS' request, apply to any district court of the United States in whose jurisdiction such disobedience or resistance occurs for an order enforcing the subpoena. The district courts of the United States have jurisdiction to order compliance with the subpoena, and to punish failure to obey a subpoena as a contempt of court. This paragraph does not authorize VETS to seek issuance of a subpoena to the legislative or judicial branches of the United States.

### §1002.290   Does VETS have the authority to order compliance with USERRA?

No. If VETS determines as a result of an investigation that the complaint is meritorious, VETS attempts to resolve the complaint by making reasonable efforts to ensure that any persons or entities named in the complaint comply with the Act.

If VETS' efforts do not resolve the complaint, VETS notifies the person who submitted the complaint of:

(a) The results of the investigation; and,

(b) The person's right to proceed under the enforcement of rights provisions in 38 U.S.C. 4323 (against a State or private employer), or 38 U.S.C. 4324 (against a Federal executive agency or the Office of Personnel Management (OPM)).

### §1002.291   What actions may an individual take if the complaint is not resolved by VETS?

If an individual receives a notification from VETS of an unsuccessful effort to resolve his or her complaint relating to a State or private employer, the individual may request that VETS refer the complaint to the Attorney General.

### §1002.292   What can the Attorney General do about the complaint?

(a) If the Attorney General is reasonably satisfied that an individual's complaint is meritorious, meaning that he or she is entitled to the rights or benefits sought, the Attorney General may appear on his or her behalf and act as the individual's attorney, and initiate a legal action to obtain appropriate relief.

(b) If the Attorney General determines that the individual's complaint does not have merit, the Attorney General may decline to represent him or her.

### Enforcement of Rights and Benefits Against a State or Private Employer

### §1002.303   Is an individual required to file his or her complaint with VETS?

No. The individual may initiate a private action for relief against a State or private employer if he or she decides not to apply to VETS for assistance.

### §1002.304   If an individual files a complaint with VETS and VETS' efforts do not resolve the complaint, can the individual pursue the claim on his or her own?

Yes. If VETS notifies an individual that it is unable to resolve the complaint, the individual may pursue the claim on his or her own. The individual may choose to be represented by private counsel whether or not the Attorney General decides to represent him or her as to the complaint.

### §1002.305   What court has jurisdiction in an action against a State or private employer?

(a) If an action is brought against a State or private employer by the Attorney General, the district courts of the United States have jurisdiction over the action. If the action is brought against a State by the Attorney General, it must be brought in the name of the United States as the plaintiff in the action.

(b) If an action is brought against a State by a person, the action may be brought in a State court of competent jurisdiction according to the laws of the State.

(c) If an action is brought against a private employer or a political subdivision of a State by a person, the district courts of the United States have jurisdiction over the action.

(d) An action brought against a State Adjutant General, as an employer of a civilian National Guard technician, is considered an action against a State for purposes of determining which court has jurisdiction.

### §1002.306   Is a National Guard civilian technician considered a State or Federal employee for purposes of USERRA?

A National Guard civilian technician is considered a State employee for USERRA purposes, although he or she is considered a Federal employee for most other purposes.

### §1002.307   What is the proper venue in an action against a State or private employer?

(a) If an action is brought by the Attorney General against a State, the action may proceed in the United States district court for any district in which the State exercises any authority or carries out any function.

(b) If an action is brought against a private employer, or a political subdivision of a State, the action may proceed in the United States district court for any district in which the employer maintains a place of business.

### §1002.308   Who has legal standing to bring an action under USERRA?

An action may be brought only by the United States or by the person, or representative of a person, claiming rights or benefits under the Act. An employer, prospective employer or other similar entity may not bring an action under the Act.

### §1002.309   Who is a necessary party in an action under USERRA?

In an action under USERRA only an employer or a potential employer, as the case may be, is a necessary party respondent. In some circumstances, such as where terms in a collective bargaining agreement need to be interpreted, the court may allow an interested party to intervene in the action.

### §1002.310   How are fees and court costs charged or taxed in an action under USERRA?

No fees or court costs may be charged or taxed against an individual if he or she is claiming rights under the Act. If the individual obtains private counsel for any action or proceeding to enforce a provision of the Act, and prevails, the court may award reasonable attorney fees, expert witness fees, and other litigation expenses.

### §1002.311   Is there a statute of limitations in an action under USERRA?

USERRA does not have a statute of limitations, and it expressly precludes the application of any State statute of limitations. At least one court, however, has held that the four-year general Federal statute of limitations, 28 U.S.C. 1658, applies to actions under USERRA. *Rogers* v. *City of San Antonio,* 2003 WL 1566502 (W.D. Texas), *reversed on other grounds,* 392 F.3d 758 (5th Cir. 2004). But see *Akhdary* v. *City of Chattanooga,* 2002 WL 32060140 (E.D. Tenn.). In addition, if an individual unreasonably delays asserting his or her rights, and that unreasonable delay causes prejudice to the employer, the courts have recognized the availability of the equitable doctrine of *laches* to bar a claim under USERRA. Accordingly, individuals asserting rights under USERRA should determine whether the issue of the applicability of the Federal statute of limitations has been resolved and, in any event, act promptly to preserve their rights under USERRA.

### §1002.312   What remedies may be awarded for a violation of USERRA?

In any action or proceeding the court may award relief as follows:

(a) The court may require the employer to comply with the provisions of the Act;

(b) The court may require the employer to compensate the individual for any loss of wages or benefits suffered by reason of the employer's failure to comply with the Act;

(c) The court may require the employer to pay the individual an amount equal to the amount of lost wages and benefits as liquidated damages, if the court determines that the employer's failure to comply with the Act was willful. A violation shall be considered to be willful if the employer either knew or showed reckless disregard for whether its conduct was prohibited by the Act.

(d) Any wages, benefits, or liquidated damages awarded under paragraphs (b) and (c) of this section are in addition to, and must not diminish, any of the other rights and benefits provided by USERRA (such as, for example, the right to be employed or reemployed by the employer).

§ 1002.313  Are there special damages provisions that apply to actions initiated in the name of the United States?

Yes. In an action brought in the name of the United States, for which the relief includes compensation for lost wages, benefits, or liquidated damages, the compensation must be held in a special deposit account and must be paid, on order of the Attorney General, directly to the person. If the compensation is not paid to the individual because of the Federal Government's inability to do so within a period of three years, the compensation must be converted into the Treasury of the United States as miscellaneous receipts.

§ 1002.314  May a court use its equity powers in an action or proceeding under the Act?

Yes. A court may use its full equity powers, including the issuance of temporary or permanent injunctions, temporary restraining orders, and contempt orders, to vindicate the rights or benefits guaranteed under the Act.

Signed at Washington, DC, this 8th day of December, 2005.

Charles S. Ciccolella,

*Assistant Secretary for Veterans' Employment and Training.*

[FR Doc. 05–23961 Filed 12–16–05; 8:45 am]

BILLING CODE 4510-79-P

---

DEPARTMENT OF LABOR

Veterans' Employment and Training Service

20 CFR Part 1002

RIN 1293–AA14

Notice of Rights and Duties Under the Uniformed Services Employment and Reemployment Rights Act

AGENCY: Veterans' Employment and Training Service, Department of Labor.

ACTION: Final rule.

SUMMARY: On March 10, 2005, the Veterans' Employment and Training Service (VETS) of the Department of Labor (Department or DOL) issued an interim final rule to implement a requirement of the Veterans Benefits Improvement Act of 2004 (VBIA), Public Law 108–454 (Dec. 10, 2004). The VBIA

amended the Uniformed Services Employment and Reemployment Rights Act (USERRA) by adding a requirement that employers provide a notice of the rights, benefits, and obligations of employees and employers under USERRA. The text of this notice was included in the interim final rule, and the Department sought comment on that text. This preamble to the final rule addresses comments received during the comment period. This final rule does not affect the Department's pending proposal to implement USERRA, which was published in the **Federal Register** of September 20, 2004.

DATES: *Effective Date:* This rule will be effective on January 18, 2006.

FOR FURTHER INFORMATION CONTACT: For information, contact Mr. Kenan Torrans, Office of Operations and Programs, Veterans' Employment and Training Service (VETS), U.S. Department of Labor, Room S1316, 200 Constitution Ave., NW., Washington, DC 20210. Telephone: 202–693–4731 (this is not a toll-free number). Electronic mail: *torrans-william@dol.gov.* For press inquiries, contact Michael Biddle, Office of Public Affairs, U.S. Department of Labor, Room S–1032, 200 Constitution Avenue, NW., Washington, DC 20210. Telephone: 202–693–5051 (this is not a toll-free number). Electronic mail: *biddle.michael@dol.gov.*

Individuals with hearing or speech impairments may access the telephone numbers above via TTY by calling the toll-free Federal Information Relay Service at 1–800–877–8339.

SUPPLEMENTARY INFORMATION:

I. Background

The Veterans Benefits Improvement Act of 2004 (VBIA), Public Law 108–454 (Dec. 10, 2004), amended several provisions of the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA), 38 U.S.C. 4301–4333. In part, the VBIA imposed a new requirement, codified at 38 U.S.C. 4334, that "Each employer shall provide to persons entitled to rights and benefits under [USERRA] a notice of the rights, benefits, and obligations of such persons and such employers under [USERRA]." Employers may provide the notice by posting it where employee notices are customarily placed. However, employers are free to provide the notice to employees in other ways that will minimize costs while ensuring that the full text of the notice is provided (e.g., by handing or mailing out the notice, or distributing the notice via electronic mail).

The VBIA required the Secretary of Labor to make available to employers

the text of the required notice not later than March 10, 2005, ninety days after the enactment of the VBIA. The publication of the interim final rule containing the text of the notice was pursuant to this Congressional mandate. Effective March 10, 2005, the VBIA requires employers to provide the notice "to persons entitled to rights and benefits" under USERRA.

The VBIA also created a demonstration project under which approximately half of the claims against Federal executive agencies arising under USERRA will be transferred to the Department of Labor to the Office of Special Counsel. Section 204(a) of the VBIA directs the "Secretary of Labor and the Office of Special Counsel [to] carry out a demonstration project under which certain claims against Federal executive agencies under [USERRA] are referred to * * * the Office of Special Counsel for assistance, including investigation and resolution of the claim as well as enforcement of rights with respect to the claim." Under this demonstration project, the Secretary of Labor transfers to OSC those cases involving Federal executive agency employees with odd-numbered social security numbers. The demonstration project began on February 8, 2005, and will end on September 30, 2007.

USERRA provides employment and reemployment rights for members of the uniformed services, including veterans and members of the Reserve and National Guard. Under USERRA, service members who leave their civilian jobs for military service can perform their duties with the knowledge that they will be able to return to their jobs with the same pay, benefits, and status they would have attained had they not been away on duty. USERRA also prohibits employers from discriminating against these individuals in employment because of their military service.

Over 500,000 members of the National Guard and Reserve have been mobilized since the President's declaration of a national emergency following the attacks of September 11, 2001. As service members conclude their tours of duty and return to civilian employment, it is important that employees be fully informed of their USERRA rights, benefits, and obligations. It is also important for service members to know how the Department can assist them in enforcing these rights. Providing employees with a notice of the USERRA rights, benefits, and obligations of employees and employers advances these dual objectives of informing the public about both the rights and obligations established by USERRA and about the availability of the

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Dale S. Fischer and the assigned discovery Magistrate Judge is Andrew J. Wistrich.

The case number on all documents filed with the Court should read as follows:

## CV13- 5306 DSF (AJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

===============================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:



[✓] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

LACKIE DAMMEIER MCGILL & ETHIR
Michael D. McGill SBN 231615
367 N Second Avenue
Upland, CA 91786
Phone: (909) 985-4003 Fax:(909) 985-3299
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MITCHELL JONES, <br><br><br> PLAINTIFF(S) <br> v. <br><br> COUNTY OF LOS ANGELES, A Public Entity; and <br> DOES 1 THROUGH 10 INCLUSIVE; <br><br><br> DEFENDANT(S). | CASE NUMBER <br><br> **CV13- 5306** DSF (AJWx) <br><br><br> **SUMMONS** |

TO:     DEFENDANT(S):

A lawsuit has been filed against you.

Within   21   days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney,  Carolina Veronica Diaz _____, whose address is Lackie Dammeier McGill & Ethir, APC 367 N Second Avenue, Upland, CA 91786   . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court
**JULIE PRADO**

Dated:   JUL 2 3 2013

By: _____
        Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

MITCHELL JONES

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

COUNTY OF LOS ANGELES, A Public Entity; and DOES 1 THROUGH 10 INCLUSIVE;

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

LACKIE DAMMEIER MCGILL & ETHIR, APC
367 North Second Avenue
Upland, CA 91786

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   **MONEY DEMANDED IN COMPLAINT:** $ _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

1. Violations of USERRA, (38 U.S.C. §4301 et. seq.)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☒ 440 Other Civil Rights | | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | **LABOR** | |
| | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 720 Labor/Mgmt. Relations | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 740 Railway Labor Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 448 Education | ☐ 790 Other Labor Litigation | |
| | | | | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY: Case Number:** CV13- 5306

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☒ NO  ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☒ NO  ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)  ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| COUNTY OF LOS ANGELES | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES | |

**\*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _____ DATE: 07/23/2013

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |